IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| THE TRANSPARENCY PROJECT, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION No. 4:20CV467 |
| | § | |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF JUSTICE, et al., | § | JUDGE SEAN D. JORDAN |
| | § | |
| Defendants. | § | |

**<u>DECLARATION OF PATRICK N. FINDLAY</u>**

I, Patrick N. Findlay, do hereby state and declare as follows:

1. I am the General Counsel of the National Security Division (NSD) of the United States Department of Justice ("DOJ" or the "Department"). I lead the Office of General Counsel ("OGC"), which is the successor organization to NSD's former Office of Strategy Management and Development ("OSMD"). NSD is a component of the Department. *See* 72 Fed. Reg. 10064 (Mar. 7, 2007). I have served as the General Counsel of NSD since March of 2020 and was previously the Acting Chief of OSMD from July 2018 until its dissolution and replacement with the OGC in March of 2020. Prior to serving as the Acting Chief, I was a Special Counsel in OSMD from June 2016 to July 2018. Prior to my positions with NSD, I served as an Associate General Counsel for the Federal Bureau of Investigation ("FBI") from July 2012 until June 2016.

2. The Records and Freedom of Information Act Unit ("NSD FOIA") is a constituent part of OGC and is responsible for responding to requests for access to NSD records and information pursuant to the Freedom of Information Act ("FOIA"), *codified at* 5 U.S.C. § 552, as well as processing the NSD records which are responsive to FOIA requests received by other parts of the Executive Branch.

3.  As NSD General Counsel, I have been delegated Top Secret Original Classification Authority ("OCA") by the Attorney General of the United States. *See* Exec. Order No. 13526 § 1.3(c) (Dec. 29, 2009).

4.  Through the exercise of my official duties, I have become familiar with this action and the underlying FOIA requests at issue.  The statements contained herein are based upon my personal knowledge of the subject of the FOIA requests, as well as information provided to me in the course of my official duties.

5.  I submit this declaration in support of the Department's motion for summary judgment in this proceeding.

### Plaintiff's FOIA Requests and NSD's Responses

6.  Related to this litigation, NSD FOIA received several FOIA requests from Plaintiff by electronic filing. The first request was dated October 26, 2018, a copy of which is attached hereto as Exhibit A.  The second request was dated June 11, 2020, a copy of which is attached hereto as Exhibit B. The third request was dated June 15, 2020, a copy of which is attached hereto as Exhibit C. The fourth request, through which the Plaintiff sought the same records requested via the request of October 26, 2018, was dated June 18, 2020, a copy of which is attached hereto as Exhibit D.

7.  On September 2, 2020, NSD FOIA responded to the June 11, 2020, request indicating that the request had been assigned tracking number NSD 20-341. A copy of this NSD response is attached as Exhibit E. In this response, NSD FOIA further informed Plaintiff that it does not maintain FBI records and sought clarification. NSD FOIA went on to note that, as such, if NSD FOIA did not receive a response within 30 days, the request would be administratively closed.

NSD FOIA did not receive such a response, and NSD 20-341 was administratively closed accordingly.

8. On November 5, 2020, NSD FOIA responded to the June 15, 2020, request, indicating that the request had been assigned tracking number NSD 20-333. A copy of this NSD response is attached as Exhibit F.

9. NSD FOIA issued an interim response to NSD 20-333 on March 9, 2021, releasing one 40-page record in part, with redactions made per 5 U.S.C. § 552(b)(6). A copy of this NSD response is attached as Exhibit G.

10. NSD FOIA issued a final response to NSD 20-333 on August 30, 2021, whereby it released one record that was 149 pages in length, with redactions made pursuant to 5 U.S.C. § 552(b)(6). A copy of this NSD response is attached as Exhibit H.

11. On November 16, 2021, NSD FOIA issued a final response to the request dated June 18, 2020, indicating that the request had been assigned tracking number NSD 20-338 and releasing one record in full as responsive to part two of the request. A copy of this NSD response is attached as Exhibit I.  Further, in this response, NSD FOIA declined to confirm or deny the existence of records responsive to part one of this request, a so-called *Glomar* response, per 5 U.S.C. § 552(b)(1). Finally, NSD FOIA noted that it had referred one additional record to a different component of the Department for direct response to Plaintiff.

### NSD's *Glomar* Response

12. Part one of NSD 20-338 sought the following records:

> *I request the opportunity to view all documents, records, communications and/or other tangible evidence reflecting or pertaining to surveillance of Edward Butowsky of Texas or Matt Couch of Arkansas. The term "surveillance" includes, but is not limited to, any attempt to hack into the computers, phones, other electronic devices, and/or online accounts of Mr.*

> *Butowsky or Mr. Couch. If any information obtained by surveillance was relayed to third parties, that information should be produced for inspection.*

13.     Based on its context, NSD FOIA interpreted the request as seeking NSD records regarding surveillance that, should they exist, would have been authorized under the *Foreign Intelligence Surveillance Act of 1978* (FISA), *codified at* 50 U.S.C. § 1801, *et seq*.  As such, NSD FOIA asserted and continues to assert, a *Glomar* response to item one of the request pursuant to FOIA Exemption 1 as further explained below.

14.     As background, I note that because much of NSD's work is of a classified nature, NSD FOIA frequently asserts Exemption 1, protecting properly classified information from disclosure in response to FOIA requests.[1]  Information in NSD records is frequently, though not exclusively, classified under section 1.4(c) of Executive Order 13526 which covers intelligence activities, sources, and methods.[2]  In circumstances where a confirmation that responsive records exist would disclose a classified fact, such as with item one in this request, NSD's usual practice is to assert a *Glomar* response, thereby neither confirming nor denying the existence of information that would disclose or suggest any such fact pursuant to FOIA Exemption 1 and section 3.6(a) of Executive Order 13526.[3]

---

[1] *See* 5 U.S.C. § 552(b)(1) ("(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant such Executive order.")

[2] Section 1.4 protects as classified information that "could reasonably be expected to cause identifiable or describable damage to the national security" with subsection c covering "intelligence activities (including covert action), intelligence sources or methods, or cryptology."

[3] "An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Exec. Order No. 13526 § 3.6(a).

4

15.     As further background, I note that section 2.2 of Executive Order 13526 provides for the derivative classification of National Security Information (NSI) by individuals who are not OCAs, including staff of NSD FOIA, through the use of classification guidance. *The United States Department of Justice, National Security Information, Classification Guide* (Ver. 2) (August 22, 2019) ("NSICG") is one such example. NSICG sets forth derivative classification guidance for certain information regularly encountered in NSD FOIA's work.

16.     Several enumerated categories of information in the NSICG, designated for protection under section 1.4(c) of Executive Order 13526, would apply to records responsive to part one of this request, if any such records were to exist. Specifically, such items would be classified under the NSICG as "an investigative technique requiring a FISA court order or other FISA authorized collection," *see* NSICG, Table 1.10, Item No.INV-4 (a), or because "[t]he fact that a FISA court order or other FISA authorized collection was applied for or obtained in a specific case," s*ee* NSICG, Table 1.10, Item No.INV-8. Consistent with the longstanding treatment of FISA collection as classified, NSD FOIA determined that any FISA-related information responsive to part one of the request would be classified, if it existed, absent some countervailing public disclosure or other action leading to declassification.

17.     As an OCA, I confirm that the guidance provided in the NSICG is appropriate in requiring the classification of FISA-related records responsive to part one of Plaintiff's request, should they exist, as they would implicate section 1.4 (c) of Executive Order 13526.  This is because such disclosure would cause harm to national security as it could permit hostile intelligence services to use FOIA to acquire information about United States intelligence investigations.  Once a particular source or method, or the fact of its use in a particular situation, is disclosed, its continued usefulness may be degraded.  If NSD were to indicate that it maintains

responsive information, such confirmation would provide intelligence analysts of foreign intelligence services with individual pieces of information that could be compiled into a catalogue of FISA activities.  Intelligence services and other adversaries could use these disclosures to gain insight into which intelligence agents operating in this country were known to the U.S. Government and which were not.  Further, this information could be used to deploy counterintelligence assets against the U.S. Government thereby impairing U.S. intelligence collection.

18.     Conversely, revealing the absence of responsive records pertaining to particular individuals would tend to indicate that persons within the scope of the request were not targets of surveillance conducted pursuant to FISA.  That fact could be extremely valuable to foreign powers and hostile intelligence services who could use it to carry out intelligence activities with some comfort that the U.S. Government is either not monitoring certain people and may not even suspect them or otherwise is not concerned with their activities.

19.     As a result, to protect critical intelligence information and minimize the harm to national security, NSD necessarily asserts a *Glomar* response to requests for information pertaining to operational FISA work.  Any such records, were they to exist, would relate to intelligence collection overseen, though not undertaken, by NSD.  The existence of such operations is properly classified under section 1.4(c) of Executive Order 13526.  Thus, NSD must refuse to confirm or deny whether or not such records exist.

20.     Further, to be credible and effective, absent highly unusual circumstances, NSD must use the *Glomar* response consistently in all cases where the existence of records responsive to a FOIA request is a classified fact, as it is here, including instances in which NSD does not possess records responsive to a particular request.  If NSD were to invoke a *Glomar* response only

when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist.  This practice would reveal the very information that NSD must protect in the interest of national security.  An admission of the fact that NSD was in possession of particular records relating to specific FISA-authorized surveillance targets would provide hostile foreign powers with access to additional, operationally valuable information about hypothetical United States intelligence investigations and allow those powers to subvert those same hypothetical investigations.  Similarly, if NSD were to make clear to the public via a response to a FOIA request that it did not possess responsive records relating to specific FISA-authorized surveillance targets, hostile foreign powers could benefit from knowledge of this fact.

21.     I am confident that the determination about the existence or nonexistence of the requested records being classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security. *See* Exec. Order No. 13526 § 1.7(a).

## NSD's Exemption 6 Redactions

22.     NSD also has redacted, and thus withheld, the names and contact information, including e-mail addresses and direct telephone numbers, of non-Senior Executive Service (SES) Executive Branch personnel engaged in their official duties. NSD FOIA withheld this information pursuant to FOIA Exemption 6 because the withheld portions of these records "would constitute a clearly unwarranted invasion of personal privacy of third parties." *See* 5 U.S.C. § 552(b)(6).

23.     Though it is the general practice, NSD FOIA does not always redact such names. In this case, NSD balanced the privacy interests of the Executive Branch personnel identified in the documents, including their interests in avoiding publicity regarding aspects of their work,

against the public interest in the disclosure of this information. NSD has assessed that the

legitimate public interest in the names and contact information of particular employees is minimal

in this context because this information would not shed any meaningful light on NSD's or the

Department's operations. As a result, NSD determined that the privacy rights of these individuals

outweighed the public interest, if any, in the disclosure of the information.  NSD determined,

therefore, that releasing this information would constitute a clearly unwarranted invasion of these

individuals' privacy which outweighs the public interest in disclosure.

### Conclusion

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true

and correct.

Executed this 2nd day of February, 2022, at Washington, D.C.

PATRICK
FINDLAY

Digitally signed by PATRICK
FINDLAY
Date: 2022.02.02 10:40:47
-05'00'

Patrick N. Findlay

Exhibit A

# THE TRANSPARENCY PROJECT

P.O. Box 20753
Brooklyn, New York 11202
(979) 985-5289

October 26, 2018

| | |
|---|---|
| Office of the Attorney General | Office of Legislative Affairs |
| U.S. Department of Justice | U.S. Department of Justice |
| 950 Pennsylvania Avenue, N.W. | 950 Pennsylvania Avenue, N.W. |
| Washington, DC 20530-0001 | Washington, DC 20530-0001 |
| | |
| National Security Division | Executive Office for U.S. Attorneys |
| U.S. Department of Justice | U.S. Department of Justice |
| 950 Pennsylvania Avenue, N.W. | 950 Pennsylvania Avenue, N.W. |
| Washington, DC 20530-0001 | Washington, DC 20530-0001 |
| | |
| Criminal Division | Federal Bureau of Investigation |
| U.S. Department of Justice | 935 Pennsylvania Avenue, NW |
| 950 Pennsylvania Avenue, N.W. | Washington, D.C. 20535-0001 |
| Washington, DC 20530-0001 | |

Via electronic submission

To Whom It May Concern:

  In 2017, the inspector general for the U.S. House of Representatives began investigating Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, and Rao Abbas regarding mishandling of computer systems and electronic equiment. *See, e.g.*, Jenna Lifhits, "The IT guy and Wasserman Schultz," June 15, 2018, *The Weekly Standard*, https://www.weeklystandard.com/jenna-lifhits/the-strange-case-of-debbie-wasserman-schulzs-it-guy. On behalf of The Transparency Project, and as permitted by the Freedom of Information Act, I request the following information from the respective entities to whom this letter is addressed:

1. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Imran Awan.

2. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Abid Awan.

3. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Jamal Awan.

4. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Hina Alvi.

5.  Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Rao Abbas.

6.  From the National Security Division only, I request documents, files, records, and communications (regardless of electronic, paper or other format) referencing Seth Conrad Rich or "Seth Rich," who is deceased.

Each of the numbered items above should be considered a separate request.

The Transparency Project is a nonprofit Texas corporation and intends to use all of the information requested above to educate the public about government misconduct, therefore I request a waiver of any fees. If charges will apply, please let me know the approximate amount of such charges in advance.  I can be reached by email at tyclevenger@yahoo.com if you need additional information.

Sincerely,

Ty Clevenger
Executive Director
The Transparency Project

Exhibit B

# THE TRANSPARENCY PROJECT

P.O. Box 20753
Brooklyn, New York 11202
(979) 985-5289

20-341 (Clevenger)

June 11, 2020


Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Office of Legislative Affairs
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Executive Office for U.S. Attorneys
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

Via electronic submission

To Whom It May Concern:

On November 7, 2018, Judicial Watch, Inc. filed suit for information that sought pursuant to the Freedom of Information Act ("FOIA"), namely the following:

(1) Any and all records related to any investigations or preliminary investigations involving former congressional IT support staffers Abid Awan, Imran Awan, Jamal A wan, and Hina R. Alvi. As part of this request, searches should of records [ sic] should include, but not be limited to, the FBI automated indices, its older manual indices, and its Electronic Surveillance (EL SUR) Data Management System (EDMS), as well as cross-referenced files.

(2) Any and all records of communication sent to or from FBI employees, officials or contractors involving the subjects in bullet item 1.

*See Judicial Watch, Inc. v. U.S. Department of Justice*, Case No. 1:18-cv-02563 (D.D.C.). As permitted by FOIA, and on behalf of the Transparency Project, I request the opportunity to view the same information, to include any information already provided to Judicial Watch.

The Transparency Project is a nonprofit Texas corporation and intends to use all of the information requested above to educate the public about government misconduct, therefore I request a waiver of any fees. If charges will apply, please let me know the

approximate amount of such charges in advance.  I can be reached by email at
tyclevenger@yahoo.com if you need additional information.

Sincerely,

Ty Clevenger
Executive Director

Exhibit C

# THE TRANSPARENCY PROJECT

P.O. Box 20753
Brooklyn, New York 11202
(979) 985-5289

June 15, 2020

FOIA Initiatives Coordinator                                    20-333 (Clevenger)
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 6150
Washington, D.C. 20530-0001

*Via email*
nsdfoia@usdoj.gov

Federal Bureau of Investigation
Attn: FOI/PA Request
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

*Via facsimile*
(540) 868-4997

To Whom It May Concern:

On or about November 23, 2019, an interview of Asst. Attorney General Bill Demers of the National Security Division was broadcast by CBS's *60 Minutes* news magazine. *See* "Trump DOJ official on 2016 Russian election hack: 'They were certainly looking to hurt Hillary Clinton.'" https://www.cbsnews.com/news/trump-doj-official-on-2016-russian-election-hack-they-were-certainly-looking-to-hurt-hillary-clinton-60-minutes/. In the interview with correspondent Bill Whitaker, Gen. Demers alleged that Russians hacked into Democratic National Committee servers in 2016 for the purpose of hurting presidential candidate Hillary Clinton.

During one clip of the interview, an announcer elaborated on the supporting evidence that the National Security Division claimed to have in its possession:

Assistant Attorney General John Demers runs the division, along with deputies Adam Hickey and Sean Newell. DOJ attorney, Heather Alpino, worked with special counsel Mueller on the Russian indictments. All have access to the underlying intelligence, and have no doubt the Russians interfered in the 2016 election.

The clip was followed by an exchange between Mr. Whitaker and Gen. Demmers:

Bill Whitaker: This really happened.

John Demers: Yes. That really happened. And we believe that if we had to we could prove that in court tomorrow using only admissible, non-classified evidence to 12 jurors.

Bill Whitaker: Do you ever expect to get the 12 Russian officials to trial?

John Demers: I would be surprised. But the purpose of the indictment isn't just that, although that's certainly one of the purposes. The purpose of this kind of indictment is even to educate the public. For a legal document, the 29-page indictment is a page-turner. It details how U.S. intelligence agencies tracked each defendant's actions, sometimes by the keystroke, revealing the fictitious names and phony emails used to infiltrate the Democrats' computers, and tracing the stolen data on its circuitous route from Washington, D.C. to Moscow.

Bill Whitaker: The information in the indictment is very detailed. You have descriptions of the Russian agents typing into their computers.

John Demers: Obviously I can't go into too much detail because I don't wanna reveal investigative methods. But the insight here is that behind every one of those keyboards is not an IP address. It's a human being.

On behalf of The Transparency Project, and as permitted by the Freedom of Information Act, I request the opportunity to view the following:

(a) All documents, records, communications, and other tangible evidence supporting Gen. Demers's claims to *60 minutes* above, *i.e.*, about Russian involvement in obtaining the DNC emails in 2016.

(b) All documents, records, communications, and other tangible evidence relied on by Gen. Demers, Adam Hickey, Sean Newell, and Heather Alpino in support of their conclusions that Russians were responsible for obtaining the DNC emails in 2016.

(c) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning Seth Conrad Rich and/or Aaron Nathan Rich.

(d) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning other entities or individuals who may have played a role in stealing, hacking, leaking or improperly obtaining the DNC emails in 2016.

(e) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division indicating whether the DNC emails were hacked externally, leaked from a source inside the DNC, or otherwise transmitted to third parties such as Wikileaks. If there was one or more than one instance of hacking, leaking, or other unauthorized transmission of DNC emails in 2016, please provide details for each such incident, *e.g.*, the dates,

persons and entities involved, the data that was hacked, leaked, or otherwise transmitted, and the means by which it was hacked, leaked, or transmitted.

(f)  All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division or the FBI regarding whether Debbie Wasserman-Shultz or any other member of Congress was blackmailed or extorted, whether directly or indirectly, as a result of information procured by any of the following: Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, or anyone affiliated with the government of Pakistan.

The Transparency Project is a nonprofit Texas corporation and intends to use all of the information requested above to educate the public about government misconduct, therefore I request a waiver of any fees. If charges will apply, please let me know the approximate amount of such charges in advance.  I can be reached by email at tyclevenger@yahoo.com if you need additional information.

Sincerely,

Ty Clevenger
Executive Director
The Transparency Project

Exhibit D

# THE TRANSPARENCY PROJECT

P.O. Box 20753
Brooklyn, New York 11202
(979) 985-5289

20-338

June 18, 2020

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505

Director, Information Management Division
Office of the Director of National Intelligence
Washington, D.C. 20511

FOIA Initiatives Coordinator
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 6150
Washington, D.C. 20530-0001

Federal Bureau of Investigation
Attn: FOI/PA Request
Record/Information Dissemination Section
170 Marcel Drive
Winchester, VA 22602-4843

      Re: Freedom of Information Act Request

To Whom It May Concern:

      I write on behalf of the The Transparency Project ("TTP"), a nonprofit corporation headquartered in Texas, to request information pursuant to the Freedom of Information Act, 5 U.S.C. § 552.

1. I request the opportunity to view all documents, records, communications and/or other tangible evidence reflecting or pertaining to surveillance of Edward Butowsky of Texas or Matt Couch of Arkansas. The term "surveillance" includes, but is not limited to, any attempt to hack into the computers, phones, other electronic devices, and/or online accounts of Mr. Butowsky or Mr. Couch. If any information obtained by surveillance was relayed to third parties, that information should be produced for inspection.

2. I request the opportunity to view all documents, records, communications and/or other tangible evidence pertaining to whether former Central Intelligence Agency Director David Petraeus mishandled classified information or sold such information during his tenure as CIA director. This request includes, but is not limited to, documents, records,

communications and/or other tangible evidence in the possession of the Office of the Inspector General of the CIA and/or the Office of Intelligence Community Inspector General. This request further includes, but is not limited to, any draft indictments, draft arrest warrants, actual arrest warrants, and/or records of arrest.

I have attached release authorizations from Mr. Butowsky and Mr. Couch. TTP intends to use the requested information to educate the public about government misconduct, therefore I request a waiver of any fees. If charges will apply, please let me know the approximate amount of such charges in advance.  I can be reached by email at tyclevenger@yahoo.com if you need additional information.


Sincerely,

Ty Clevenger
Executive Director

Exhibit E

**From:** Mallory, Arnetta (NSD)
**Sent:** Wednesday, September 2, 2020 10:10 PM
**To:** tyclevenger@yahoo.com
**Subject:** NSD FOIA #20-341

Ty Clevenger
PO Box 20753
Brooklyn, NY 11202-0753

Re: FOIA/PA #20-341

Dear Mr. Clevenger:

This is to acknowledge your email dated June 11, 2020 to the Mail Referral Unit for information pertaining to (1) Any and all records related to any investigations or preliminary investigations involving former congressional IT support staffers Abid Awan, Imran Awan, Jamal A wan, and Hina R. Alvi. As part of this request, searches should of records [ sic] should include, but not be limited to, the FBI automated indices, its older manual indices, and its Electronic Surveillance (EL SUR) Data Management System (EDMS), as well as cross-referenced files.  (2) Any and all records of communication sent to or from FBI employees, officials or contractors involving the subjects in bullet item 1.  Our FOIA office received your Freedom of Information Act request on June 19, 2020.

In response to the COVID-19 public health emergency, the NSD FOIA staff is teleworking full time.  Our FOIA operations have been diminished while we are teleworking and our FOIA intake and FOIA processing will be slower than normal.

Please provide more clarity of your request to the National Security Division.  Our Division does not maintain FBI records.  If we do not receive a response from you within 30 days, your file will be administratively closed.

You may contact our Government Information Specialist, Arnetta Mallory, for any further assistance and to discuss any aspect of your request at:

U.S. Department of Justice
Records and FOIA Unit
3 Constitution Square
175 N Street N.E. 12th Floor
Washington, DC  20530
(202) 233-2639

Sincerely,


Arnetta Mallory
Government Information Specialist

Exhibit F

**U.S. Department of Justice**

National Security Division

*Washington, D.C. 20530*

Ty Clevenger
PO Box 20753
Brooklyn, NY 11202-0753      November 5, 2020

Re: FOIA/PA #20-333

Dear Mr. Clevenger:

       This is to acknowledge your email dated June 15, 2020 attaching a Freedom of Information Act (FOIA) request. We received your Freedom of Information Act request on June 15, 2020 and have assigned it NSD #20-333.

       Specifically, your request seeks:

       *(a) All documents, records, communications, and other tangible evidence supporting Gen. Demers's claims to 60 minutes above, i.e., about Russian involvement in obtaining the DNC emails in 2016.*

       *(b) All documents, records, communications, and other tangible evidence relied on by Gen. Demers, Adam Hickey, Sean Newell, and Heather Alpino in support of their conclusions that Russians were responsible for obtaining the DNC emails in 2016.*

       *(c) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning Seth Conrad Rich and/or Aaron Nathan Rich.*

       *(d) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning other entities or individuals who may have played a role in stealing, hacking, leaking or improperly obtaining the DNC emails in 2016.*

       *(e) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division indicating whether the DNC emails were hacked externally, leaked from a source inside the DNC, or otherwise transmitted to third parties such as Wikileaks. If there was one or more than one instance of hacking, leaking, or other unauthorized transmission of DNC emails in 2016, please provide details for each such incident, e.g., the dates, persons and entities involved, the data that was hacked, leaked, or otherwise transmitted, and the means by which it was hacked, leaked, or transmitted.*

       *(f) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division or the FBI regarding whether Debbie Wasserman-Shultz or any other member of Congress was blackmailed or extorted, whether directly or indirectly, as a result of information procured by any of the following: Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, or anyone affiliated with the government of Pakistan.*

       Three discrete categories of law enforcement and national security records are excluded from the

requirements of FOIA. *See* 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Additionally, NSD maintains investigative and prosecutorial files pertaining to subjects of NSD investigations. We do not routinely search these records in response to requests regarding NSD investigations in cases where the confirmation or denial of the existence of responsive records would, in and of itself, reveal information which would constitute a clearly unwarranted invasion of personal privacy of third parties or would reasonably be expected to interfere with enforcement proceedings. Accordingly, we can neither confirm nor deny the existence of records that may be potentially responsive to your request pursuant to 5 U.S.C. 552(b)(6) and/or 7(A) and/or (7)(C).

Portions of your request are too broad in scope to identify any responsive records. Specifically, items (b), (d), and (f) are too broad for us to craft a search for records or to conclusively determine that we would neither confirm nor deny their existence without conducting a search. The Department of Justice regulations require that requests, must describe the records that you seek in enough detail to enable Department personnel to locate them with a reasonable amount of effort. And, whenever possible, your request should include specific information about each record sought, such as the date, title or name, author, recipient, and subject matter of the record.[28 CFR 16.3 (b)].

Please provide your response regarding items (b), (d), and (e) within 30 days of the date of this letter clarifying these items.

We will conduct searches for records in response to items (a), (c), and (f) that would not fall within the aforementioned scope of records whose existence the NSD can neither confirm nor deny.

As this matter is already in litigation, we are omitting our standard appeal paragraph. If you have any questions concerning this response please contact Assistant United States Attorney, Andrea Parker of the Eastern District of Texas at (409) 839-2538.

Notwithstanding the pending litigation, you may also contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer to try to resolve disputes between FOIA requesters and federal agencies. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at (877) 684-6448; or facsimile at (202) 741-5769. You also have the right to seek dispute resolution services through the DOJ's FOIA Public Liaison. NSD FOIA's Public Liaison, Patricia Matthews, may be reached by telephone at (202) 233-0756.

Sincerely,

ARNETTA MALLORY    Digitally signed by ARNETTA MALLORY
Date: 2020.11.05 12:47:07 -05'00'

Arnetta Mallory
Government Information Specialist

Exhibit G

**U.S. Department of Justice**

National Security Division

---

*Washington, D.C. 20530*

Ty Clevenger
PO Box 20753
Brooklyn, NY 11202-0753                    March 9, 2021
Via email: tyclevenger@yahoo.com

Re: FOIA/PA #20-333

Dear Mr. Clevenger:

This is our first interim response to your email dated June 15, 2020 attaching a Freedom of Information Act (FOIA) request.

Specifically, your request seeks:

*(a) All documents, records, communications, and other tangible evidence supporting Gen. Demers's claims to 60 minutes above, i.e., about Russian involvement in obtaining the DNC emails in 2016.*
*(b) All documents, records, communications, and other tangible evidence relied on by Gen. Demers, Adam Hickey, Sean Newell, and Heather Alpino in support of their conclusions that Russians were responsible for obtaining the DNC emails in 2016.*
*(c) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning Seth Conrad Rich and/or Aaron Nathan Rich.*
*(d) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning other entities or individuals who may have played a role in stealing, hacking, leaking or improperly obtaining the DNC emails in 2016.*
*(e) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division indicating whether the DNC emails were hacked externally, leaked from a source inside the DNC, or otherwise transmitted to third parties such as Wikileaks. If there was one or more than one instance of hacking, leaking, or other unauthorized transmission of DNC emails in 2016, please provide details for each such incident, e.g., the dates, persons and entities involved, the data that was hacked, leaked, or otherwise transmitted, and the means by which it was hacked, leaked, or transmitted.*
*(f) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division or the FBI regarding whether Debbie Wasserman-Shultz or any other member of Congress was blackmailed or extorted, whether directly or indirectly, as a result of information procured by any of the following: Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, or anyone affiliated with the government of Pakistan.*

In an e-mail dated November 19, 2020, you indicated that "We would be willing to limit the initial search to Mr. Demers, but eventually we would like to see the relevant info for the other individuals."

We have conducted a search of the records of Mr. John Demers and located a record that is responsive to your request. We are withholding portions of that record pursuant to the following FOIA exemption set forth in 5 U.S.C. 552(b):

   (6) Which permits the withholding of personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

   NSD is continuing to process remaining records that are responsive to your request. Please note that NSD is also conducting searches and processing records that are beyond the narrowed scope of just the records of Mr. Demers. We will provide you with an update, to include a possible supplemental production prior to the next (after the March 16, 2021) Joint Status Report in this matter.

   Please note that three discrete categories of law enforcement and national security records are excluded from the requirements of FOIA. *See* 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Additionally, NSD maintains investigative and prosecutorial files pertaining to subjects of NSD investigations. We do not routinely search these records in response to requests regarding NSD investigations in cases where the confirmation or denial of the existence of responsive records would, in and of itself, reveal information which would constitute a clearly unwarranted invasion of personal privacy of third parties or would reasonably be expected to interfere with enforcement proceedings. Accordingly, we can neither confirm nor deny the existence of records that may be potentially responsive to your request pursuant to 5 U.S.C. 552(b)(6) and/or (7)(A) and/or (7)(C).

   As this matter is already in litigation, we are omitting our standard appeal paragraph. If you have any questions concerning this response please contact Assistant United States Attorney, Andrea Parker of the Eastern District of Texas at (409) 839-2538.

   Notwithstanding the pending litigation, you may also contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer to try to resolve disputes between FOIA requesters and federal agencies. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at (877) 684-6448; or facsimile at (202) 741-5769. You also have the right to seek dispute resolution services through the DOJ's FOIA Public Liaison. NSD FOIA's Public Liaison, Patricia Matthews, may be reached by telephone at (202) 233-0756.

                    Sincerely,

                    KEVIN TIERNAN   Digitally signed by KEVIN
                                    TIERNAN
                                    Date: 2021.03.09 11:52:15
                                    -05'00'

                    Kevin G. Tiernan
                    Records and FOIA

| | |
|---|---|
| From: | Raimondi, Marc (PAO) |
| To: | Demers, John C. (NSD); Andrews, Kelli (NSD); Hickey, Adam (NSD); ██b6██ |
| Subject: | 2019 10 31 GRU July 2018 Indictment Media Report |
| Date: | Thursday, October 31, 2019 2:00:12 PM |
| Attachments: | 2019 10 31 GRU July 2018 Indictment Media Report.docx |

John, when our intern ██b6██ heard you were doing 60 Minutes on this case, she took it upon herself, unasked, to compile all the past clips for your review.

If you find it useful, please feel free to send her a note because I know she spent a good amount of time on it: ██b6██

██b6██ /Adam, for your records. I messed with the margins a bit to get it down to 39 pages from 50.

# GRU U.S. Election Hacking Indictment: July 13, 2018

[Indictment](#)

**DOJ Press Release (full release is at the end of this document):** [Grand Jury Indicts 12 Russian Intelligence Officers for Hacking Offenses Related to the 2016 Election](#)

*Media Report Compiled on October 31st, 2019 for AAG Demers 60M Prep*

**Headlines:**

[Mueller probe indicts 12 Russians with hacking of Democrats in 2016](#) *The Washington Post*

[12 Russian Agents Indicted in Mueller Investigation](#) *NYT*

[Justice Department Charges Russian Cyberspies With Attack On 2016 Election](#) *NPR*

[Russian intel officers charged with hacking Dems, Clinton to disrupt election](#) *NBC*

[12 Russians indicted in Mueller investigation](#) *CNN*

[Russian intelligence officers indicted in DNC hacking](#) *CBS*

[12 Russian intelligence officers indicted for hacking into DNC, Clinton campaign](#) *USA Today*

[Read Mueller's full indictment against 12 Russian officers for election interference](#) *PBS*

[Russian officers indicted for allegedly hacking Clinton campaign, DNC emails](#) *Fox News*

[Mueller indicts 12 Russians for DNC hacking as Trump-Putin summit looms](#) *POLITICO*

[Mueller Probe Indicts 12 Russians in Hacking of DNC and Clinton Campaign](#) *WSJ*

[U.S. accuses Russian spies of 2016 election hacking as summit looms](#) *Reuters*

[Russian Intelligence Officers Have Been Indicted For Hacking Hillary Clinton's Presidential Campaign](#) *BuzzFeed News*

[The Coincidence at the Heart of the Russia Hacking Scandal](#) *The Atlantic (Opinion)*

[Mueller's Politicized Indictment of Twelve Russian Intelligence Officers](#) *National Review (Opinion)*

*The Washington Post July 13, 2018*

A dozen Russian military intelligence officers were indicted Friday on charges they hacked Democrats' computers, stole their data and published those files to disrupt the 2016 election — the clearest connection to the Kremlin established so far by special counsel Robert S. Mueller III's investigation of interference in the presidential campaign.

The indictment against members of the Russian military agency known as the GRU marks the first time Mueller has taken direct aim at the Russian government, accusing specific military units and their named officers of a sophisticated, sustained effort to hack the computer networks of Democratic organizations and the Hillary Clinton campaign.

Deputy Attorney General Rod J. Rosenstein announced the charges at a midday news conference. Mueller, as has been his practice, did not attend the announcement. Court records show that a grand jury that Mueller has been using returned an indictment Friday morning.

The suspects "covertly monitored the computers, implanted hundreds of files containing malicious computer code, and stole emails and other documents," Rosenstein said. "The goal of the conspirators was to have an impact on the election. What impact they may have had . . . is a matter of speculation; that's not our responsibility."

The indictment comes days before President Trump is due to meet with Russian President Vladimir Putin in Finland. Rosenstein said he briefed Trump earlier this week on the charges.

Trump's lawyer Rudolph W. Giuliani said on Twitter that the indictments "are good news for all Americans. The Russians are nailed. No Americans are involved." He then called on Mueller "to end this pursuit of the president and say President Trump is completely innocent."

The 11-count, 29-page indictment describes in granular detail a carefully planned and executed attack on the information security of Democrats, as Russian government hackers implanted hundreds of malware files on Democrats' computer systems to steal information. The hackers then laundered the pilfered material through fake personas called DC Leaks and Guccifer 2.0, as well as others, to try to influence voters.

One of their conduits, identified in the indictment only as "Organization 1," was WikiLeaks, the global anti-secrecy group led by Julian Assange, according to people familiar with the case. The indictment describes WikiLeaks communicating with Guccifer 2.0 to obtain material.

On July 6, 2016, according to the indictment, WikiLeaks wrote, "if you have anything Hillary related we want it in the next tweo [sic] days prefable [sic] because the DNC [Democratic National Convention] is approaching and she will solidify bernie supporters behind her after," referring to Clinton's rival for the Democratic nomination, Sen. Bernie Sanders (I-Vt.). WikiLeaks explained, "we think trump has only a 25% chance of winning against hillary . . . so conflict between bernie and hillary is interesting."

WikiLeaks released nearly 20,000 Democratic National Committee emails on the eve of the convention later that month, providing an embarrassing look at party operations and attitudes toward the Sanders campaign.

A former Justice Department official who was previously involved in the Russia probe said the charges should serve as a warning for the United States to buttress its election security as Americans prepare to vote in congressional elections in November.

"The detailed charges in this indictment make it unmistakably clear that the United States faces an aggressive, sophisticated adversary bent on using cyber means to subvert our democratic processes and institutions," said David Laufman, a former chief of the Justice Department's Counterintelligence and Export

Control Section. "Now is the time for unequivocal recognition of this threat by both the executive branch and Congress, and for a unified and well-coordinated commitment to confront it."

The indictment offers troubling new accusations about the extent of Russian hacking efforts and interactions with Americans.

 "On or about August 15, 2016, the conspirators, posing as Guccifer 2.0, received a request for stolen documents from a candidate for the U.S. Congress," the indictment states. "The conspirators responded using the Guccifer 2.0 persona and sent the candidate stolen documents related to the candidate's opponent." The indictment does not identify the candidate.

The indictment also describes an online conversation between the GRU, posing as Guccifer 2.0, and a "person who was in regular contact with senior members of the presidential campaign of Donald J. Trump."

People familiar with the case said that person is longtime Trump adviser Roger Stone. In August 2016, the hacker persona wrote: "please tell me if i can help u anyhow . . . it would be a great pleasure to me."

Stone's lawyer Grant Smith said, "It is clear from the indictment issued today that our client, Roger Stone, was not in any way involved with any of the alleged hacking of the 2016 election. As he testified before the House Intelligence Committee under oath, his 24-word exchange with someone on Twitter claiming to be Guccifer 2.0 is benign, based on its content, context and timing."

U.S. officials identified one of the GRU sections that carried out the operations as Unit 26165, which worked out of a building about four miles from the Kremlin. It was responsible for hacking the DNC and the Democratic Congressional Campaign Committee, according to the indictment, which accuses Viktor Netyksho of being the military officer in command of Unit 26165 at the time.

Although the DNC was able to partially kick the Russian hackers out of its system in June 2016, the indictment says three months later, the GRU "successfully gained access to DNC computers hosted on a third-party cloud-computing service" which held "test applications related to the DNC's analytics," according to the indictment. The hacker stole that data from the DNC, the indictment said.

Another group of Russian military officers, Unit 74455, working out of a building that GRU officers referred to as the "Tower," used fake online personas to spread stolen files, officials charged. The indictment identifies Col. Aleksandr Osadchuk as the commanding officer of that unit.

The indictment also notes an interesting development on July 27, 2016 — the day then-candidate Trump gave a press conference declaring his hope that missing Clinton emails would be found and made public, saying: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing."

The indictment says "on or about" that same day, "the conspirators attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office. At or around the same time, they also targeted seventy-six email addresses at the domain for the Clinton campaign."

The Russian Foreign Ministry rejected the indictment's allegations as lacking evidence and described the charges as a clear effort to derail the Trump-Putin summit in Helsinki.

 "It is unfortunate that distributing false information has become the norm in Washington, and that criminal cases are being initiated based on clearly political motives," the ministry said. Referring to the Mueller investigation, the statement went on: "The question remains how long this shameful comedy that is embarrassing the United States will go on."

Rosenstein said the hackers interacted with some Americans in the course of their efforts but noted that those people had not been charged with a crime.

"When we confront foreign interference in American elections, it is important for us to avoid thinking politically as Republicans or Democrats and instead to think patriotically as Americans. Our response must not depend on who was victimized," he said. "There will always be adversaries who work to exacerbate domestic differences and try to confuse, divide and conquer us. So long as we are united in our commitment to the values enshrined in the Constitution, they will not succeed."

Mueller and a team of prosecutors have been working since May 2017 to determine whether any Trump associates conspired with Russia to interfere in the election. With the new indictment, his office has filed charges against 32 people on crimes including hacking, money laundering and lying to the FBI. Twenty-six of those charged are Russians who are unlikely to ever be put on trial in the United States.

In February, Mueller indicted a group of Russian Internet trolls who worked out of the Internet Research Agency, a company based in St. Petersburg and owned by a wealthy associate of Putin.

Trump's former campaign manager, Paul Manafort, is in jail in Alexandria, Va., awaiting trial this month on financial fraud charges brought by Mueller but stemming from activities that predated the Trump campaign.

Mueller's probe has come under sustained attack from Trump and at a press conference in England on Friday before Rosenstein spoke, the president again labeled the investigation a "witch hunt."

"I think that we're being hurt very badly by the — I would call it the witch hunt," said Trump as he stood beside British Prime Minister Theresa May. "It really hurts our relationship with Russia."

Rosenstein said of his decision to brief Trump, "It was important for the president to know what information we've uncovered because he's got to make very important decisions for the country. He needs to understand what evidence we have of foreign election interference."

## 12 Russian Agents Indicted in Mueller Investigation

*NYT July 13, 2018*

WASHINGTON — The special counsel investigating Russian interference in the 2016 election issued an indictment of 12 Russian intelligence officers on Friday in the hacking of the Democratic National Committee and the Clinton presidential campaign. The indictment came only three days before President Trump was planning to meet with President Vladimir V. Putin of Russia in Helsinki, Finland.

The 29-page indictment is the most detailed accusation by the American government to date of the Russian government's interference in the 2016 election, and it includes a litany of brazen Russian subterfuge operations meant to foment chaos in the months before Election Day.

From phishing attacks to gain access to Democratic operatives, to money laundering, to attempts to break into state elections boards, the indictment details a vigorous and complex effort by Russia's top military intelligence service to sabotage the campaign of Mr. Trump's Democratic rival, Hillary Clinton.

The timing of the indictment, by Robert S. Mueller III, the special counsel, added a jolt of tension to the already freighted atmosphere surrounding Mr. Trump's meeting with Mr. Putin. It is all but certain to feed into the conspiratorial views held by the president and some of his allies that Mr. Mueller's prosecutors are determined to undermine Mr. Trump's designs for a rapprochement with Russia.

The president has long expressed doubt that Russia was behind the 2016 attacks, and the 11-count indictment illustrates even more the distance between his skepticism and the nearly unanimous views of the intelligence and law enforcement agencies he leads.

"Free and fair elections are hard fought and contentious, and there will always be adversaries who work to exacerbate domestic differences and try to confuse, divide and conquer us," Rod J. Rosenstein, the deputy attorney general, said Friday during a news conference announcing the indictment.

"So long as we are united in our commitment to the shared values enshrined in the Constitution, they will not succeed," he said.

It was a striking statement a day after Republican members of Congress, engaging in a shouting match during a hearing, attacked Peter Strzok, the F.B.I. agent who oversaw the early days of the Russia investigation, and questioned the integrity of the Justice Department for what they charged was bias against the president.

The announcement created a bizarre split screen on cable networks of the news conference at the Justice Department and the solemn pageant at Windsor Castle in England, where Mr. Trump and his wife, Melania, were reviewing royal guards with Queen Elizabeth II.

Russia has denied that its government had any role in hacking the presidential election, and on Friday, Mr. Trump said he would confront Mr. Putin directly. But the president said he did not expect his Russian counterpart to acknowledge it.

"I don't think you'll have any, 'Gee, I did it, you got me,'" Mr. Trump said during a news conference hours before the indictment was announced. He added that there would not be any "Perry Mason" — a reference to the 1950s and 1960s courtroom TV drama in which Perry Mason, a criminal defense lawyer played by Raymond Burr, often got people to confess. "I will absolutely firmly ask the question."

But Mr. Trump also said he believed that the focus on Russia's election meddling and whether his campaign was involved were merely partisan issues that made it more difficult for him to establish closer ties with Mr. Putin.

The Kremlin agreed. A statement on Friday from Russia's Foreign Ministry said that the indictment was meant to "spoil the atmosphere before the Russian-American summit."

After the indictment was announced, Senator Chuck Schumer of New York, the Democratic leader, and others in his party called on Mr. Trump to cancel his one-on-one meeting with Mr. Putin.

The indictment, Mr. Schumer said in a statement, was "further proof of what everyone but the president seems to understand: President Putin is an adversary who interfered in our elections to help President Trump win." He added that "glad-handing with Vladimir Putin" would "be an insult to our democracy."

The indictment builds on a declassified report released in January 2017 by several intelligence agencies, which concluded that "Putin and the Russian government aspired to help President-elect Trump's election chances when possible by discrediting Secretary Clinton and publicly contrasting her unfavorably to him."

Mr. Trump has long questioned the findings of intelligence agencies, suggesting alternate scenarios for who might have carried out the hacking campaigns. "It also could be somebody sitting on their bed that weighs 400 pounds, O.K.?" Mr. Trump said during the first presidential debate in September 2016.

Friday's indictment did not include any accusations that the Russian efforts succeeded in influencing the election results, nor evidence that any of Mr. Trump's advisers knowingly coordinated with the Russian campaign — a point immediately seized upon by the president's allies.

Rudolph W. Giuliani, the president's lawyer, said in a Twitter post that the indictment showed "no Americans are involved," and he called on Mr. Mueller to end the inquiry. "The Russians are nailed," Mr. Giuliani wrote.

Still, the indictment added curious new details to the events leading up to the November 2016 elections.

The indictment revealed that on July 27, 2016, Russian hackers tried for the first time to break into the servers of Mrs. Clinton's personal offices. It was the same day that Mr. Trump publicly encouraged Russia to hack Mrs. Clinton's emails.

"I will tell you this, Russia: If you're listening, I hope you're able to find the 30,000 emails that are missing," Mr. Trump said during a news conference in Florida. "I think you will probably be rewarded mightily by our press."

The indictment does not mention those remarks.

Separately, the indictment states that the hackers were communicating with "a person who was in regular contact with senior members of the presidential campaign." Two government officials identified the person as Roger J. Stone Jr., a longtime adviser to Mr. Trump and the subject of close scrutiny by the F.B.I. and Mr. Mueller's team. There is no indication that Mr. Stone knew he was communicating with Russians.

Communicating on Aug. 15 as Guccifer 2.0, an online persona, the Russian hackers wrote: "thank u for writing back … do u find anyt[h]ING interesting In the docs i posted?"

Two days later, the hackers wrote the person again, adding, "please tell me If i can help u anyhow … it would be a great pleasure to me."

In another interaction several weeks later, the hackers, again writing as Guccifer 2.0, pointed to a document stolen from the Democratic Congressional Campaign Committee and posted online, asking, "what do u think of the info on the turnout model for the democrats entire presidential campaign."

The person replied: "[p]retty standard."

Friday's indictment is a "big building block in the narrative being constructed for the American people regarding what happened during the election," said Raj De, the chairman of the cybersecurity practice at Mayer Brown and the former general counsel of the National Security Agency.

By pulling together threads that Americans have read about for years — including the hacking of political institutions and campaigns, the dissemination of hacked emails and the attempts to compromise state election infrastructure — "this shows that the Russian campaign to impact the election was more coordinated and strategic than some have given it credit," Mr. De said. "This indictment is our clearest window into that campaign."

The document is a portrait of a coordinated and well-executed attack that targeted more than 300 people affiliated with the Clinton campaign, as well as other Democratic Party organizations. They implanted malicious computer code into computers, covertly monitored their users and stole their files that led to a series of disastrous leaks.

Investigators identified the 12 individuals in the indictment more than a year ago, according to a person with knowledge of the investigation who was not authorized to speak publicly about it.

Starting in April 2016, the hackers began to spread their stolen files using several online personas, including DC Leaks and Guccifer 2.0. The tens of thousands of stolen documents were released in stages that wreaked havoc on the Democratic Party throughout much of the election season.

The Russians also worked with people and organizations that were in a position to spread the information, including WikiLeaks, identified in the indictment as "Organization 1."

According to the indictment, WikiLeaks wrote to Guccifer 2.0 in July 2016 asking for "anything Hillary related" in the coming days.

Most of the Russian intelligence officials charged in Friday's indictment worked for the Russian military intelligence agency, formerly known as the G.R.U. and now called the Main Directorate.

While many of the broad elements of the Russian scheme were known before, investigators have not previously said how the Russian agents paid for the hacking campaign. The hackers' use of cryptocurrency

was one of the last pieces to fall into place for investigators in a case that they have been working on for more than a year.

The indictment released Friday said that the agents handled the most delicate transactions with the cryptocurrency Bitcoin. The Malaysian computer server that hosted DCLeaks.com, for instance, was paid for with the virtual currency.

Because Bitcoin functions without any central authority, the technology "allowed the conspirators to avoid direct relations with traditional financial institutions, allowing them to evade greater scrutiny of their identities and sources of funds," the indictment said.

The Russian agents had several methods for acquiring Bitcoin, according to the indictment. At one point, the agents were actually mining new Bitcoin, a process that involves using computers to unlock new Bitcoin by solving complex computational problems.

The indictment's extraordinary details may raise pointed questions about actions taken and not taken by American intelligence agencies and the Obama administration as the Russian campaign unfolded.

In many instances, the indictment describes the actions of individual Russian intelligence officers on particular dates. It is unclear from the indictment whether American intelligence agencies, primarily the National Security Agency, were watching in real time as the Russians prepared for and carried out their attacks against Democratic targets in spring 2016.

It was not until October 2016 that the government put out its first public statement on the Russian intrusion. If Americans knew much earlier about Russian actions, there will be questions about why they did not warn the targets, try countermeasures or call Russia out publicly before they did.

It is possible, however, that American spies did not detect the Russian attacks in real time, but reconstructed them later by studying the hacked Democratic networks and possibly breaking into Russian systems to examine logs.

Some experts said that the granular detail in the indictment was a warning to groups who might be eyeing future attacks.

"Even from a historical perspective, I can't think of a case when someone went into this level of naming and shaming," said Thomas Rid, a professor of strategic studies at Johns Hopkins University. "This is really significant."

"There is going to be a deterrent effect on third parties," he said. "If you are doing this kind of work, there are now so many examples of you finding your name in an indictment, it will definitely have an effect."

**Justice Department Charges Russian Cyberspies With Attack On 2016 Election**

*NPR July 13th, 2018*

The Justice Department charged 12 Russian intelligence officers on Friday with a litany of alleged offenses related to Russia's hacking of the Democratic National Committee's emails, state election systems and other targets in 2016.

Deputy Attorney General Rod Rosenstein, who announced the indictments, said the Russians involved belonged to the military intelligence service GRU. They are accused of a sustained cyberattack against Democratic Party targets, including its campaign committee and Hillary Clinton's campaign.

The GRU attackers also allegedly targeted state election systems, including government agencies and their vendors, and stole information about 500,000 American voters.

The attacks were a signature feature of Russia's active measures against the United States; embarrassing emails were passed to WikiLeaks, which released them publicly. The GRU also created other ways to pass the material it stole into the public, including a website called DCLeaks and a fake persona called "Guccifer 2.0."

The flood of embarrassing information about the inner workings of the Democratic Party's leadership led to the resignation of then-DNC Chairwoman Debbie Wasserman-Schultz. Later, Clinton's campaign chairman John Podesta also was embarrassed by the release of his emails.

The Russians named in the indictment discussed how and when to release material they had accumulated to make the biggest political splash inside the United States, Rosenstein said.

There is no allegation in the indictment that any American participated knowingly in the GRU cyberattacks, Rosenstein said.

Justice Department special counsel Robert Mueller is continuing to investigate whether anyone in the United States conspired with the Russian attack on the election.

But Rosenstein said that responsibility for this prosecution — which is unlikely to go forward to a trial in court as Russia is unlikely to extradite the suspects who have been charged — would pass from Mueller's office to the national security division of the Justice Department.

Friday's announcement follows a separate but related indictment by the special counsel's office from earlier this year of Russians allegedly connected to the campaign of social media agitation aimed at amplifying political controversy within the United States.

The Russian government has so far declined to extradite the people named, although one American attorney has been arguing the case in Washington on behalf of a company that's involved.

### *Cui bono?*

Rosenstein asked Americans to not only focus on who was hurt by or benefited politically from the Russian attacks but to unite against foreign influence in the American democratic process.

"In my remarks, I have not identified the victims," Rosenstein said. "When we confront foreign interference in American elections, it is important for us to avoid thinking politically as Republicans or Democrats and instead to think patriotically as Americans. Our response must not depend on who was victimized."

The U.S. intelligence community has concluded, with further verification by the Senate intelligence committee, that Russia's active measures were aimed at hurting Clinton and helping Trump.

White House spokeswoman Lindsay Walter emphasized that no one in the Trump campaign was connected with the indictment unsealed on Friday.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," she said. "This is consistent with what we have been saying all along."

Separately, one of Trump's lawyers, former New York Mayor Rudy Giuliani, welcomed the Justice Department announcement and said it showed that Mueller should finish up soon.

"The indictments Rod Rosenstein announced are good news for all Americans," he wrote on Twitter. "The Russians are nailed. No Americans are involved. Time for Mueller to end this pursuit of the President and say President Trump is completely innocent."

The Americans who were unwittingly communicating with the Russian spies included a candidate for Congress — who is not identified — and at least one journalist. At least "one person who was in regular contact with senior members of the presidential campaign" also communicated with the GRU officers.

The indictment also says that on July 27, 2016, the GRU officers "attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office." They also pinged 76 emails associated with the Clinton campaign.

July 27 was the day that Trump said, "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing" from Clinton's email servers.

**Geopolitical implications**

Rosenstein's announcement took place just ahead of a planned meeting between President Trump and Russian President Vladimir Putin on Monday in Helsinki.

Trump told reporters Friday during his visit to the United Kingdom that he planned to "ask" Putin about Russia's attack on the election.

Trump has gone back and forth as to what he acknowledges about what took place and has cited Russia's official denials about its active measures. The president also has said the interference took place and vowed that if it returned in the 2018 midterm election — as U.S. intelligence officials have warned it may — he would "counteract it very strongly."

Rosenstein said the announcement of the charges on Friday took place because that was when the special counsel's office had completed its work investigating them and had the ability to present the evidence to a grand jury. The deputy attorney general said he had briefed the president about the matter.

Russia's foreign ministry said the indictments were an attempt to "spoil" the meeting.

Virginia Sen. Mark Warner, the top Democrat on the Senate intelligence committee, called on Trump to cancel his one-on-one meeting with Putin in Helsinki.

Warner told reporters on Capitol Hill that he worried that Trump's "ad hoc style" in which he "does not prepare" would be "taken advantage of" by Putin.

House Minority Leader Nancy Pelosi, D-Calif., said the indictment emphasized how tough Trump must be on Putin at their summit.

"The stakes for the upcoming Trump-Putin meeting could not be higher," Pelosi said. "President Trump must demand and secure a real, concrete and comprehensive agreement that the Russians will cease their ongoing attacks on our democracy. Failure to stand up to Putin would constitute a profound betrayal of the Constitution and our democracy."

Pelosi later joined other Democrats on Friday in calling for Trump to cancel his meeting with Putin.

Republicans stopped short of calling for Trump to cancel his meeting but some of them did also call for the president to take a firm line.

"All patriotic Americans should understand that Putin is not America's friend, and he is not the president's buddy," said Nebraska Sen. Ben Sasse. "We should stand united against Putin's past and planned future attacks against us."

South Carolina Rep. Trey Gowdy, chairman of the House oversight committee, echoed the note that Rosenstein sounded about how Americans of all political parties should be concerned about foreign election interference.

"I am pleased Russia is being held accountable for their actions against our country," Gowdy said. "This was not an attack on Republicans or an attack on Democrats — this was an attack on the United States."

The oversight committee plans to convene a hearing about election security by the end of July.

**Russian intel officers charged with hacking Dems, Clinton to disrupt election**

*NBC July 13th, 2018*

WASHINGTON — Twelve Russian intelligence officers have been indicted in connection with the bitcoin-funded hacking of Democratic organizations and the Hillary Clinton campaign "with the intent to interfere" in the 2016 election, officials announced Friday.

The charges, brought by special counsel Robert Mueller and announced by Deputy Attorney General Rod Rosenstein, come at a diplomatically sensitive time — just days before President Donald Trump meets formally for the first time with Russian President Vladimir Putin in Helsinki.

Among the new details: the conspirators allegedly first tried to compromise email accounts used by Clinton's personal office on July 27, 2016, the same day that Trump appeared to urge Russia to go after her emails at a campaign press conference in Florida.

Prosecutors say that in August 2016, a U.S. congressional candidate requested and received from stolen documents related to an opponent from an online persona created by the Russian cabal. And a state lobbyist received stolen data on Democratic donors later that month, the indictment alleges.

Rosenstein, who laid out the allegations at a news conference that began while Trump was meeting with Queen Elizabeth in London, said he had briefed Trump earlier in the week and that the president was "fully aware" of the charges in the indictment.

A statement from the White House did not address the allegations of Russian government interference and focused only on what was not in the indictment.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result. This is consistent with what we have been saying all along," the statement said.

The broad strokes of the hacking operation had already been made public, but the indictment provided new details and named names.

The court papers say that the defendants — two of whom were also charged with orchestrating attacks on state election systems — disseminated emails stolen from the Democrats through two online personas that they created, Guccifer 2.0 and DC Leaks.

William Bastone of the Smoking Gun website tweeted later Friday that he was the "U.S. reporter" referred to in the indictment who had received from Guccifer 2.0 the "password access to a nonpublic, password-protected website" that contained emails that had been stolen from "Victim 1."

The defendants used spear-phishing techniques to steal user names, passwords and emails and paid for the operation with bitcoin and other cryptocurrencies, the indictment alleges.

"The goal of the conspiracy was to have an impact on the election," Rosenstein said, adding that the indictment does not allege the Russian conduct changed the vote count or outcome of the 2016 election that put Trump in the White House.

Mueller, who has been investigating Russian interference in the 2016 election and possible collusion by the Trump campaign for more than a year, says the 12 defendants in Friday's indictment are members of the GRU, Russia's military intelligence agency.

Beginning in March 2016, they allegedly used fake identities and bogus accounts to trick volunteers and employees of Clinton's 2016 campaign and gain access to usernames and passwords that they used to steal emails and hack into other computers.

They allegedly also hacked into the networks of the Democratic Congressional Campaign Committee and the Democratic National Committee.

The goal of the conspiracy was to have an impact on the election.

The indictment says that in August and September 2016, Russians posing as Guccifer 2.0 were in contact with a person who communicated with senior Trump campaign officials, flagging emails posted and offering assistance.

"Please tell me if i can help u anyhow...it would be great pleasure to me," Guccifer 2.0 wrote, according to the indictment. The description matches a contact that longtime Trump associate Roger Stone has previously said he had with Guccifer.

The court papers also say that an unidentified organization — which matches the description of Wikileaks — coordinated the release of DNC emails with Guccifer 2.0 in July 2016 with an eye toward disrupting the party's convention.

"if you have anything hillary relayed we want it in the next tweo [sic] days prefable [sic] because the DNC is approaching and she will solidify bernie supporters behind her after," the organization wrote, according to the indictment.

DNC Chair Tom Perez said the latest indictments show the magnitude of the Russian operation. "This is not a witch hunt and it is certainly not a joke, as Donald Trump has desperately and incorrectly argued in the past," Perez said. "It's long past time for him and his allies in the Republican Party to stop ignoring this urgent threat to our national security."

The hackers were identified as Viktor Borisovich Netyksho, Boris Alekseyevich Antonov, Dmitriy Sergeyevich Badin, Ivan Sergeyevich Yermakov, Aleksey Viktorovich Lukashev, Sergey Aleksandrovich Morgachev, Nikolay Yuryevich Kozachek, Pavel Vyacheslavovich Yershov, Artem Andreyevich Malyshev, Aleksandr Vladimirovich Osadchuk, Aleksey Aleksandrovich Potemkin, and Anatoliy Sergeyevich Kovalev — all officials in Unit 26165 and Unit 74455 of GRU.

Kovalev is accused of targeting a state voter system in the U.S. In July 2016, he allegedly hacked the website of an unnamed state board of elections and stole information for 500,000 voters. The following month, he hacked into the computers of a U.S. vendor that supplied software used to verify voter registration information.

Friday's announcement isn't Mueller's first move against the Russians. In February, he brought charges against 13 Russian nationals who allegedly carried out a campaign of social media-fueled information warfare — some of it supporting Trump and disparaging Clinton — that he said was aimed at meddling in the 2016 election.

**12 Russians indicted in Mueller investigation**

*CNN July 14th, 2018*

**Washington (CNN)**The Justice Department announced indictments against 12 Russian nationals as part of special counsel Robert Mueller's investigation of Russian interference in the 2016 election, accusing them of engaging in a "sustained effort" to hack Democrats' emails and computer networks.

All 12 defendants are members of the GRU, a Russian federation intelligence agency within the main intelligence directorate of the Russian military, who were acting in "their official capacities."

The revelations provide more detail on the sophisticated assault on the US election in 2016, including the release of emails designed to damage Democratic presidential candidate Hillary Clinton.

The indictment was announced at almost exactly the moment that President Donald Trump rolled into the quadrangle of Windsor Castle to meet the awaiting Queen Elizabeth II in the symbolic highpoint of his visit to Britain.

Trump is due to meet Russian President Vladimir Putin -- who has denied election meddling -- in Helsinki on Monday for a summit that includes a one-on-one meeting with only interpreters present. White House press secretary Sarah Sanders said Friday the summit will not be canceled.

The Justice Department says the hacking targeted Clinton's campaign, Democratic National Committee and the Democratic Congressional Campaign Committee, with the intention to "release that information on the internet under the names DCLeaks and Guccifer 2.0 and through another entity."

Deputy Attorney General Rod Rosenstein said the indictment does not name any American citizen, but told reporters that defendants "corresponded with several Americans during the course of the conspiracy through the internet."

"There is no allegation in this indictment that any American citizen committed a crime," Rosenstein said at a news conference. "There is no allegation that the conspiracy altered the vote count or changed any election result."

Deputy White House press secretary Lindsay Walters referenced Rosenstein's comments and said there is no evidence tying the Trump campaign to hacking attempts.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," Walters said in a statement. "This is consistent with what we have been saying all along."

Trump private attorney Rudy Giuliani in a tweet said the indictments are "good news for all Americans" but called on the special counsel investigation to end.

"The Russians are nailed. No Americans are involved. Time for Mueller to end this pursuit of the President and say President Trump is completely innocent," he tweeted.

Trump, meanwhile, did not criticize Putin or condemn Russia's actions in a pair of tweets on Saturday, instead attacking his predecessor, former President Barack Obama, with what has become a familiar claim of his.

"The stories you heard about the 12 Russians yesterday took place during the Obama Administration, not the Trump Administration," Trump wrote. "Why didn't they do something about it, especially when it was reported that President Obama was informed by the FBI in September, before the Election?"

"These Russian individuals did their work during the Obama years," Trump continued in a tweet later Saturday. "Why didn't Obama do something about it? Because he thought Crooked Hillary Clinton would win, that's why. Had nothing to do with the Trump Administration, but Fake News doesn't want to report the truth, as usual!"

Obama, however, personally warned Putin against messing with the election, imposed sanctions on Russian individuals and entities, kicked out 35 Russian diplomats and closed two of the Kremlin's compounds in the United States.

**Announced as Trump meets Queen Elizabeth II**

Rosenstein said he briefed Trump about the allegations in the indictment earlier this week and that "the President is fully aware of the department's actions today."

Asked about the timing of the announcement, Rosenstein said it came as "a function of the collection of the facts, the evidence, the law, and a determination that it was sufficient to present the indictment at this time."

The unfolding drama on both sides of the Atlantic reflected how Trump's presidency has been overshadowed by the Mueller probe from its earliest moments and how the investigation frequently tramples the President's attempts to carve out favorable headlines.

Some lawmakers are calling on Trump to cancel the meeting with Putin.

"Glad-handing with Vladimir Putin on the heels of these indictments would be an insult to our democracy," said Senate Minority Leader Chuck Schumer.

"President Trump must be willing to confront Putin from a position of strength and demonstrate that there will be a serious price to pay for his ongoing aggression towards the United States and democracies around the world," said GOP Sen. John McCain in a statement. "If President Trump is not prepared to hold Putin accountable, the summit in Helsinki should not move forward."

In a statement, Russia's foreign ministry said there was no basis for the charges and said purpose of the announcement is to "spoil the atmosphere" before Monday's summit.

"It is regrettable that the duplication of false information in Washington has become the norm, and criminal cases are worked up for obvious political reasons. The question remains: how long will they continue to break this shameful comedy that disgraces the US," the Russian statement said.

**Russian military stole information of 500,000 voters**

Eleven of the Russians are charged with identity theft, conspiracy to launder money and conspiracy to commit computer crimes. Two defendants are charged with a conspiracy to commit computer crimes.

"Russian GRU officers hacked the website of a state election board and stole information about 500,000 voters," Rosenstein said. "They also hacked into computers of a company that supplied software used to verify voter registration information."

The defendants worked for two units of the GRU that "engaged in active cyber operations to interfere in the 2016 presidential elections," Rosenstein said. One unit stole information using spearfishing schemes and hacked into computer networks where they "installed malicious software that allowed them to spy on users and capture keystrokes, take screenshots and exfiltrate or remove data from those computers."

Intelligence gathered by US officials captured some of the Russians accused in Friday's indictments congratulating each other and celebrating the success of their operation during the campaign, according to a person familiar with the investigation. They were also captured celebrating Trump's victory. The source said the intelligence was gathered both before and after the 2016 election.

Each of the Russians involved held military titles. One leader was Sergey Aleksandrovich Morgachev, a lieutenant colonel who used the hacking tool "X-Agent." The other Russians involved also used various pseudonyms to send phishing emails to Democratic Party affiliates.

The two-part operation started with a "spearphishing" effort in early 2016, the indictment describes. The Russians hit more than 300 people connected to the Clinton campaign and Democratic political groups.

One of those targets was Clinton campaign chairman John Podesta, whom Aleksey Viktorovich Lukashev and others spammed with a link that appeared to come from Google as a security notification but led Podesta

to a GRU-created website. Another phishing effort involved the Russians using an email address with one letter deviated from the name of a Clinton campaign member's.

The computer crimes the Russians face also accuse them of installing malware on Democratic campaign computers. That allowed them to steal passwords, record staffers' keystrokes, take screenshots and observe computer work done on fundraising and voter outreach projects, according to the indictments. They also watched a Democratic campaign committee employee access the organization's bank account information.

Though the Democratic organizations realized they were hacked by May 2016 and attempted to flush out the hackers, the Russians continued to watch the computers through their hacks until a month before the election, according to the indictment.

The then worked to distribute the documents starting in June 2016. The Russian intelligence agents had registered the website DCLeaks.com and started a Facebook page and Twitter feed claiming they were "American hacktivists." Once the DNC announced publicly it had been hacked, the Russians used the online moniker Guccifer 2.0, claiming they were a lone Romanian. They did this "to undermine the allegations of Russian responsibility for the intrusion," the indictment said. They also took steps to cover their tracks, deleting files and logs on computers.

In June 2016, Guccifer 2.0 began posting stolen documents through a Wordpress site they ran. To spread the material further, they shared stolen documents with people including a US congressional candidate, a state lobbyist, journalists, an entity known as Organization 1, which appears to be Wikileaks, and a person in touch with the Trump campaign.

It has been more than a year since the special counsel's Russia investigation began. The probe had already resulted in criminal charges against 14 Russians, five Americans and one Dutch citizen and three corporate entities. One of those people has already been sentenced and served a month in prison, while three others pleaded guilty and await sentencing.

A number of Trump associates have so far been swept up in the special counsel investigation.

Paul Manafort, Trump's campaign chairman in 2016, is currently in jail after his bail was revoked for alleged witness tampering and faces two sets of criminal charges related to his years of working as a lobbyist for pro-Russian Ukrainian politicians. He has maintained his innocence and is set to go to trial on bank fraud and other financial allegations on July 25.

Former Trump campaign official and Manafort deputy Rick Gates, former Trump campaign aide George Papadopoulos and former Trump White House national security adviser Michael Flynn have all entered guilty pleas in connection with the investigation. Gates, Papadopoulos and Flynn have all pleaded guilty to making false statements to investigators. All agreed to cooperate with the special counsel's office, but Papadopoulos' cooperation is likely to come to an end in September when he is sentenced. The four Trump associates that have been charged are not accused of helping Russia meddle in the election.

**Russian intelligence officers indicted in DNC hacking**

*CBS July 13, 2018*

Twelve Russians have been indicted by a grand jury in the special counsel probe for alleged hacking during the 2016 election, including for hacking emails of the Democratic National Committee, Deputy Attorney General Rod Rosenstein announced Friday.

Rosenstein said the 12 defendants are all members of the Russian intelligence arm GRU, and attempted to interfere with the 2016 presidential election by "spear phishing" volunteers and employees of Hillary Clinton's campaign. By allegedly doing this — tricking staffers into clicking on emails from rogue accounts — they were able to steal usernames and passwords, eventually hacking into the networks of the Democratic

National Campaign Committee and Democratic National Committee. The GRU, Rosenstein said, created and controlled the groups D.C. Leaks and Guccifer 2.0., which in 2016, posted thousands of emails from Democratic party officials.

"The object of the conspiracy was to hack into the computers of U.S. persons and entities involved in the 2016 presidential election, steal documents from those computers, and stage releases of the stolen documents to interfere with the 2016 U.S. presidential election," the indictment reads.

The indictment says that the alleged conspirators "spearphished individuals affiliated with the Clinton campaign throughout the summer of 2016," and then goes on to say that "on or about July 27, 2016, the conspirators attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office. At or around the same time, they also targeted seventy-six email addresses at the domain for the Clinton campaign."

Also on July 27, 2016, when those efforts had already been ongoing, Donald Trump expressed the hope that Russia would find Clinton's missing emails. "I will tell you this -- Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing. I think you will probably be rewarded mightily by our press," the GOP presidential nominee said at a press conference in Miami.

The indictment also claims in a related allegation that Russian officers hacked a state election board's website and stole the information of roughly 500,000 voters. The indictment also alleges the GRU officers hacked into computers belonging to a company that supplies software used to verify voter information, and targeted local and state election offices.

Rosenstein made it clear that no Americans are accused of any wrongdoing in this indictment.

"There is no allegation in this indictment that Americans knew they were corresponding with Russian intelligence officers," said Rosenstein, who also noted there is no evidence the alleged hacking had any impact on the election results.

The indictment does mention that Russians provided opposition research to a congressional candidate, although that individual is not named.

The indictment claims the conspirators, posing as Guccifer 2.0, "received a request for stolen documents from a candidate for the U.S. Congress. The Conspirators responded using the Guccifer 2.0 persona and sent the candidate stolen documents related to the candidate's opponent," the indictment reads.

The charges come just days before President Trump is set to meet with Russian President Vladimir Putin in Helsinki, Finland. Sen. Mark Warner, the vice chairman of the Senate Intelligence Committee, said Mr. Trump shouldn't be meeting with Putin one-on-one.

"There should be no one-on-one meeting between this president and Mr. Putin. There needs to be other Americans in the room," Warner told reporters Friday.

Rosenstein said he briefed Mr. Trump on the indictment earlier this week.

"I'll allow president to speak for himself," Rosenstein said when asked for Mr. Trump's response to the news. "Obviously it's important for the president to know what information we've uncovered because he's got to make very important decisions for the country. So he needs to understand what evidence we have of foreign election interference."

Hours before the DOJ announcement, in a press conference with British Prime Minister Theresa May, Mr. Trump called the Russia investigation into election meddling and any ties to Trump associates a "rigged witch hunt."

The White House Friday seized on Rosenstein's statement that the indictment doesn't include Americans, but did not condemn the Russians' alleged actions.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result. This is consistent with what we have been saying all along," White House Deputy Press Secretary Lindsay Walters said.

Back in July 2016, Mr. Trump tweeted that the "new joke in town" is Russia leaked the "disastrous DNC emails."

"The new joke in town is that Russia leaked the disastrous DNC e-mails, which should never have been written (stupid), because Putin likes me," he tweeted on July 25, 2016.

Rudy Giuliani, the lawyer who is aiding Mr. Trump in the Russia investigation, used Rosenstein's announcement as an opportunity to call on Mueller to end his investigation and declare Mr. Trump's innocence.

When a reporter in London asked Mr. Trump if he would bring up election meddling with Putin, Mr. Trump said he would.

The charges come after Mueller's investigation has already led to the indictment of 13 Russian nationals who were accused of manipulating social media.

In the face of alleged foreign interference, Rosenstein urged unity and patriotism against foreign interference.

"When we confront foreign interference in American elections, it is important for us to avoid thinking politically as Republicans or Democrats and instead to think patriotically as Americans. Our response must not depend on who was victimized," Rosenstein said in his prepared remarks.

"The blame for election interference belongs to the criminals who committed election interference," the deputy attorney general added. "We need to work together to hold the perpetrators accountable, and keep moving forward to preserve our values, protect against future interference, and defend America."

It is unclear, if not unlikely, however, that the indicted Russians will ever see a courtroom. The U.S. does not have an extradition treaty with Russia.

## 12 Russian intelligence officers indicted for hacking into DNC, Clinton campaign

*USA Today July 13th, 2018*

WASHINGTON — Twelve Russian military intelligence officers were charged Friday in a far-reaching hacking scheme that targeted the Democratic National Committee and the Clinton presidential campaign as part of the Kremlin's effort to undermine the 2016 election, the Justice Department announced.

The 11-count indictment, unveiled just days before President Donald Trump was set to meet with Russian President Vladimir Putin in Helsinki, Finland, asserts that the Russian suspects "engaged in a sustained effort" to penetrate the most sensitive repositories of information held by the Democratic Party.

Deputy Attorney General Rod Rosenstein announced the action, part of the continuing investigation into Russia's interference in the 2016 campaign by special counsel Robert Mueller, as some Democratic lawmakers called on the White House to immediately punish the Kremlin by canceling the Putin meeting.

The White House did not immediately address that demand Friday, but rather reasserted that the indictment had not implicated anyone connected to the campaign.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," White House spokeswoman Lindsay Walters said. "This is consistent with what we have been saying all along."

While Friday's announcement came as Trump was meeting with Queen Elizabeth II during his trip to the United Kingdom, Rosenstein said that he had briefed Trump earlier this week before his departure abroad.

At the heart of the case, Mueller's team charged that the Russian operatives sought to "steal documents" from the Democrat computer systems and "stage the release... to interfere with the 2016 U.S. presidential election."

The charges build on a case Mueller brought in February, charging 13 Russian nationals and three businesses – including an internet firm tied to the Kremlin – with waging "information warfare against the United States" with the goal of "spreading distrust toward the candidates and the political system."

Still, Friday's indictment contained no allegations that the actions altered the vote count or changed the outcome of the 2016 presidential elections.

"Free and fair elections are hard-fought and contentious, and there will always be adversaries who work to exacerbate domestic differences and try to confuse, divide and conquer us," Rosenstein said. "So long as we are united in our commitment to the shared values enshrined in the Constitution, they will not succeed."

Among the jarring disclosures in the 29-page indictment included the allegation that the Russian intelligence officials first sought to penetrate email accounts associated with Clinton's personal offices on July 27, 2016.

Earlier that same day, then-candidate Trump appeared to enlist Russia in a similar effort.

"Russia, If you're listening, I hope you're able to find the 30,000 emails that are missing," Trump said at the time, referring to Clinton's use of a private email server while she was secretary of State.

Also contained in Friday's court documents, federal prosecutors said that the Russian operatives in August 2016 "received a request for stolen documents from a candidate for U.S. Congress."

According to court papers, the suspects posing as online activists later sent the unnamed candidate stolen information related to the candidate's opponent.

The group also allegedly conspired to hack into computers of state election boards, secretaries of State and U.S. companies that supplied software and other technology related to election administrations. According to court papers, the personal information of at least 500,000 voters was stolen from one state election organization.

Because the Russian officials remain in Russia, it is highly unlikely that they will ever be prosecuted in the United States. Nevertheless, the U.S. action follows a practice of so-called "naming and shaming" of foreign government operatives implicated in actions against the U.S.

The indictment included charges of conspiracy, aggravated identity theft and money laundering. Federal prosecutors asserted that the Russian hackers corresponded with "several" Americans. But Rosenstein said there was no evidence that the Americans were aware that they were corresponding with Russian intelligence officers.

The deputy attorney general said the announcement of the charges were made with "no regard to politics," adding that the evidence was "sufficient" to bring the case.

The suspects, according to the indictment, were attached to two military divisions of Russia's Main Intelligence Directorate, known as the GRU — Unit 26165 and Unit 74455. In 2016, Unit 26165 operatives

allegedly launched spearphishing campaigns — sending misleading emails to targets in attempts to steal usernames, passwords and other personal information — against the Clinton campaign.

Those stolen credentials, according to federal prosecutors, were used to hack into the DCCC and the DNC. At the same time, the suspects were able to "monitor" the activities of dozens of staffers and "implant hundreds of malicious files to steal passwords and maintain access to these networks."

Democratic National Committee Chairman Tom Perez said that while the DNC was a primary target of the attack, the indictment outlines a vast disruption effort.

"Donald Trump has desperately been calling this investigation a witch hunt. But once again we have cold hard proof that he is absolutely wrong," Perez said. "This is not a witch hunt. This is not a joke. This is an attack on our democracy."

Democratic lawmakers described the charges as only further proof of what the U.S. intelligence community determined long ago: that Russia sought to tilt the election to Trump's favor.

"President Putin is an adversary who interfered in our elections to help President Trump win," Senate Minority Leader Chuck Schumer, D-N.Y., said. "President Trump should cancel his meeting with Vladimir Putin until Russia takes demonstrable and transparent steps to prove that they won't interfere in future elections. Glad-handing with Vladimir Putin on the heels of these indictments would be an insult to our democracy."

Schumer was joined in the call by a coalition of  Democrat lawmakers, including Virginia Sen. Mark Warner, the senior Democrat on the Senate Intelligence Committee.

House Democratic Leader Nancy Pelosi said the indictment highlighted "a massive, concerted operation to interfere in our elections," and she warned that the Kremlin "will do so again in the fall."

"Strong, immediate action is needed to secure our state election systems," Pelosi said.

She continued: "The stakes for the upcoming Trump-Putin meeting could not be higher. President Trump must demand and secure a real, concrete and comprehensive agreement that the Russians will cease their ongoing attacks on our democracy.  Failure to stand up to Putin would constitute a profound betrayal of the Constitution and our democracy."

Arizona Sen. John McCain, the Republican chairman of the Armed Services Committee, also urged Trump to use Friday's indictment to confront the Russian leader.

"If President Trump is not prepared to hold Putin accountable, the summit in Helsinki should not move forward," McCain said.

Republican House Foreign Affairs Committee Chairman Ed Royce of California, meanwhile, argued that the charges demonstrate that the Trump administration was holding Russia "accountable."

"For years, we've known about the Kremlin's campaign to weaponize information and chip away at our institutions," Royce said. "And yet for years, we have not done enough to counter it. I'm glad that's begun to change, thanks in part to Congress, but there's much more to be done."

Sen. Ben Sasse, R-Neb., said the criminal charges should serve to unite Americans to push back against the Kremlin's disruption campaign.

"This is not a Republican or a Democrat view -- it is simply the reality," Sasse said. "All patriotic Americans should understand that Putin is not America's friend, and he is not the president's buddy."

**Read Mueller's full indictment against 12 Russian officers for election interference**

*PBS July 13th, 2018*

Twelve Russian intelligence officers were accused Friday of trying to interfere in the 2016 presidential elections, including a hack of Democratic National Committee.

The allegations came in the latest indictment from special counsel Robert Mueller's investigation into Russian interference in the elections and possible ties to President Donald Trump's campaign. The announcement comes days before Trump's scheduled meeting with Russian President Vladimir Putin; the president pledged this morning during his visit with British Prime Minister Theresa May to raise the issue of election meddling with Putin.

According to the indictment, the officers worked for a military agency known as "GRU," which conspired to hack into computers of those working on the elections with the goal of stealing and releasing documents. That includes the DNC, but also computers associated with the Democratic Congressional Campaign Committee as well as those of volunteers and employees of the Hillary Clinton campaign.

Starting in June 2016, they released tens of thousands of these documents using online pseudonyms, such as "Guccifer 2.0" and "DC Leaks." They used a network of computers around the world, a system paid for with cryptocurrency, to conceal their identities.

They also broke into the computers of those charged with overseeing elections, including state election officials and secretaries of state, as well as companies in charge of election technology and software.

Deputy Attorney General Rod Rosenstein said he has no evidence that the hacking changed the outcome of the 2016 election, nor that "any American was a knowing participant in the alleged unlawful activity."

**Russian officers indicted for allegedly hacking Clinton campaign, DNC emails**

*Fox News July 13th, 2018*

A federal grand jury has indicted 12 Russian intelligence officers for allegedly hacking emails from the Hillary Clinton campaign and Democratic Party during the 2016 election, the Justice Department announced Friday.

"The internet allows foreign adversaries to attack America in new and unexpected ways," Deputy Attorney General Rod Rosenstein said during a press conference.

All 12 defendants are members of GRU, the Russian intelligence agency.

The case stems from Special Counsel Robert Mueller's probe into Russia's efforts to interfere in the 2016 presidential election. It comes as President Trump plans to meet Russian President Vladimir Putin for a summit in Helsinki on Monday.

The indictment amounted to the clearest allegation yet of Russian meddling in the election, blaming Moscow for the email hacking scandal that rocked the 2016 race by revealing embarrassing and politically damaging discussions by major Democrats. The charges swiftly fueled calls from Democratic lawmakers for Trump to cancel his Putin summit.

But as Trump continues to describe the probe as a "witch hunt," the White House downplayed the allegations.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," said Lindsay Walters, the deputy White House press secretary. "This is consistent with what we have been saying all along."

Of the 12 defendants, 11 are charged with conspiracy to commit computer crimes, eight counts of aggravated identity theft and conspiracy to launder money. Another is charged with a separate conspiracy to commit computer crimes.

The 29-page indictment says starting in March 2016, the Russian agents used "a variety of means to hack the email accounts of volunteers and employees" of Hillary Clinton's campaign. Her campaign chairman, John Podesta, famously had his emails leaked during the campaign.

They also targeted campaign committees, like the Democratic National Committee and the Democratic Congressional Campaign Committee, the indictment said.

"The conspirators covertly monitored the computers of dozens of DCCC and DNC employees, implanted hundreds of files containing malicious computer code and stole emails and other documents from the DCCC and DNC,"  it read.

By April 2016, according to the documents, the defendants began to release the hacked materials to the public by using fictitious online personas like DCLeaks and Guccifer 2.0.

The indictment comes as Mueller's team has investigated whether anyone associated with the Trump campaign assisted the Russians.

But during his press conference, Rosenstein said, "there is no allegation in this indictment that any American citizen committed a crime."

He also said, "There is no allegation that the conspiracy changed the vote count or affected any election result. The special counsel's investigation is ongoing."

Director of National Intelligence Dan Coats, reacting to the indictment and the broader cyber threat on Friday, said there is "not yet" this kind of electoral interference happening in the midterms – but warned history could repeat itself.

"In regards to state actions, Russia has been the most aggressive foreign actor. No question," he said. "We are not yet seeing the kind of electoral interference in specific states and voter databases that we experienced in 2016. However, we fully realize that we are just one click away … from a similar situation repeating itself."

Oleksandr Danylyuk, a military and intelligence expert on Russian information operations, told Fox News he believes Russia "does not stop its active measures in the inter-election period."

"Politicians of both camps should understand that the United States is under a hybrid attack," said Danylyuk, who chairs the Center for Defense Reforms in Ukraine. "In this regard, they have to put state interests above their party interests."

He also called on journalists to be aware of how they can be used.

"Much of the kompromat will be provided by Russian proxies directly to American politicians and journalists," Danylyuk said. "They must fight the temptations to use this information without checking its reality."

The Rosenstein announcement came at the same time Trump was meeting with Queen Elizabeth II in England, with plans to meet Putin for a summit on Monday. Trump has previously cited Putin's denials of election interference, while saying he would like their two countries to get along.

"President Trump should cancel his meeting with Vladimir Putin until Russia takes demonstrable and transparent steps to prove that they won't interfere in future elections," Senate Minority Leader Chuck

Schumer, D-N.Y., said Friday. "Glad-handing with Vladimir Putin on the heels of these indictments would be an insult to our democracy."

Rosenstein said he briefed the president on the charges this week.

Though the indictment listed the Democratic groups, Rosenstein made a point of not naming the political affiliation of the hacked organizations during his press statement, saying it's important to think "patriotically" and not politically in the face of such threats.

Florida Rep. Debbie Wasserman Schultz, who served as chairman of the Democratic National Committee during the time period, took aim at Trump in a statement.

"I'm pleased that the Justice Department is following the facts wherever they may lead, despite Donald Trump's dangerous distortions and his refusal to acknowledge the conclusions reached by the American intelligence community," she said.

Russian individuals have previously been indicted as part of the case. In February, Mueller brought a case against 13 Russians and three Russian companies who are accused of setting a "strategic goal to sow discord in the U.S. political system, including the 2016 presidential election."

In that case, the defendants are accused of spreading derogatory information about Clinton, denigrating Republican candidates Ted Cruz and Marco Rubio -- and ultimately supporting Democratic candidate Bernie Sanders and then-Republican candidate Donald Trump.

**Mueller indicts 12 Russians for DNC hacking as Trump-Putin summit looms**

*POLITICO July 13th, 2018*

Special counsel Robert Mueller indicted 12 Russian military officials on Friday and accused them of hacking into two Democratic Party computer systems to sabotage the 2016 presidential election.

Deputy Attorney General Rod Rosenstein announced the indictment, filed in federal district court in Washington, just days before a scheduled Monday summit in Helsinki between President Donald Trump and Russian President Vladimir Putin. U.S. intelligence agencies have assessed that Putin ordered a Russian effort to manipulate the 2016 election in Trump's favor.

Rosenstein said the Russians stole and released Democratic documents after planting malicious computer codes in the network of the Democratic National Committee as well as the Democratic Congressional Campaign Committee. The Russians also illegally downloaded data related to some 500,000 voters from a state database, he charged.

While many of the indictment's details confirmed previous news reports and other assessments, it dramatically shifts the context for Trump's upcoming meeting with Putin, whom U.S. intelligence services have concluded was behind the 2016 election interference scheme. Senate Democratic leader Chuck Schumer quickly called on Trump to cancel the planned meeting.

Speaking at a press conference at Justice Department headquarters in Washington, Rosenstein said he briefed Trump about the upcoming criminal charges earlier this week. He said the indictment's timing was "a function of the collection of the facts, the evidence, and the law and a determination that it was sufficient to present the indictment at this time."

"I'll let the president speak for himself," Rosenstein told reporters when asked if Trump—who just this morning in Great Britain again blasted the Russia investigation as a "rigged witch hunt"—supported the latest step in the nearly 14-month old Mueller probe.

"Obviously it was important for the president to know what information we've uncovered because he's got to make very important decisions for the country. So he needs to understand what evidence we have for an election interference," he added.

Rosenstein added that the indictment does not allege that any U.S. citizen committed a crime, nor that "the conspiracy changed the vote count or affected any election result."

White House officials and Trump allies declared Rosenstein's statement as validating Trump's claim that there was "no collusion" between his campaign and Moscow.

"The indictments Rod Rosenstein announced are good news for all Americans," said Trump's personal lawyer, Rudy Giuliani. "The Russians are nailed. No Americans are involved. Time for Mueller to end this pursuit of the President and say President Trump is completely innocent."

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," White House spokeswoman Lindsay Walters said. "This is consistent with what we have been saying all along."

However, during a question-and-answer session with reporters, Rosenstein was more cautious. He said the lack of any claim that the hacking affected vote totals or the outcome of the election was not a conclusion on whether that happened, but rather something beyond the purview of federal prosecutors.

"We know the goal was to have an impact on the election. What impact they may have had or what their motivation may have been—independently of what's required to prove this offense—is a matter of speculation," the deputy attorney general said. "That's not our responsibility."

The indictments are the latest charges in a probe that has already netted guilty pleas from three former Donald Trump campaign aides, two of them for lying to the FBI about their contacts with Russians during or after the 2016 campaign. Mueller is also investigating the president for potential obstruction of justice, related in part to his April 2017 firing of FBI Director James Comey, who was then overseeing the federal government's burgeoning Trump-Russia probe.

Although the 11-criminal count indictment was obtained by prosecutors from Mueller's office, Rosenstein said plans are to hand the case off to Justice's National Security Division "while we await the apprehension of the defendants." That possibility seems remote—however Democrats on Friday called on Trump to demand their extradition to when he meets with Putin.

While Rosenstein stood alone on the podium five months ago when he announced another Mueller indictment of Russians alleged to have used social media to manipulate Americans during the 2016 election, on Friday he was flanked by two other officials: Assistant Attorney General for National Security John Demers and Rosenstein's top deputy, Ed O'Callaghan. Demers heads the division assigned to take over the case, while O'Callaghan has been overseeing Mueller' probe.

Mueller, who has been the focus of intense attacks and vitriol from Trump and his allies, was again absent as the new charges were announced.

Several Trump allies said they welcomed tough action against Russian election meddlers. "This is good stuff. This is what they ought to be doing," said Trump's personal lawyer John Dowd, who has often criticized Mueller's focus on Trump and his associates.

But appearing next to British Prime Minister Theresa May outside London hours before the indictment was publicly unveiled, Trump had complained that the Mueller probe has complicated his effort to befriend the Russian leader.

"I think that really hurts our country and it really hurts our relationship with Russia," he said. "I think that we would have a chance to have a very good relationship with Russia and a very good chance—a very good relationship with President Putin. I would hope so."

The indictment alleges that the Russian military officials in 2016 sent spearphishing emails to volunteers and employees of Clinton's campaign, including its chairman, John Podesta. Through those tactics, they stole user names and passwords from several people and used the information to both steal emails and hack into other Clinton campaign computers, according to the charges. The Russians allegedly funded their online hacking network with cryptocurrency.

Prosecutors say Russian officials also gained access to computer networks at the DCCC and DNC, where they covertly monitored the online activity of dozens of employees while implanting hundreds of files of malicious computer code to steal passwords and stay on their networks. The techniques allowed the Russians to get into cloud-based services in September 2016 that contained "test applications related to the DNC's analytics," the indictment says. From there, the hackers created backup files and then moved the backups to other cloud accounts the hackers controlled, the charges say.

In late May and early June, the indictment adds, the Russians took "countermeasures" to maintain access to DNC and DCCC networks after the Democratic groups hired a security company to fight off the intrusions. Those measures included attempts to "delete traces of their presence on the DCCC network using the computer program CCleaner. They also spent seven hours trying to reactive a hacking tool known as "X-Agent" that the security company had disabled, according to the indictment.

According to the indictment, the Russians employed a wide variety of tactics, including the creation of a fake website that mimicked the progressive ActBlue.com with the goal of siphoning contributions from Democratic donors. The Russians allegedly used stolen login credentials to insert the fraudulent link on the Democratic Congressional Campaign Committee's website, where donors would click on it.

On April 6, 2016, the Russians allegedly sought to access the emails of more than 30 Clinton campaign officials, creating a fake email address that nearly matched one of the campaign officials and including an attachment that appeared to be about Clinton's poll numbers.

"In fact this link directed the recipients' computers to a GRU-created website," the indictment alleges.

The charges filed in U.S. District Court in Washington against the Russians include criminal conspiracy to commit offense against the U.S. through cyber operations and attempting to hack into state election officials, aggravated identity theft and money laundering.

Democrats have long speculated that Moscow received guidance from Americans, possibly even ones within the Trump campaign, about how to which political targets to exploit and what kinds of leaked information would most resonate with swing voters.

Key figures close to Trump—including his son Donald Trump Jr. and his former political adviser Roger Stone—have admitted to communicating with Kremlin-linked individuals and WikiLeaks, the group that posted many of the Democrats' hacked emails.

The indictment describes communications between an unnamed person and Guccifer 2.0, an online persona the indictment calls a cover for the GRU hackers. Guccifer 2.0 released tens of thousands of emails through DC Leaks and Wikileaks, per the indictment.

After Guccifer 2.0 posted the stolen documents, the persona contacted a person identified in the indictment as "a person who was in regular contact with senior members of the presidential campaign of Donald J. Trump." The communications match text messages to and from Stone that have been previously reported and which Stone himself, who says he did nothing wrong, posted on his personal website.

The Russians asked Stone about the info they posted on the Democrats' turnout model and Stone replied it was "pretty standard," the indictment alleges.

Mueller's prior indictments have also revealed that George Papadopoulos, a Trump campaign foreign policy aide who pleaded guilty to lying to the FBI, was told by a Kremlin-linked professor that the Russian government had "dirt" on Clinton in the form of "thousands of emails" a full three months before the DNC hack became public.

Mueller has also indicted Russian Internet "trolls," not directly employed by the Russian government, for using fake American personas to communicate with "unwitting" Trump aides and U.S. individuals as they gathered information on the American political landscape.

While lawyers for one of the Russian companies fighting Mueller's earlier charges has pushed back in federal court, It's still considered unlikely any of the latest spate of charged hackers will actually end up in a U.S. court.

But American officials see indictments of overseas hackers as a way of shaming foreign governments. In recent years, the Justice Department has similarly filed charges against Chinese and Iranian officials for cyber intrusions.

Even before the indictments landed, Trump said he would raise with Putin the issue of Russian election interference. He has done so at least once before, during the leaders' first meeting in at the G20 summit in Hamburg, Germany last July.

After that meeting, Trump reported that Putin had denied the charges, and Trump publicly declared that it was "time to move forward." Russia's foreign minister separately claimed that that Trump "accept[ed]" Putin's insistence that the Russian government did not meddle in the election.

Trump has often cast doubt on whether Russia meddled in the election at all. During a 2016 presidential debate with Clinton, he said the election meddling could have been the work of China or even "somebody sitting on their bed, that weighs 400 pounds."

The DNC was first breached in the summer of 2015, according to CrowdStrike, the cyber firm hired by the committee after the digital break-in.

The culprit, the firm said, was "Cozy Bear," a Russian intelligence-linked hacker group that had previously infiltrated the White House and State Department. The FBI first reached out to the DNC in September to alert staffers that they were under digital siege. But the tech-support contractor that picked up the phone thought it might be a prank and the committee didn't follow through. That allowed the Russians free rein to explore DNC servers, collecting login credentials and lifting private emails and documents.

The following April, another group, the Russian military-aligned "Fancy Bear," joined its counterpart, apparently without any coordination between the two. Fancy Bear started collecting much of the same information, according to researchers.

Weeks later, the DNC caught on to the digital rummaging — and it quickly dawned on officials that they might have a catastrophe on their hands. In June, the DNC went public, blaming Russia for the digital espionage.

But what came next caught everyone — including counterintelligence veterans — off guard. The day after the DNC revealed it had been compromised, an online persona that went by the name Guccifer 2.0 popped up, claiming to be the DNC hacker and posting a sampling of documents stolen from the committee's servers.

What first appeared to be a confusing oddity quickly became a dominant force in the 2016 election. Guccifer 2.0 proceed to disseminate reams of documents, shopping them to journalists and bloggers around the country in an effort to destabilize both local and national elections. Other mysterious websites, such as DCLeaks.com, suddenly appeared, posting caches of purloined emails and documents that the media eagerly consumed and converted into splashy headlines. WikiLeaks, the pro-transparency activist group, also started posting stolen DNC emails in July.

Separately, the Clinton campaign was rocked by its own data breach. In March 2016, Russian hackers infiltrated campaign chairman John Podesta's personal Gmail account, gaining access after Podesta clicked on a link in a fake email instructing him to change his password.

Six months later, WikiLeaks started Podesta's entire Gmail catalogue online in small, daily batches.

Two months after the 2016 election, a declassified report issued by the CIA, FBI and NSA — at President Barack Obama's request — stated with "high confidence" that Russian military intelligence had used the Guccifer 2.0 persona, DCLeaks.com and WikiLeaks to release its hacked documents.

The leaks had a quick political impact: In July 2016, Florida Rep. Debbie Wasserman Schultz resigned as DNC chairwoman after the party's national convention, a casualty of a batch of 20,000 stolen emails posted on WikiLeaks that suggested bias against the political committee against Clinton's primary rival, Bernie Sanders.

Trump gleefully spotlighted the Democratic divide. And while Sanders publicly made amends with Clinton, the leaks fueled lingering suspicion among his supporters, some of whom post-election studies and polls show stayed home that November or even voted for Trump.

The Clinton campaign leaks also became a regular subject in the American media, which picked up on everything from portions of Clinton's private speeches to Wall Street bankers to Podesta's recipe for "creamy" risotto. The omnipresent headlines distracted and demoralized Clinton's team.

Trump reveled in the chaos. "I love WikiLeaks!" he proclaimed at one October 10 rally, waving paper copies of hacked emails in the air. "This WikiLeaks is like a treasure trove!" he said later that month.

Clinton supporters also say the leaked Podesta emails blunted the fall out from two bombshell news stories that were damaging for Trump. WikiLeaks' first post of Podesta's communications came just half an hour after The Washington Post released the "Access Hollywood" videotape of Trump bragging about sexually assaulting women. That same day, the Obama administration took the unprecedented step of accusing Russia of deploying its hackers to meddle with the U.S. election.

"WikiLeaks is unfortunately now practically a fully owned subsidiary of Russian intelligence," Clinton told an Australian broadcaster a week after the Podesta emails started appearing on the site.

Still, WikiLeaks founder Julian Assange insisted there was "no proof" Russia was behind the stolen documents that ended up on his website.

In a statement on Friday, Wasserman Schultz applauded the latest Mueller indictments. "The Democratic National Committee was the first major target of the Russian attack on our democracy, and I strongly believe that every individual who helped carry it out—foreign or domestic—should be held accountable to the fullest extent of the law," she said. "I'm pleased that the Justice Department is following the facts wherever they may lead, despite Donald Trump's dangerous distortions and his refusal to acknowledge the conclusions reached by the American Intelligence Community."

**Mueller Probe Indicts 12 Russians in Hacking of DNC and Clinton Campaign**

*WSJ July 14th, 2018*

Special counsel Robert Mueller charged a dozen Russian intelligence officers on Friday with hacking the computers of Democratic organizations and ensuring the pilfered information became public, putting Russia's interference in the 2016 election front and center as President Donald Trump prepares to meet President Vladimir Putin in Helsinki.

The detailed 29-page indictment, which identified the alleged operatives by name and rank, is the latest set of charges in Mr. Mueller's wide-ranging investigation into the Kremlin's electoral meddling.

Mr. Trump, who has expressed skepticism that Russia was involved in the hacking, told reporters before the indictment that he planned to raise the issue with Mr. Putin.

In a tweet Saturday morning issued from his golf resort in Scotland, Mr. Trump faulted the Obama administration for the Russian hacking alleged in the indictment.

"The stories you heard about the 12 Russians yesterday took place during the Obama Administration, not the Trump Administrations," he wrote. "Why didn't they do something about it, especially when it was reported that President Obama was informed by the FBI in September, before the Election?"

Mr. Obama in September confronted Mr. Putin over election meddling.

The indictment lays out a vivid picture of a powerful nation deploying the latest technological trickery in a secretive effort to subvert the U.S. election. It alsooutlines notable details, including the way operatives allegedly used false Google security alerts to hoodwink Democratic staffers or created emails that differed by one letter from the name of a staffer of Democratic candidate Hillary Clinton.

Russia doesn't extradite its citizens to face trial in the U.S., so the defendants aren't likely to see the inside of an American courtroom, though they may be restricted in their ability to travel. Rather, the document lays out a broad case that the Russian government directed an array of crimes as it sought to disrupt the 2016 campaign.

In announcing the case, Deputy Attorney General Rod Rosenstein cited the deep partisan divide in the U.S. between Republicans and Democrats, and encouraged Americans to assess the charges on their merits and not through a political lens.

"The Internet allows foreign adversaries to attack America in new and unexpected ways," Mr. Rosenstein said. "Our response must not depend on who was victimized."

A White House spokeswoman noted that the indictment cited no wrongdoing by Americans and didn't allege that any votes were affected. "This is consistent with what we have been saying all along," spokeswoman Lindsay Walters said.

Russia on Friday repeated its previous denials of electoral meddling, saying the indictment was designed to "spoil the atmosphere" of the Trump-Putin meeting.

Democrats urged Mr. Trump to cancel the summit and refrain from meeting Mr. Putin until Russia takes responsibility and pledges to refrain from future election interference. They were joined by Sen. John McCain (R., Ariz.), who said on Twitter that "if President Trump is not prepared to hold Putin accountable, the #HelsinkiSummit should not move forward."

The indictment depicted a determined effort by two units of the Kremlin's intelligence directorate, called the GRU, to steal tens of thousands of emails and documents from Mrs. Clinton's campaign and Democratic groups, distribute them through fake online personas and pay for it through mining digital currency. Two of the defendants were also accused of hacking computers of those responsible for administering elections, including secretaries of state.

The hacked emails, from the account of Clinton campaign Chairman John Podesta and others, led to a series of embarrassing news stories at the height of the 2016 campaign.

According to the indictment, the Russian officers targeted more than 300 people associated with the Clinton campaign, the Democratic Congressional Campaign Committee and the Democratic National Committee, luring them with fake emails.

The hackers sent such a "spear-phishing" email to Mr. Podesta on March 19, 2016. Mr. Podesta followed the fake security instructions in the message, giving the hackers the ability to steal more than 50,000 of his emails, the indictment said.

Meanwhile, the officers were also targeting the DCCC, and obtained the credentials of one employee to access the network. That gave them access to at least 10 computers and the ability to monitor employees' computer activity and steal passwords. Using that information, they successfully hacked into the DNC computers, ultimately gaining access to 33 DNC computers.

Once inside the network, Russian operatives demonstrated a focused effort to find files on particular topics, the indictment said. Shortly after breaching the DCCC in April 2016, the alleged conspirators searched for files that included the words "hillary," "trump" or "cruz." A folder labeled "Benghazi Investigations" was also copied, the indictment said.

This was around the time that Trump foreign policy adviser George Papadopoulos learned that Russia possessed "dirt" on Mrs. Clinton, according to documents filed in connection with his plea agreement with Mr. Mueller's team.

By May 2016, the Democratic groups hired a cybersecurity company to address the breach, but the GRU officers continued to try to maintain their access to the networks, and remained on the DNC network until October 2016, the indictment said.

On July 27, 2016, the officers tried for the first time to spear-phish email accounts used by Mrs. Clinton's personal office, the indictment said. Earlier that day, Mr. Trump had invited Russia to unearth missing emails from her time as secretary of state, telling reporters, "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing."

The indictment alleges that two of the main conduits of the stolen data, Guccifer 2.0 and DCLeaks, were created by the Russian government. Guccifer 2.0 claimed to be a lone Romanian hacker, which the indictment alleges was intended to "undermine allegations of Russian responsibility for the intrusion."

The Russians later began funneling information to "Organization 1," which isn't named in the indictment but is identifiable as Wikileaks.org, which published thousands of emails belonging to Mr. Podesta and the DNC.

In August 2016, the Russian officers posing as Guccifer 2.0 communicated with a person "who was in regular contact" with "senior members" of the Trump campaign, telling the person, "please tell me if i can help u anyhow…it would be a great pleasure to me." The indictment doesn't name the person, but former Trump adviser Roger Stone has posted on his website a text exchange with Guccifer that corresponds to language included in the indictment.

Eleven of the GRU officials are charged with conspiring to commit computer crimes, launder money and commit identity theft through the DNC and Clinton hacks. One of the officers, along with a 12th individual, were also accused of trying to hack into state election agencies and voting software companies.

Specifically, "Russian GRU officers hacked the website of a state election board and stole information about 500,000 voters," Mr. Rosenstein said. There is no allegation that information was used to alter vote totals.

Friday's indictment follows previous election-interference accusations Mr. Mueller has leveled at Moscow. In February, a federal grand jury indicted three Russian companies and 13 Russian citizens on charges of engaging in a widespread effort to meddle in the 2016 campaign through social-media messages, invented fake personas and staged rallies.

Before Friday's indictment, Mr. Mueller's office had publicly filed cases against 20 people and three companies, and had obtained five guilty pleas, including from Mr. Trump's first national security adviser, Michael Flynn. Mr. Flynn pleaded guilty last year to lying to the FBI about his communications with the Russian ambassador to the U.S.

Director of National Intelligence Dan Coats, speaking about Russian cyber influence at the Hudson Institute think tank shortly after the indictment was released, said U.S. intelligence agencies continue to see Russia attempting to create new social media accounts that pose as Americans in order to inflame political and social divisions.

Intelligence agencies haven't yet seen Russia attempt to hack election infrastructure as it did in the 2016 election, Mr. Coats said. "However," he added, "we fully realize that we are one click away from a similar situation repeating itself."

## U.S. accuses Russian spies of 2016 election hacking as summit looms

*Reuters July 13th, 2018*

WASHINGTON (Reuters) - A federal grand jury charged 12 Russian intelligence officers on Friday with hacking Democratic computer networks in 2016, in the most detailed U.S. accusation yet that Moscow meddled in the presidential election to help Republican Donald Trump.

The indictment, which alleges a wide-ranging conspiracy involving sophisticated hacking and staged releases of documents, raises the stakes for a summit next week between President Trump and Russian President Vladimir Putin.

Officers of Russia's military intelligence agency, the GRU, covertly monitored computers of Democratic candidate Hillary Clinton's campaign and Democratic campaign committees, and stole large amounts of data, the indictment said.

"In addition to releasing documents directly to the public, the defendants transferred stolen documents to another organization, not named in the indictment, and discussed timing the release of the documents in an attempt to enhance the impact on the election," Deputy U.S. Attorney General Rod Rosenstein told a news conference.

Friday's indictment was secured by Special Counsel Robert Mueller as part of his probe into Russian involvement in the election. It was the first by Mueller that directly charges the Russian government with meddling in the election, which Trump unexpectedly won. The Kremlin denies it interfered.

Rosenstein said he briefed Trump this week about the indictment. It contains no allegations that U.S. citizens committed a crime, he said.

A few hours before the indictments were announced, Trump called the Mueller investigation a "rigged witch hunt" that is hurting the United States' relationship with Russia.

The announcement of the indictment came at an awkward time for Trump, who met Britain's Queen Elizabeth at Windsor Castle on Friday for tea during a visit to Britain.

Trump said he would "absolutely, firmly ask" Putin about the meddling at their planned meeting in Helsinki on Monday.

The Russian Foreign Ministry said on Friday that the indictment aimed to damage the atmosphere before the summit. It said there was no evidence that the 12 people charged were linked to military intelligence or hacking.

Several prominent Democratic lawmakers called on Trump to cancel the summit.

"In light of this stunning indictment by the Justice Department that these Russian conspirators attacked our democracy and were communicating with Americans to interfere in our election, President Trump should immediately cancel his meeting with Vladimir Putin," said Senator Jack Reed, the ranking Democrat on the Senate Armed Services Committee.

**PROPAGANDA, HACKING**

Mueller is investigating whether Trump's campaign colluded with Russia and whether the president has unlawfully sought to obstruct the Russia investigation.

U.S. intelligence agencies concluded in January 2017 that Russia, in action ordered by Putin, used propaganda and hacking to meddle in the election to harm Clinton and eventually help Trump.

But the 29-page document describes several incidents in which the alleged Russian hackers, using the internet personas DCLeaks and Guccifer 2.0, were in contact with Americans.

It says Russian operatives provided direct assistance to a candidate for the U.S. Congress, who in August 2016 requested and received from Guccifer 2.0 documents stolen from the DCCC about their opponent. The candidate and the person's party affiliation were not identified.

That same month, the indictment says, "the Conspirators, posing as Guccifer 2.0, sent a reporter stolen documents pertaining to the Black Lives Matter movement," which was a sensitive political issue for the Democratic Party.

Deputy U.S. Attorney General Rod Rosenstein announces grand jury indictments of 12 Russian intelligence officers in special counsel Robert Mueller's Russia investigation during a news conference at the Justice Department in Washington, U.S., July 13, 2018. REUTERS/Leah Millis

The reporter, who was not identified, "responded by discussing when to release the documents and offering to write an article about their release."

The indictment says the Russian operatives wrote to a unnamed person "who was in regular contact with senior members" of the Trump campaign. Trump ally Roger Stone told CNN he "probably" was the person referred to in the indictment.

The indictment says the Russian operatives told the person it would be a "great pleasure" to help them and later asked their opinion about a stolen DCCC document posted online. "(P)retty standard," the person responded.

Stone denied passing any stolen emails to WikiLeaks. He said in a statement to Reuters: "The indictments today show I did not conspire with any of the defendants to do the hacking, distribute the stolen emails or aid them in anyway."

 **"RUSSIANS ARE NAILED"**

A former federal prosecutor, Renato Mariotti, raised the question of the next steps in the probe.

"The open question is whether Americans were involved in this and will they be charged. You can certainly imagine a subsequent indictment in the future of an American of being part of this conspiracy," Mariotti said.

The indictment says that on or about July 27, 2016, the Russians attempted for the first time to break into email accounts "at a domain hosted by a third-party provider and used by Clinton's personal office. At or around the same time, they also targeted 76 email addresses at the domain of the Clinton Campaign."

The same day, candidate Trump told a news conference: "Russia if you are listening I hope you're able to find the 30,000 (Clinton) emails that are missing," referring to emails from a private server used by Clinton when she was secretary of state.

The indictment documents extensive cooperation between the Russian hackers and the unnamed "Organization 1."

That group appears to match WikiLeaks, which released large numbers of hacked Democratic Party emails during the 2016 campaign.

On July 22, 2016, Organization 1 "released over 20,000 emails and other documents stolen from the DNC network by the Conspirators," the indictment said. That matches the date that a WikiLeaks began publishing internal DNC documents.

WikiLeaks, which was not indicted, did not immediately respond to a request for comment.

In June 2016, "Organization 1 sent a private message to Guccifer 2.0 to '(s)end any new material (stolen from the DNC) here for us to review and it will have a much higher impact than what you are doing," the indictment said.

Trump lawyer Rudolph Giuliani, in a tweet, said the indictments showed it was time to end the special counsel's probe.

"The indictments Rod Rosenstein announced are good news for all Americans. The Russians are nailed. No Americans are involved. Time for Mueller to end this pursuit of the President and say President Trump is completely innocent," Giuliani said.

Mueller has secured indictments against several former Trump campaign aides, including former campaign chairman Paul Manafort and former White House national security adviser Michael Flynn.

In February, Mueller charged 13 Russians and three Russian companies in an elaborate conspiracy to interfere in the election. That indictment said the Russians adopted false online personas to push divisive messages, traveled to the United States to collect intelligence and staged political rallies while posing as Americans.

**Russian Intelligence Officers Have Been Indicted For Hacking Hillary Clinton's Presidential Campaign**

*BuzzFeed News July 13th, 2018*

Twelve Russian military officers were indicted Friday by a federal grand jury for hacking Hillary Clinton's presidential campaign and two Democratic organizations — marking the latest charges to come out of special counsel Robert Mueller's investigation.

The defendants, all members of the Russian intelligence agency GRU, are accused of conspiring to hack into computer networks, steal documents, and orchestrate their release with the goal of interfering with the 2016 presidential election.

Although the Russian defendants communicated with unnamed Americans, according to the indictment, there is no allegation in the charging papers that any American citizen knew they were participating in unlawful activity or that they were communicating with Russian intelligence. The charging papers indicate

that the defendants were in touch with an unnamed person who was in contact with senior members of the Trump campaign.

The indictment also alleges a scheme to hack into state government networks to steal voter information. According to charging papers, hackers stole the personal information of more than 500,000 voters from the website of an unidentified state board of elections, including names, addresses, partial Social Security numbers, birthdates, and driver's license numbers. The indictment doesn't specify what happened to that information, and Deputy Attorney General Rod Rosenstein did not elaborate when asked about it on Friday. Rosenstein said there was no evidence that the alleged criminal activity affected vote counts or election outcomes.

At a press conference on Tuesday announcing the indictment, Rosenstein warned against public speculation about federal investigations.

"I want to caution you that people who speculate about federal investigations usually do not know all of the relevant facts. We do not try cases on television or in congressional hearings. Most anonymous leaks are not from the government officials who actually conduct investigations," Rosenstein said in prepared remarks. "We follow the rule of law, which means that we follow procedures and reserve judgment. We complete our investigations and evaluate all of the evidence before we reach any conclusion."

Rosenstein said he had briefed President Donald Trump about the indictment. Asked about Trump's repeated characterization of Mueller's investigation as a "witch hunt," Rosenstein said he could only comment on the evidence. When charges are filed, he said, they represent "a determination by prosecutors and agents, without regard to politics, that we believe the evidence is sufficient to justify the charges."

Although the case came out of Mueller's investigation, Rosenstein said it would be transferred to the Justice Department's National Security Division.

Mueller's investigation is ongoing, Rosenstein said Friday. White House spokesperson Lindsay Walters put out a statement highlighting Rosenstein's comments that no Americans were accused of criminal activity and that there was no allegation that votes were affected.

"Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result. This is consistent with what we have been saying all along," Walters said.

Responding to news of the latest charges, Trump's personal lawyer Rudy Giuliani tweeted, "Time for Mueller to end this pursuit of the President and say President Trump is completely innocent."

The charges come as Trump will meet face-to-face with Russian President Vladimir Putin in Finland on Monday. Trump has in the past defended Russia and said he believes Putin when Putin said he didn't meddle in the election.

"I don't think anybody knows it was Russia that broke into the DNC. She's saying Russia, Russia, Russia. Maybe it was. I mean, it could be Russia, but it could also be China, but it could also be lots of other people, it also could be someone sitting on their bed that weighs 400 pounds, OK?" Trump said in September 2016.

In a brief, hastily organized press conference, Sen. Mark Warner, the ranking member of the Senate Intelligence Committee, commended the Mueller investigation, which he said had resulted in "direct evidence of Russian agents interfering in our elections." He said a "vast majority" of the information from today was new, at least to that level of specificity, and he stated his surprise at the information.

"What is remarkable about special prosecutor Mueller's work was the level of specificity to identify the actual Russian spies who specifically interfered in our state's election systems, who hacked into the DNC, who hacked into the Democratic Congressional Campaign Committee, who hacked into John Podesta's

emails. That's pretty good investigation work by Mueller and his team," Warner said. He spent time criticizing the White House's attitude toward Russia, and called on Trump to stop taking one-on-one meetings with Putin, expressing a fear that Trump could be taken advantage of.

According to the indictment, as of at least March 2016 the GRU officers had launched a sustained effort to hack into the computer networks of the DNC, Clinton's campaign, and the Democratic Congressional Campaign Committee. That included hacking the email account of Clinton's campaign chair, John Podesta.

Within months, the defendants are accused of having staged the release of tens of thousands of stolen documents. According to the indictment, the officers registered a domain, DCLeaks.com, and created the "fictitious persona" Guccifer 2.0, to facilitate the release of documents. When the DNC announced it had been hacked in June 2016, prosecutors say the defendants created Guccifer 2.0 to falsely make it seem as though it was the work of a single Romanian hacker. They also allegedly used the Guccifer 2.0 persona to release documents through the website of an additional unnamed entity, referred to as "Organization 1."

According to the indictment, the defendants, through the Guccifer 2.0 persona, communicated with an unidentified person "who was in regular contact with senior members" of the Trump campaign, asking what they thought about the released documents and offering to send information. The charging papers also alleged that the defendants, via Guccifer 2.0, also communicated with an unnamed US congressional candidate, a state lobbyist, and a reporter.

The indictment alleges that the GRU officials used spear-phishing to target volunteers and employees of Clinton's campaign. They allegedly were able to steal the usernames and passwords of numerous individuals, and then use those credentials to steal emails and maintain access. The defendants allegedly sent Podesta a "spoofing" email that was made to look like a security notification from Google, instructing the recipient to click on a link. According to the indictment, the hackers stole more than 50,000 emails from Podesta's account.

Once the hackers had access to the DCCC network, they allegedly searched one computer for the terms "hillary," "cruz," and "trump," copied a folder called "Benghazi Investigations," and targeted computers with opposition research and 2016 field operations information.

During his news conference, Rosenstein spoke about the nonpartisan nature of the investigation.

"When we confront foreign interference in American elections, it's important for us to avoid thinking politically as Republicans or Democrats and instead to think patriotically as Americans," Rosenstein said. "Partisan warfare fueled by modern technology does not fairly reflect the grace, dignity, and unity of the American people."

"Our response must not depend on which side was victimized," he said.

When asked about the timing of the indictment, days before Trump is scheduled to meet with Putin, Rosenstein said, "The timing, as I mentioned, is a function of the collection of the facts, the evidence, and the law."

The defendants are Russian nationals, and assuming they don't travel to the United States or otherwise participate in the US litigation, it will be difficult for the Justice Department to pursue the charges against them. The pending case could make it difficult for them to travel internationally, and could make them subject to the US sanctions.

This is the second case brought by Mueller's office against a group of Russian nationals accused of attempting to interfere in the 2016 election. In February, a grand jury returned an indictment against the Russian-based troll farm Internet Research Agency, two other Russian entities, and 13 Russian individuals accused of creating fake US personas to manage social media accounts and collect intelligence.

Only one of the defendants in that case, Concord Management and Consulting, has engaged in the case to date. Concord has pleaded not guilty and is contesting the legitimacy of Mueller's appointment.

This is the ninth case brought by Mueller's office. It was filed in the US District Court for the District of Columbia, and assigned to US District Judge Amy Berman Jackson — the same judge presiding over one of the special counsel office's prosecutions against former Trump campaign chair Paul Manafort.

No one from Trump's campaign has been charged with colluding with the Russian government, but prosecutors have connected people involved in the campaign and Russia-affiliated individuals in court papers. Alex van der Zwaan, a Dutch lawyer, pleaded guilty earlier this year to lying to investigators about his contacts with former deputy Trump campaign chair Rick Gates — who had been Manafort's co-defendant but has since pleaded guilty and agreed to cooperate — and an unnamed person known as "Person A." According to a March filing by prosecutors, Gates told van der Zwaan that Person A, who Gates was in touch with in 2016, was a former Russian intelligence officer with GRU; the FBI assessed that Person A still had ties to Russian intelligence in 2016.

Media reports speculated that Person A was Konstantin Kilimnik, a longtime Russian-Ukrainian business partner of Manafort; Kilimnik has denied ties to Russian intelligence. In June, Kilimnik became Manafort's new co-defendant — Mueller's office charged him with attempting to interfere with potential witnesses.

Two civil lawsuits have made the jump in connecting the DNC hack to the Trump campaign, alleging a conspiracy with the Russian government. One, filed last year in DC federal court on behalf of two DNC donors and a former DNC employee, was dismissed earlier this month after a judge found it was filed in the wrong jurisdiction; the judge did not rule on the substance of the allegations. The plaintiffs refiled the case this week in the US District Court for the Eastern District of Virginia.

In April, the DNC filed a lawsuit of its own in federal court in Manhattan in April. That case is pending.

**The Coincidence at the Heart of the Russia Hacking Scandal**

*The Atlantic July 13ᵗʰ, 2018*

The broad outlines of Friday's indictment by Special Counsel Robert Mueller, charging 12 Russians with conspiracy, identity theft, and money laundering in connection with hacking during the 2016 presidential election, are not surprising. The hacking of the Democratic National Committee has been public knowledge since July 2016, and even then, the authorities publicly stated that the perpetrators were Russian government officials. Other details, such as the apparent involvement of WikiLeaks and Trump adviser Roger Stone, were also known. Some of the details, however, are striking.

On July 27, 2016, at a Trump press conference in Florida, the candidate referred to 33,000 emails that an aide to Hillary Clinton had deleted from the former secretary of state's personal email server. The DNC had recently announced the Russian intrusion, and Trump speculated that if Russia broke into the DNC, it would have accessed Clinton's emails, too.

"By the way, if they hacked, they probably have her 33,000 emails," Trump said. "I hope they do. They probably have her 33,000 emails that she lost and deleted. Because you'd see some beauties there."

That was perhaps irresponsible speculation, but it wasn't crazy. There were widespread questions about Clinton's information security, and whether she might have compromised government secrets. But a few minutes later Trump said something much stranger.

"I will tell you this: Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing," he said. "I think you will probably be rewarded mightily by our press."

The president was encouraging a foreign adversary to illegally hack into messages by a former secretary of state that might contain sensitive information, then release them publicly.

Trump had good reason to believe that Russia *was* listening. The previous month, his son, Donald Jr.; son-in-law, Jared Kushner; and campaign chairman, Paul Manafort, had a meeting at Trump Tower with Russians who they believed were offering damaging information about Clinton. (The meeting wasn't revealed to the public until 2017, and both the Russians and the Trump campaign officials say no dirt was exchanged.) Prior to the meeting, Trump Jr. had received an email stating that the meeting was "part of Russia and its government's support for Mr. Trump."

Mueller's indictment offers new evidence that Russia was listening—and acting on Trump's request. The indictment charges 12 officers of the GRU, Russia's military-intelligence agency, with hacking intended to interfere with the election. According to the document:

The Conspirators spearphished individuals affiliated with the Clinton Campaign throughout the summer of 2016. For example, on or about July 27, 2016, the Conspirators 7 attempted after hours to spearphish for the first time email accounts at a domain hosted by a third-party provider and used by Clinton's personal office. At or around the same time, they also targeted seventy-six email addresses at the domain for the Clinton Campaign.

In other words, a Russian attempt to penetrate Clinton's server and her campaign came around the same time that Trump was publicly pleading with Russia to do just that. (Mueller alleges that there had been attempts to hack Clinton's campaign since at least March 2016.)

Trump's hacking request was so egregious that it earned immediate pushback from other Republicans. Speaker Paul Ryan's spokesman issued a statement saying, "Russia is a global menace led by a devious thug. Putin should stay out of this election." Even Mike Pence, Trump's own vice-presidential nominee, contradicted his running mate. "If it is Russia [that hacked the DNC] and they are interfering in our elections, I can assure you both parties and the United States government will ensure there are serious consequences," he said.

The indictment notes other examples of Russia releasing documents at times engineered to benefit the Trump campaign, though it doesn't offer any evidence that Trump aides directed, or were aware of, those releases before they happened. The indictment notes that WikiLeaks released a tranche of emails allegedly stolen by Russia on July 22, 2016—just three days before the DNC, a convenient stroke of timing for Trump. Then, on October 7, 2016, WikiLeaks released another batch of hacked emails within hours of the revelation of the *Access Hollywood* tape, in which Trump is overheard boasting about sexually assaulting women.

In a statement responding to the indictment on Friday, the White House did not condemn Russian interference in the election, instead striking a purely defensive note regarding the president's 2016 victory. "Today's charges include no allegations of knowing involvement by anyone on the campaign and no allegations that the alleged hacking affected the election result," a spokeswoman said. "This is consistent with what we have been saying all along." Trump is scheduled to meet one-on-one with Russian President Vladimir Putin on Monday in Helsinki, Finland.

At the time of Trump's comments in July 2016, it was easy to write them off as the latest sideshow from his circus of a campaign. Though he was at that moment enjoying a brief post-Republican National Convention bounce in the polls, Trump was widely expected to lose the election, so his comments, while dangerous, were of limited relevance.

That was incorrect, of course: Trump defeated Clinton. And since then, the public has learned a great deal about both Russian interference in the election and ties between the Trump campaign and Russia.

Mueller indicted a coterie of Russians on charges of interfering in the election via online trolling. The public learned of the June 2016 Trump Tower meeting, despite multiple attempts by Trump Jr. to mislead about it. Former National-Security Adviser Michael Flynn pleaded guilty to lying to the FBI about contacts with the Russian ambassador. Former Trump campaign foreign-policy adviser George Papadopoulos pleaded guilty to lying to the FBI about contacts with Russians during the election. Another foreign-policy aide, Carter Page, offered confusing and sometimes contradictory evidence about his travels to Russia and elsewhere. Mueller has produced evidence showing Manafort's deep pre-campaign ties to the Kremlin. Kushner reportedly attempted to establish a back-channel to communicate with Russia. And so on.

As I have argued, the question of whether these ties existed ought to be closed. There is extensive evidence to support that they did. Friday's indictment adds an astonishing new wrinkle. Trump campaign officials may or may not have been colluding with a Russian influence operation behind closed doors, but Trump himself was making no attempt to hide his own desires, with cameras and reporters watching. The Russians heeded his call.

**Mueller's Politicized Indictment of Twelve Russian Intelligence Officers**

*National Review July 16th, 2018*

So, is Russia now presumed innocent of hacking the 2016 election?

If not, it is difficult to understand any proper purpose served by Special Counsel Robert Mueller's indictment of twelve military officers in the Kremlin's intelligence services for doing what everybody in America already knew that they did, and has known since before Donald Trump took office — indeed, since before the 2016 election.

Make no mistake: This is nakedly politicized law enforcement. There is absolutely no chance any of the Russian officials charged will ever see the inside of an American courtroom. The indictment is a strictly political document by which the special counsel seeks to justify the existence of his superfluous investigation.

Oh, and by the way, the answer to the question posed above is, "Yes, it is now the official position of the United States that Russia gets our Constitution's benefit of the doubt." Here is Deputy Attorney General Rod Rosenstein announcing the Friday the 13th indictment: "In our justice system, everyone who is charged with a crime is presumed innocent unless proven guilty."

Of course, the indicted Russians are never going to be proven guilty — not in the courtroom sense Rosenstein was invoking.

As is so often the case in today's politicized Justice Department, Rosenstein was trying to make a different political point. As he went on to note, if people whom we have formally charged are presumed innocent, then, *a fortiori*, people who have not been accused — implicitly, Rosenstein was talking about President Trump — must also be presumed innocent. But, see, you can't make that point without stepping on the political purpose of Friday's charade: We have taken the not only pointless but reckless step of *indicting* operatives of a hostile foreign power who cannot be prosecuted and whose schemes could easily have been exposed — and, in fact, *have* been exposed, multiple times — in public government reports; so now, due-process rules oblige us to caution you that we must presume the Russians did not do what we have formally accused them of doing. They are entitled to that presumption unless and until we convict them in court . . . which is never going to happen.

Rosenstein made another telling remark at his big press conference. The Justice Department, he explained, will now "transition responsibility for this case to our Department's National Security Division while we await the apprehension of the defendants."

Now, stop giggling over that last part — the bit where we hold our breath until Russian dictator Vladimir Putin extradites his spies into the FBI's waiting arms. I'm talking about the first part: Mueller's case, *the definitive case about what Russia did to interfere in the 2016 election*, is no longer Mueller's case. It is being "transitioned" — i.e., buried — in the Justice Department unit that deals with counterintelligence matters that do not result in public trials.

This underscores what we have been arguing here since before Mueller was appointed: There was no need and no basis in federal regulations for a special counsel.

A special counsel is supposed to be appointed only when there are (a) a concrete factual basis to believe federally prosecutable crimes have been committed, calling for a criminal investigation, and (b) a conflict of interest that prevents the Justice Department from conducting the criminal investigation.

As we've observed countless times, there was no basis for a criminal investigation of President Trump or the Trump campaign. The fact that Russia interfered in an American election — as it routinely does — never meant that the perceived beneficiary of the interference was criminally complicit in it. There is no known evidence that Trump-campaign officials had any involvement in hacking by the Russian intelligence services. Mueller's new indictment powerfully suggests that this could not have happened — the Russians were expert in their cyberespionage tactics, they did not need anyone's help, and they took pains to conceal their identity from everyone with whom they dealt.

Moreover, even though Trump-campaign officials have been charged with other crimes (having nothing to do with the 2016 election), and some of those Trump officials had "contacts" with Russians, Mueller has never charged one of them with a crime related to Russia's espionage attack on the election, nor has he ever elicited from any defendant who pled guilty an admission of any such crime. The only known allegations of such a crime are contained in the unverified, Clinton-campaign-sponsored Steele dossier, and the Trump-campaign figures implicated in it have either not been charged at all (e.g., Carter Page, Michael Cohen), or not been charged with a "collusion" crime (Paul Manafort).

Thus, among the worst aspects of Mueller's new indictment is its continuation of the Justice Department's politicized perversion of its critical counterintelligence mission.

Lacking the requisite basis to conduct a criminal investigation, the Justice Department used its counterintelligence mission as a pretext for appointing a special counsel. This was grossly improper: (1) Counterintelligence work, which is geared at thwarting the operations of hostile foreign powers, is not the prosecutor work of building criminal cases; (2) not surprisingly, then, there is no authority in the regulations to assign a special counsel to a counterintelligence investigation; and (3) because counterintelligence authorities do not afford Americans the due-process protections required in criminal investigations, the Justice Department is not permitted to use counterintelligence as a pretext for conducting what is actually an effort to build a criminal prosecution.

Now Mueller has taken the next logical wayward step: He has woven an indictment that can never be tried out of counterintelligence work against foreign governments that is not supposed to be the subject of criminal prosecution — i.e., the subject of public courtroom testing under due-process rules.

This is not the way counterintelligence is supposed to work. And the Justice Department knows it. That is why Mueller's indictment will now be the property of DOJ's National Security Division, the home of other non-prosecutable foreign counterintelligence work that is never intended to see the light of day in a public courtroom.

And why such an easy transition? *Because there is no conflict of interest.*

There never was. Russia's interference in the 2016 election was never something that the Justice Department was unable to investigate in the normal course. In fact, for months, *the Trump Justice Department was*

*investigating it in the normal course*, just as the Obama Justice Department had done. Then, President Trump fired FBI director James Comey. It was this event that prompted Rosenstein to appoint Mueller. We got a special counsel not because of Russia's espionage or any evidence indicating actual Trump-campaign complicity in it; we got a special counsel because Rosenstein was deeply involved in Comey's ouster and wanted to fend off Democratic attacks on him over it.

The only point of the new indictment is to justify Rosenstein's decision and Mueller's existence. Proponents of the unnecessary special counsel want to say, "See, we really needed this investigation." But that can be said with a straight face only if the goalposts are moved.

To be clear, we did need *an FBI counterintelligence investigation* of Russia's espionage operation against the 2016 election, and we already had a quite aggressive one before Mueller came on the scene. But we would have needed *a special-counsel investigation* only if there had been a concrete factual basis to believe the *Trump campaign conspired in Russia's espionage operation against the 2016 election.*

There never was. So now, the purported need for Mueller is being rationalized on two fictitious premises.

The first is that the new indictment shows we needed Mueller to get to the bottom of Russia's perfidy. This is false: There is nothing new in Mueller's indictment, his participation was unnecessary to discover what our counterintelligence investigators have learned, and the intelligence they have gathered should not have been put in an indictment — aggression by hostile foreign powers is not a law-enforcement issue, and it is a mockery of the justice system to charge foreign aggressors and pretend we presume them innocent of their attacks against our country.

The second is that the number of indictments Mueller has generated proves that there were solid grounds to suspect Trump-campaign "collusion" in Russia's election-meddling. The blatant, partisan dishonesty of this claim is best encapsulated in this passage from the *Washington Post*'s report on Mueller's new indictment:

Mueller and a team of prosecutors have been working since May 2017 to determine whether any Trump associates conspired with Russia to interfere in the election. With the new indictment, his office has filed charges against 32 people on crimes including hacking, money laundering and lying to the FBI.

The *Post* goes on grudgingly to point out that 26 of the 32 charged are Russians "who are unlikely to ever be put on trial in the United States." (*Unlikely?*) But the paper conveniently omits mention of the fact that *none of the 32 have been charged with a Trump–Russia conspiracy to interfere in the election.* That's the only thing Mueller was needed for.

As I pointed out on Twitter over the weekend, besides the two-dozen-odd Kremlin operatives already charged, there are 144 million other people in Russia who will never see the inside of an American courtroom. If Mueller indicts every one of them, his stats will look *really* impressive . . . and there will still be no Trump conspiracy against the election.

What there will be, though, is a new international order in which nation-states are encouraged to file criminal charges against each other's officials for actions deemed to be provocative (or, more accurately, actions that can be exploited for domestic political purposes). Of all government officials in the world, American officials are the most active on the global stage — and that includes meddling in other countries' elections. I doubt our diplomats, intelligence operatives, elected officials, and citizens will much like living in the world Robert Mueller and Rod Rosenstein have given us. If the idea was to give Vladimir Putin and his thug regime a new way to sabotage the United States, nice work.

Department of Justice Office of Public Affairs

---

FOR IMMEDIATE RELEASE Friday, July 13, 2018

# GRAND JURY INDICTS 12 RUSSIAN INTELLIGENCE OFFICERS FOR HACKING OFFENSES RELATED TO THE 2016 ELECTION

The Department of Justice today announced that a grand jury in the District of Columbia returned an indictment presented by the Special Counsel's Office. The indictment charges twelve Russian nationals for committing federal crimes that were intended to interfere with the 2016 U.S. presidential election. All twelve defendants are members of the GRU, a Russian Federation intelligence agency within the Main Intelligence Directorate of the Russian military. These GRU officers, in their official capacities, engaged in a sustained effort to hack into the computer networks of the Democratic Congressional Campaign Committee, the Democratic National Committee, and the presidential campaign of Hillary Clinton, and released that information on the internet under the names "DCLeaks" and "Guccifer 2.0" and through another entity.

"The Internet allows foreign adversaries to attack America in new and unexpected ways," said Deputy Attorney General Rod J. Rosenstein. "Together with our law enforcement partners, the Department of Justice is resolute in its commitment to locate, identify and seek to bring to justice anyone who interferes with American elections. Free and fair elections are hard-fought and contentious, and there will always be adversaries who work to exacerbate domestic differences and try to confuse, divide, and conquer us. So long as we are united in our commitment to the shared values enshrined in the Constitution, they will not succeed."

According to the allegations in the indictment, Viktor Borisovich Netyksho, Boris Alekseyevich Antonov, Dmitriy Sergeyevich Badin, Ivan Sergeyevich Yermakov, Aleksey Viktorovich Lukashev, Sergey Aleksandrovich Morgachev, Nikolay Yuryevich Kozachek, Pavel Vyacheslavovich Yershov, Artem Andreyevich Malyshev, Aleksandr Vladimirovich Osadchuk, Aleksey Aleksandrovich Potemkin, and Anatoliy Sergeyevich Kovalev were officials in Unit 26165 and Unit 74455 of the Russian government's Main Intelligence Directorate.

In 2016, officials in Unit 26165 began spearphishing volunteers and employees of the presidential campaign of Hillary Clinton, including the campaign's chairman. Through that process, officials in this unit were able to steal the usernames and passwords for numerous individuals and use those credentials to steal email content and hack into other computers. They also were able to hack into the computer networks of the Democratic Congressional Campaign Committee (DCCC) and the Democratic National Committee (DNC) through these spearphishing techniques to steal emails and documents, covertly monitor the computer activity of dozens of employees, and implant hundreds of files of malicious computer code to steal passwords and maintain access to these networks.

The officials in Unit 26165 coordinated with officials in Unit 74455 to plan the release of the stolen documents for the purpose of interfering with the 2016 presidential election. Defendants registered the domain DCLeaks.com and later staged the release of thousands of stolen emails and documents through that website. On the website, defendants claimed to be "American hacktivists" and used Facebook accounts with fictitious names and Twitter accounts to promote the website. After public accusations that the Russian government was behind the hacking of DNC and DCCC computers, defendants created the fictitious persona Guccifer 2.0. On the evening of June 15, 2016 between 4:19PM and 4:56PM, defendants used their Moscow-based server to search for a series of English words and phrases that later appeared in Guccifer 2.0's first blog post falsely claiming to be a lone Romanian hacker responsible for the hacks in the

hopes of undermining the allegations of Russian involvement.

Members of Unit 74455 also conspired to hack into the computers of state boards of elections, secretaries of state, and US companies that supplied software and other technology related to the administration of elections to steal voter data stored on those computers.

To avoid detection, defendants used false identities while using a network of computers located around the world, including the United States, paid for with cryptocurrency through mining bitcoin and other means intended to obscure the origin of the funds. This funding structure supported their efforts to buy key accounts, servers, and domains. For example, the same bitcoin mining operation that funded the registration payment for DCLeaks.com also funded the servers and domains used in the spearphishing campaign.

The indictment includes 11 criminal counts:

- Count One alleges a criminal conspiracy to commit an offense against the United States through cyber operations by the GRU that involved the staged release of stolen documents for the purpose of interfering with the 2016 president election;
- Counts Two through Nine charge aggravated identity theft for using identification belonging to eight victims to further their computer fraud scheme;
- Count Ten alleges a conspiracy to launder money in which the defendants laundered the equivalent of more than $95,000 by transferring the money that they used to purchase servers and to fund other costs related to their hacking activities through cryptocurrencies such as bitcoin; and
- Count Eleven charges conspiracy to commit an offense against the United States by attempting to hack into the computers of state boards of elections, secretaries of state, and US companies that supplied software and other technology related to the administration of elections.

There is no allegation in the indictment that any American was a knowing participant in the alleged unlawful activity or knew they were communicating with Russian intelligence officers. There is no allegation in the indictment that the charged conduct altered the vote count or changed the outcome of the 2016 election.

Everyone charged with a crime is presumed innocent unless proven guilty in court. At trial, prosecutors must introduce credible evidence that is sufficient to prove each defendant guilty beyond a reasonable doubt, to the unanimous satisfaction of a jury of twelve citizens.

This case was investigated with the help of the FBI's cyber teams in Pittsburgh, Philadelphia and San Francisco and the National Security Division. The Special Counsel's investigation is ongoing. There will be no comments from the Special Counsel at this time.

Exhibit H



**U.S. Department of Justice**

National Security Division

*Washington, D.C. 20530*

Ty Clevenger
212 S. Oxford St. #7D
Brooklyn, NY 112217

August 30, 2021

Re: FOIA/PA #20-333

Dear Mr. Clevenger:

This is our final response to your email dated June 15, 2020 attaching a Freedom of Information Act (FOIA) request.

Specifically, your request seeks:

*(a) All documents, records, communications, and other tangible evidence supporting Gen. Demers's claims to 60 minutes above, i.e., about Russian involvement in obtaining the DNC emails in 2016.*

*(b) All documents, records, communications, and other tangible evidence relied on by Gen. Demers, Adam Hickey, Sean Newell, and Heather Alpino in support of their conclusions that Russians were responsible for obtaining the DNC emails in 2016.*

*(c) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning Seth Conrad Rich and/or Aaron Nathan Rich.*

*(d) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning other entities or individuals who may have played a role in stealing, hacking, leaking or improperly obtaining the DNC emails in 2016.*

*(e) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division indicating whether the DNC emails were hacked externally, leaked from a source inside the DNC, or otherwise transmitted to third parties such as Wikileaks. If there was one or more than one instance of hacking, leaking, or other unauthorized transmission of DNC emails in 2016, please provide details for each such incident, e.g., the dates, persons and entities involved, the data that was hacked, leaked, or otherwise transmitted, and the means by which it was hacked, leaked, or transmitted.*

*(f) All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division or the FBI regarding whether Debbie Wasserman-Shultz or any other member of Congress was blackmailed or extorted, whether directly or indirectly, as a result of information procured by any of the following: Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, or anyone affiliated with the government of Pakistan.*

We have conducted a search and located records that are responsive to your request. We are

withholding in part, one record pursuant to the following FOIA exemption set forth in 5 U.S.C. 552(b):

(6) Which permits the withholding of personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

Please note that three discrete categories of law enforcement and national security records are excluded from the requirements of FOIA. *See* 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Additionally, NSD maintains investigative and prosecutorial files pertaining to subjects of NSD investigations. We do not routinely search these records in response to requests regarding NSD investigations in cases where the confirmation or denial of the existence of responsive records would, in and of itself, reveal information which would constitute a clearly unwarranted invasion of personal privacy of third parties or would reasonably be expected to interfere with enforcement proceedings. Accordingly, we can neither confirm nor deny the existence of records that may be potentially responsive to your request pursuant to 5 U.S.C. 552(b)(6) and/or (7)(A) and/or (7)(C).

As this matter is already in litigation, we are omitting our standard appeal paragraph. If you have any questions concerning this response please contact Assistant United States Attorney, Andrea Parker of the Eastern District of Texas at (409) 839-2538.

Notwithstanding the pending litigation, you may also contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer to try to resolve disputes between FOIA requesters and federal agencies. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at (877) 684-6448; or facsimile at (202) 741-5769. You also have the right to seek dispute resolution services through the DOJ's FOIA Public Liaison. NSD FOIA's Public Liaison, Patricia Matthews, may be reached by telephone at (202) 233-0756.

Sincerely,

Kevin G. Tiernan
Records and FOIA

Enclosure

From:           b6                    (NSD)
To:             b6                    (NSD)
Subject:        Binder for John
Date:           Tuesday, October 29, 2019 11:48:00 AM
Attachments:    Morenets_Indictment.pdf
                khusyaynova_complaint.pdf
                indictment_concord_management.pdf
                Order.pdf
                netyksho_et_al_indictment.pdf

Hi b6 ,

I'm putting together a binder for John before the prep for his 60 Minutes Interview on Thursday. When you have a moment, would you mind putting the attached in a binder? I'm going to add a couple more documents, but it's going to take me some time to gather the right items (sifting through some voluminous reports).

- Order
- Netykscho Indictment
- Khusyaynova Complaint
- Concord Management Indictment
- Morenets Indictment

Thank you!

b6

Counsel to the Assistant Attorney General

National Security Division

(U) b6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

Criminal No. *18-263*

ALEKSEI SERGEYEVICH MORENETS
EVGENII MIKHAYLOVICH SEREBRIAKOV
IVAN SERGEYEVICH YERMAKOV
ARTEM ANDREYEVICH MALYSHEV
DMITRIY SERGEYEVICH BADIN
OLEG MIKHAYLOVICH SOTNIKOV
ALEXEY VALEREVICH MININ

Defendants.

18 U.S.C. §§ 371, 1030(a)(2)(C),
1030(a)(5)(A)
(Conspiracy)
18 U.S.C. § 1349 and § 3559(g)(1)
(Conspiracy to Commit Wire Fraud)
18 U.S.C. § 1343 (Wire Fraud)
18 U.S.C. § 1028A
(Aggravated Identity Theft)
18 U.S.C. § 1956(h)
(Conspiracy to Launder Money)

**[UNDER SEAL]**

**INDICTMENT**

**COUNT ONE**
(Conspiracy)

The grand jury charges:

1.      At all times relevant to the indictment, from at least 2014 up to and including May

2018, the Russian Federation (Russia) operated a military intelligence agency called the Main

Intelligence Directorate of the General Staff (GRU).  The GRU was headquartered in Moscow,

Russia, and was comprised of multiple units, including Units 26165 and 74455.  Military Unit

26165, also known as the "GRU 85 Main Special Service Center," was located at 20

Komsomolskiy Prospekt, Moscow, Russia.  Military Unit 74455 was located at 22 Kirova Street,

Khimki, Moscow, Russia.

**FILED**

OCT 0 3 2018

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

2.      During the charged timeframe, members of the GRU conducted persistent and sophisticated criminal cyber intrusions by hacking into the computers of victims that included U.S. persons, corporate entities, international organizations and their respective employees.  These victims were located around the world, including in the Western District of Pennsylvania, and were targeted by the GRU for their strategic interest to the Russian government.

3.      Specifically, defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ were GRU officers who knowingly and intentionally conspired with each other, and with persons known and unknown to the grand jury, (collectively, the conspirators) to gain unauthorized access (to "hack") into victim computers and steal private or otherwise sensitive information, in violation of United States laws. In many instances, the stolen information was publicized by the GRU as part of a related "influence and disinformation" campaign designed to undermine the legitimate interests of the victims, further Russian interests, retaliate against Russia's detractors and sway public opinion in Russia's favor.

THE VICTIMS

4.      Among those victims targeted by the GRU were U.S. and international anti-doping agencies, sporting federations, anti-doping officials, other sports-related organizations and nearly 250 athletes from approximately 30 countries.  The victims included, among others, the following:

- the U.S. Anti-Doping Agency (USADA), a U.S. based agency, headquartered in Colorado Springs, Colorado;

2

- the World Anti-Doping Agency (WADA), an international agency, headquartered in Montreal, Canada;

- the Canadian Centre for Ethics in Sport (CCES), a Canadian-based anti-doping agency, headquartered in Ottawa, Canada;

- the International Association of Athletics Federations (IAAF), an international sports gaming body, headquartered in Monaco;

- The Court of Arbitration for Sport (TAS/CAS), headquartered in Lausanne, Switzerland; and,

- the Fédération Internationale de Football Association (FIFA), an international governing body for football, headquartered in Zurich, Switzerland.

5.      These victims were targeted by the GRU for their role in the investigation or public condemnation of Russia's state-sponsored athlete doping program and their public support of, or involvement in, a ban on Russian athletes in worldwide athletic competitions (including the 2016 Summer Olympics and Paralympics in Rio de Janeiro, Brazil).  The GRU also targeted the victims to steal athletes' medical records which were then publicized as part of an influence and disinformation campaign.

6.      In addition to anti-doping agencies, the GRU targeted other victims of potential benefit to Russian interests, including:

- Westinghouse Electric Corporation (WEC), a nuclear energy company headquartered in the Western District of Pennsylvania;

- the Organisation for the Prohibition of Chemical Weapons (OPCW), an organization headquartered in The Hague, Netherlands, investigating the use of

chemical weapons in Syria and the March 2018 poisoning of a former GRU

officer and others in the United Kingdom with a chemical nerve agent; and,

- the Spiez Swiss Chemical Laboratory located in Spiez, Switzerland, an

  accredited laboratory of the OPCW that analyzed the chemical agent connected

  to the poisonings of a former GRU officer and others in the United Kingdom.

<u>Cyber Intrusions and Related Influence and Disinformation Campaigns</u>

7.      The cyber intrusions conducted by the GRU involved sophisticated, persistent and

unauthorized access into the victims' computer networks for the purpose of stealing private or

otherwise sensitive information.

8.      The hacking was often conducted remotely, from Russia.  If the remote hack was

unsuccessful or if it did not provide the conspirators with sufficient access to victims' networks,

"on-site" or "close access" hacking operations were conducted by the conspirators.  On-site

operations involved trained GRU hackers with sophisticated hacking equipment traveling to

victims' locations around the world.  These on-site operations often involved targeting the

computer networks used by victims organizations or their personnel through Wi-Fi connections,

such as hotel Wi-Fi networks, in an effort to gain unauthorized access to the victims' computer

networks.

9.      Defendants MORENETS and SEREBRIAKOV were two such on-site GRU

hackers who traveled to foreign countries with other conspirators, in some instances using Russian

government issued diplomatic passports to conduct on-site operations.  (See Exhibit A).

10.      The intrusions were typically conducted by the conspirators for the purpose of

stealing private or otherwise sensitive information.

11.     The conspirators thereafter publicly released select items of stolen information under the false auspices of a hacktivist group calling itself the "Fancy Bears' Hack Team."  The conspirators publicly disseminated the stolen information using online accounts and other infrastructure.  These accounts and associated infrastructure were acquired and maintained by GRU Unit 74455.

12.     Among the goals of the conspiracy was to publicize stolen information to conduct an influence and disinformation campaign designed to:

(i)      undermine, retaliate against and otherwise delegitimize the efforts of international anti-doping organizations and officials who had publicly exposed Russian government-sponsored doping by Russian athletes;

(ii)     pose as the "Fancy Bears' Hack Team," publicize and expose individual sensitive medical information and drug testing results of athletes;

(iii)    damage the reputations of clean athletes from various countries by falsely claiming that such athletes were using banned or performance-enhancing drugs.

<u>THE DEFENDANTS</u>

13.     During the timeframe of the conspiracy, ALEKSEI SERGEYEVICH MORENETS (Моренец Алексей Сергеевич) served as a Russian military intelligence officer assigned to Unit 26165.  MORENETS was a member of a Unit 26165 team that traveled with technical equipment to locations around the world to conduct on-site hacking operations to target and maintain persistent access to Wi-Fi networks used by victim organizations and personnel.  As early as July 2016 and continuing through September 2016, MORENETS targeted U.S. and international anti-doping agencies and sporting federations in Rio de Janeiro, Brazil (July and August 2016, prior to

5

and during the 2016 Summer Olympics) and Lausanne, Switzerland (September 2016). MORENETS did so by compromising Wi-Fi networks used by anti-doping personnel with access to the networks of USADA, WADA and CCES. Additionally, in April 2018, MORENETS was encountered while conducting an on-site hacking operation targeting the Organisation for the Prohibition of Chemical Weapons (OPCW) in The Hague, Netherlands, and intended to thereafter target the Spiez Swiss Chemical Laboratory in Switzerland.

14. During the timeframe of the conspiracy, EVGENII MIKHAYLOVICH SEREBRIAKOV (Серебряков Евгений Михайлович) served as a Deputy Head of Directorate, Section Chief, assigned to Unit 26165. SEREBRIAKOV was another member of a Unit 26165 team that participated in the on-site hacking operations in Rio de Janeiro, Brazil (August 2016), and Lausanne, Switzerland (September 2016), that targeted USADA, WADA and CCES. In April 2018, SEREBRIAKOV targeted the OPCW in The Hague, Netherlands, and intended to thereafter target the Spiez Swiss Chemical Laboratory in Switzerland.

15. During the timeframe of the conspiracy, IVAN SERGEYEVICH YERMAKOV (Ермаков Иван Сергеевич) served as a Russian military intelligence officer in the GRU assigned to Unit 26165. YERMAKOV conducted technical and online reconnaissance of victim organizations, their employees and their computer networks and thereafter sent spearphishing emails using fictitious personas and proxy servers in an attempt to obscure his identity and GRU affiliation. YERMAKOV also participated in, and provided remote support to, MORENETS' and SEREBRIAKOV's on-site hacking operations, all on behalf of Unit 26165. As early as November 2014 and continuing through at least August 2016, YERMAKOV and his co-conspirators targeted Westinghouse Electric Corporation (WEC) and its employees, in the Western District of

6

Pennsylvania, WADA and USADA. YERMAKOV is a charged defendant in federal indictment number CR 18-215 in the District of Columbia.

16. During the timeframe of the conspiracy, ARTEM ANDREYEVICH MALYSHEV (Малышев Артём Андреевич) served as a Senior Lieutenant assigned to Unit 26165. In 2016, MALYSHEV monitored X-Agent malware (a/k/a "Chopstick") implanted on victim networks and utilized online fictitious personas to conduct technical and online reconnaissance of victim organizations and to send spearphishing emails, all on behalf of Unit 26165. As early as July 2016 and continuing through at least August 2016, MALYSHEV participated in intrusion activities targeting WADA. MALYSHEV is a charged defendant in federal indictment number CR 18-215 in the District of Columbia.

17. During the timeframe of the conspiracy, DMITRIY SERGEYEVICH BADIN (Бадин Дмитрий Сергеевич) was an "Assistant Head of Department" assigned to Unit 26165. In his supervisory role, BADIN oversaw the criminal activities of conspirators as they engaged in computer intrusions and stole credentials, medical records and other data. BADIN also compiled and used malware and other tools to aid in the compromise of victim networks by the conspirators, including the CCES network in September and October 2016. BADIN is a charged defendant in federal indictment number CR 18-215 in the District of Columbia. (Images of defendants YERMAKOV, MALYSHEV and BADIN are attached as Exhibit B).

18. During the timeframe of the conspiracy, OLEG MIKHAYLOVICH SOTNIKOV (Олег Михайлович Сотников) served as a Russian military intelligence officer. SOTNIKOV provided support to his conspirators during their targeting of the OPCW in The Hague, Netherlands, and intended to thereafter target the Spiez Swiss Chemical Laboratory in Switzerland.

Case 2:18-cr-00263-MRH Document 4 Filed 10/03/18 Page 8 of 41

19.     During the time period of the conspiracy, ALEXEY VALEREVICH MININ (Алексей Валерьевич Минин) served as a Russian military intelligence officer.  MININ provided support to MORENETS and SEREBRIAKOV during their targeting of the OPCW in The Hague, Netherlands, and intended to thereafter target the Spiez Swiss Chemical Laboratory in Switzerland. (See Exhibit A, images of SOTNIKOV and MININ).

## MANNER AND MEANS OF THE CONSPIRACY

20.     The members of the conspiracy, who are both known and unknown to the grand jury, used the following manner and means to accomplish their objectives, which included gaining unauthorized access to computers at entities of interest to the Russian government, including Westinghouse Electric Company (WEC), the U.S. Anti-Doping Agency (USADA), the World Anti-Doping Agency (WADA), the Canadian Centre for Ethics in Sport (CCES), Court of Arbitration for Sport (TAS/CAS), the International Association of Athletics Federations (IAAF), the Fédération Internationale de Football Association (FIFA), and the Organisation for the Prohibition of Chemical Weapons (OPCW).  Conspirators further used that unauthorized access to steal information and, in some instances, publicized the stolen materials to engage in influence and disinformation operations to advance the interests of the Russian government.

21.     In order to avoid detection by law enforcement, security researchers and victims, and to mask their GRU affiliation and location in Russia, the conspirators used a variety of fictitious names and personas, as well as online infrastructure, including servers, domains, cryptocurrency, email accounts, social media accounts and other online services provided by companies in the United States and elsewhere.  The conspirators used this infrastructure for a wide range of conduct in furtherance of the conspiracy: to communicate, research and probe victims and

8

their computer networks; to send spearphishing emails; to mimic legitimate domains and websites; to store and distribute additional malware; to manage malware; to transfer stolen data; to publicly release stolen information; to draw public and media attention to such stolen information; and, to negatively influence the perception of such stolen information and the victims. Conspirators used common infrastructure to target multiple victim organizations and individuals. For example, the conspirators utilized approximately 38 common IP addresses to conduct the intrusion activities at both WADA and USADA, and much of the stolen information from all of the anti-doping-related victims was posted and disseminated through the social media accounts or website of the Fancy Bears' Hack Team, fancybear.net and fancybear.org.

22. In those instances where conspirators purchased hacking infrastructure, payments were made using a complex web of transactions involving operational accounts in fictitious names and typically utilized cryptocurrencies, such as Bitcoin, to further mask their identities and conduct.

23. The conspirators typically initiated their hacking activities by researching the victim organizations, including their computer networks and employees. This research provided technical and biographical information that the conspirators could exploit in subsequent intrusion activities.

24. The conspirators also registered domain names for use in their hacking activities. Examples include "westinqhousenuclear.com" (deliberately substituting a "q" for a "g,"), "wada.awa.org" and "wada.arna.org" (WADA's legitimate domain was "wada.ama.org"). These domains were intended to mimic or "spoof" those of legitimate websites that victims were familiar with, including webmail login pages, VPN login screens or password reset pages.

9

25.     Frequently, the conspirators crafted email messages known as "spearphishing," designed to trick unwitting recipients into giving the conspirators access to their computers and account credentials (e.g., a username and password).  Spearphishing messages were composed to resemble emails from trustworthy senders, such as email providers or colleagues, and requested the recipients to click on hyperlinks in the messages.  Such hyperlinks would direct recipients to spoofed websites which prompted the recipients to enter their login and password and enabled the capture of their credentials.  In many cases, the hyperlinks were created using an online service (e.g., Bit.ly) that abbreviated lengthy website addresses (referred to as a "URL-shortening service").  In other cases, the hyperlinks were domains that the conspirators registered for a fee with online providers, such as "wada.awa.org," and "wada.arna.org."

26.     When the conspirators' remote hacking efforts failed to capture log-in credentials, or if those accounts that were successfully compromised did not have the necessary access privileges for the sought-after information, teams of GRU intelligence officers traveled to locations around the world where targets were physically located.  Using specialized equipment, and with the remote support of conspirators in Russia, these on-site teams hacked into Wi-Fi networks used by victim organizations or their personnel, including hotel Wi-Fi networks.  After a successful hacking operation, the on-site, or close access, team transferred such access to conspirators in Russia.

27.     The conspirators developed and utilized malware and hacking tools, including "Gamefish," "X-agent" (a/k/a "Chopstick"), "X-tunnel," "Remcomsvc," and "Responder.exe," in order to hack and compromise victim computers and networks, to maintain command and control over such networks, and to steal network credentials and other sensitive and private data.

28.     After hacking into victim computers, remotely or aided by the on-site teams, the conspirators performed a variety of functions designed to identify, collect, package and steal targeted data from the victims' computers. In instances where the hacking was part of an influence or disinformation operation, conspirators publicly posted and disseminated such information, including victims' personal email communications and individual health and medical information. In some instances, such information was modified from its original form. Thereafter, the conspirators would actively solicit and promote media coverage so the stolen information would receive international attention. This was done to further a narrative favorable to the Russian government and in order to amplify its impact.

## COMPUTER INTRUSIONS and OTHER OVERT ACTS

### Westinghouse Electric Company (WEC)

29.     At all times during the conspiracy, WEC was a U.S.-based nuclear power developer, with its headquarters outside of Pittsburgh, Pennsylvania, that provided fuel, services and plant design to international customers in the commercial nuclear industry. All of WEC's internet traffic is routed through servers located in the Western District of Pennsylvania. The company's power plant designs are the basis for approximately half of the world's currently operating nuclear power plants. Since 2008, WEC has supplied Ukraine with increasing amounts of nuclear fuel.

30.     As early as November 20, 2014, IVAN SERGEYEVICH YERMAKOV performed technical reconnaissance of WEC, WEC-related IP addresses, network ports and associated domains. On December 8, 9, and 22, 2014, YERMAKOV's reconnaissance included research on WEC, its employees, and their background in nuclear energy research and development.

11

Case 2:18-cr-00263-MRH Document 4 Filed 10/03/18 Page 12 of 41

31.     On December 10, 2014, YERMAKOV and his co-conspirators registered a fake domain and website, "https://webmail.westinqhousenuclear.com" to mimic a legitimate WEC domain. Spearphishing emails were sent to at least five WEC employees, designed to appear as routine emails from the Westinghouse.com Microsoft Exchange Server. Upon clicking an enclosed link, users were directed to the spoofed domain where their login credentials were stolen and saved. Once stolen credentials were determined to be authentic by the conspirators, victims were then re-routed to the original, legitimate WEC network so that they were unaware that the theft of their passwords had occurred.

32.     Following the targeting of WEC corporate accounts, on December 24, 2014, January 15, 2015, January 17, 2015 and November 18, 2015, using Bit.ly accounts, YERMAKOV and conspirators sent spearphishing emails to the personal email accounts of four WEC employees who resided near Pittsburgh, Pennsylvania. The users of two of the accounts clicked on the malicious link which would have enabled the theft of the login credentials to their personal email accounts. These employees worked in the nuclear energy field and were involved in advanced nuclear reactor development and new reactor technology.

### World Anti-Doping Agency (WADA)

33.     WADA was established under the initiative of the International Olympic Committee (IOC) in 1999 as an international independent agency, which is composed of and funded equally by the sports movement and governments of the world. WADA, which is headquartered in Montreal, Canada, administers the World Anti-Doping Code – the document harmonizing anti-doping policies in all sports and all countries - and coordinates anti-doping activities internationally through its central drug testing clearinghouse, the Anti-Doping

Administration and Management System (ADAMS) database. The ADAMS database contains laboratory results of drug tests and location information for nearly 30,000 athletes in addition to records related to the granting or denial of therapeutic use exemptions (TUEs) for otherwise prohibited substances. Athletes whose medical information resides in the ADAMS database reside throughout the world, including in the Western District of Pennsylvania.

34. In 2014, a German documentary titled, "Top Secret Doping: How Russia Makes its Winners," aired interviews of husband and wife Russian whistleblowers who admitted to participation in the Russian state-sponsored doping program as an anti-doping official and athlete, respectively. Shortly thereafter, WADA launched an Independent Commission (IC) to investigate the validity of the allegations. In a November 2015 report, the WADA IC released its findings, namely, it "confirmed the existence of widespread cheating through the use of doping substances and methods to ensure, or enhance the likelihood of, victory for [Russian] athletes and teams." The IC made "specific findings" regarding the involvement of the Russian Federal Security Service (FSB) in Russia's efforts to evade anti-doping procedures and protections.

35. In May 2016, a prominent television newsmagazine and newspaper each published stories regarding allegations from the husband and wife whistleblowers, as well as a new Russian whistleblower who had previously managed Russia's anti-doping laboratory. The whistleblowers all alleged a Russian state-sponsored doping effort at the 2014 Sochi Winter Olympics. In response, WADA named an "independent person" (IP) to investigate their allegations.

36. On July 18, 2016, the WADA-appointed IP published his first report, the "McLaren Report," regarding Russia's systematic state-sponsored subversion of the drug testing processes prior to, during and subsequent to the 2014 Sochi Winter Olympics. WADA's Executive

Committee issued a statement accompanying this report, which recommended that the IOC and the International Paralympic Committee (IPC) "decline entries for Rio [Olympics and Paralympics] 2016, of all athletes submitted by the Russian Olympic Committee (ROC) and the Russian Paralympic Committee." Beginning that same day, multiple IP addresses were used to scan WADA's network for vulnerabilities or potential access points.

37. On July 24, 2016, the IOC Executive Board announced a "preliminary decision" (later affirmed by the broader IOC) that, as a result of the WADA IP's report, individual sporting federations could exclude Russian athletes from the 2016 Rio Summer Olympics, with each positive decision having to be approved by an arbitrator from the international Court of Arbitration for Sport (TAS/CAS). Ultimately, 111 Russian athletes were barred from participation in the Olympics. The IPC issued a blanket ban of Russian athletes for the 2016 Rio Summer Paralympics.

38. The next day, on July 25, 2016, conspirators launched a Distributed Denial-of-Service (DDoS) attack against, and vulnerability scan, of WADA's official website: wada-ama.org.

### Compromise of WADA's Computer Networks

39. On August 2, 2016, conspirators used multiple IP address to connect to or scan WADA's network. Such activity continued on August 4, 5, 8 and 9, 2016.

40. Also on August 2, 2016, defendant YERMAKOV researched WADA and password recovery requirements for WADA's ADAM's database.

41.     On August 3, 2016, conspirators registered the domain "wada.awa.org" using an email account and a fictitious name.  This registered domain spoofed, or falsely mimicked, WADA's legitimate domain: wada-ama.org.

42.     On August 3 and 4, 2016, defendant YERMAKOV researched WADA and ADAMS, as well as exploits and other hacking techniques.

43.     On August 4, 2016, conspirators, including defendant MALYSHEV, sent spearphishing emails to eleven WADA employees, appearing to be from the WADA Chief Technology Officer, which prompted the employees to click on the link to authenticate their WADA email accounts.  In fact, the link was designed to steal WADA employee login credentials. Approximately four WADA employees clicked on the malicious link which enabled conspirators to steal their login account credentials, which were later used to access their WADA accounts.

44.     On August 5, 2016, defendant YERMAKOV conducted research regarding WADA, the WADA-appointed IP, the McLaren Report and CISCO firewalls.  This included research of a specific WADA employee, including his or her LinkedIn profile.  Minutes later, conspirators created a link embedding that employee's email address using the URL-shortening service Bit.ly, and a corresponding spearphishing email was sent to the victim's email account. The employee clicked on the malicious link which was designed to allow defendant YERMAKOV and the conspirators to harvest his or her log-in credentials and gain access to his or her emails. Over the course of the conspirators' targeting of WADA, this Bit.ly account created links for the personal email accounts of at least four WADA employees.

15

45.     On August 8, 2016, conspirators registered the domain "wada-arna.org" using an email account and a fictitious name.  This registered domain spoofed, or falsely mimicked, WADA's legitimate domain: wada-ama.org.

46.     That same day, and again on August 9, 2016, defendant YERMAKOV continued research targeting WADA employees.  He also prepared to send spearphishing emails, by composing English-language draft emails and by researching information regarding CISCO security updates, CISCO access and privilege escalation.  On August 9, 2016, defendant MALYSHEV also prepared to send spearphishing emails by conducting research and reviewing a draft spearphishing email.

47.     On August 9, 2016, defendants YERMAKOV and MALYSHEV sent spearphishing emails written to appear as if they were from a WADA IT Manager to WADA employees prompting them to click on a link to "update their Cisco client."  At least one WADA employee clicked on the link and entered his or her login credentials.

Compromise of WADA's
Computer Networks Through On-Site Operations

48.     Conspirators made two operational trips to Rio de Janeiro, the site of the 2016 Summer Olympics and Paralympics, to conduct hacking operations targeting and maintaining persistent access to Wi-Fi networks used by anti-doping officials.  First, from July 10 through July 19, 2016, prior to the Olympics, defendant MORENETS traveled to Rio.  Second, from August 13, 2016 to August 19, 2016, during the Olympics, defendants MORENETS and SEREBRIAKOV traveled together to Rio.

49.     During defendants MORENETS' and SEREBRIAKOV's second trip to Rio, defendant YERMAKOV provided remote support to their close access operation.  For example,

16

on August 13 and 14, 2016, defendant YERMAKOV conducted research concerning an identified hotel chain that hosted Olympics officials, including IOC, TAS/CAS, WADA and USADA officials. Within minutes, defendant YERMAKOV also researched the routers used by some of those hotels for Wi-Fi access and methods of exploiting those routers, including through "brute force" password cracking.

50.     On August 19, 2016, approximately 15 hours before defendants MORENETS' and SEREBRIAKOV's departure from Rio, an identified IOC anti-doping official used his or her administrator credentials to log into WADA's ADAMS database from a Brazilian IP address. The conspirators captured that IOC official's username and password and thereafter used them, and another set of ADAMS credentials belonging to the same official that was created specifically for anti-doping officials at the Rio Olympic games, to gain unauthorized access to the ADAMS database and medical and anti-doping-related information available to those accounts. The broader ADAMS database was not compromised in the attack. The conspirators conducted large-scale exports of data from WADA's networks on August 29, 2016 and September 6, 2016.

<u>Tribunal Arbitral du Sport/Court of Arbitration for Sport (TAS/CAS)</u>

51.     TAS/CAS is an independent institution based in Lausanne, Switzerland, which resolves sports-related legal disputes through arbitration. In this capacity, TAS/CAS was involved in the Russian doping scandal, including a July 21, 2016 decision to uphold the suspension by IAAF of the All-Russia Athletics Federation and the July 24, 2016 decision by the IOC that individual sporting confederations could ban Russian athletes from the Rio Olympics, with the approval of a TAS/CAS arbitrator. On July 26, 2016, TAS/CAS established an *ad hoc* tribunal to

17

resolve disputes at the Rio Olympics, which was located at a Rio hotel operated by the hotel chain described herein as having been targeted by defendant YERMAKOV.

52. On August 8, 2016, the conspirators used the same email account and fictitious name that was used to register the spoofed "wada-arna.org" domain to register a second domain "tas-cass.org." The registered domain falsely mimicked TAS/CAS' legitimate domain: tas-cas.org.

53. One day later, on August 9, 2016, defendants MALYSHEV and YERMAKOV conducted online reconnaissance efforts targeting TAS/CAS email accounts and made other preparations for sending spearphishing emails.

<u>U.S. Anti-Doping Agency (USADA)</u>

54. USADA is the national anti-doping organization in the United States for Olympic and Paralympic Sports. USADA implements a national anti-doping program that includes athlete testing and also oversees therapeutic use exemptions (TUEs) for prohibited substances, consistent with the World Anti-Doping Code and in coordination with WADA and the IOC. Like WADA, USADA maintains thousands of sensitive, confidential records regarding the location of United States athletes, their drug testing history and results and TUEs. USADA is headquartered in Colorado Springs, Colorado.

55. During the timeframe of the conspiracy, USADA leadership was publicly outspoken regarding its concern about state-sanctioned doping among Russian athletes and advocated for a ban of Russian athletes from the 2016 Rio Olympics. This included cooperative efforts with CCES and other national anti-doping agencies in July 2016 to make a concerted push for a ban upon the anticipated release of the WADA McLaren Report. USADA was also a vocal

critic of the IOC's July 24, 2016 decision not to institute a full ban on Russian athletes participating in the 2016 Rio Olympics, releasing a statement that, "the decision regarding Russian participation and the confusing mess left in its wake is a significant blow to the rights of clean athletes."

56.     On August 2, 2016, defendant YERMAKOV conducted research of USADA.

57.     On August 14, 2016, conspirators began efforts to compromise USADA's network, including through "SQL injection" attacks against USADA's "ufcathlete.usada.org" website from multiple IP addresses (SQL injection attacks are a hacking technique that involved typing commands in the website's fields in order to tamper with, steal or gain unauthorized access to a database).   USADA also administers the anti-doping program for the Ultimate Fighting Championship (UFC) and specifically maintains a Russian language option for its UFC athletes. These attacks, which consisted of 24,227 SQL injection attempts from 62 different sources, continued intermittently until August 18, 2016, and used some of the same infrastructure from similar attacks against WADA during the same time frame.   The SQL injection attacks, as captured on USADA logs, show that the hackers attempted to use the "change language" function to switch from English to Russian.

58.     In late August 2016, a senior USADA anti-doping official traveled to Rio de Janeiro, Brazil for the Olympics and Paralympic games.   At that time, the USADA official served on the IPC which had unanimously suspended Russia from official participation in the 2016 Rio Paralympics.   A number of anti-doping officials stayed at a Rio hotel operated by the hotel chain described herein as having been targeted by defendant YERMAKOV.   Throughout his or her stay, the USADA official used Wi-Fi at his or her hotel and other Wi-Fi access points in Rio to remotely access USADA's computer systems and conduct official business via his or her portable electronic

19

devices.

59.    On August 19 and 25, 2016, conspirators sent spearphishing emails to the personal account of an officer serving on the USADA Board of Directors.  The emails contained a malicious link that was created by the same Bit.ly account used to send spearphishing emails to WADA employees in August 2016.

60.    On September 6, 2016, while the USADA official was still in Rio, conspirators successfully compromised the credentials for his or her USADA VPN account and Office 365 Exchange mailbox, the latter of which contained all of his or her emails.  At that time, the USADA official's account contained over 90,000 messages and an estimated 10 gigabytes of data, which included summaries of athlete test results and prescribed medications.

61.    The conspirators subsequently attempted to use the USADA official's credentials to gain unauthorized access to 33 separate USADA systems between September 7 and 14, 2016. These attempts were ultimately unsuccessful.

Canadian Centre for Ethics in Sport (CCES)

62.    CCES is the national anti-doping organization for Canada and oversees the implementation and management of Canada's Anti-Doping Program.  During the timeframe of the conspiracy, CCES coordinated drug testing and analysis, assured adherence to the World Anti-Doping Code and considered exemptions for athletes with medical conditions.  The headquarters for CCES are in Ottawa, Canada.

63.    During the conspiracy, CCES leadership spoke out publicly against Russia's state-sponsored doping program and joined with USADA in support of a ban for the Rio Olympics and beyond.  On September 19, 2016, CCES issued a media release condemning the hacking of WADA

and the athlete information in the ADAMS database, as well as the public posting of such information.

64.    In mid-September 2016, a senior CCES official traveled to Lausanne, Switzerland for a WADA-hosted anti-doping conference.  Conference proceedings and lodging were hosted at a specific hotel in Lausanne (Lausanne Hotel 1), which offered Wi-Fi for its guests.   During this trip, the CCES official traveled with a laptop computer, stayed at Lausanne Hotel 1 and used the hotel Wi-Fi connection to access the internet and conduct official business.

65.    On September 18, 2016, defendants MORENETS and SEREBRIAKOV traveled to Lausanne, Switzerland, with defendant SEREBRIAKOV staying in Lausanne Hotel 1, and defendant MORENETS staying in a second hotel in close proximity (Lausanne Hotel 2), which was also hosting anti-doping officials as guests.   Both reservations were for four nights. Defendants MORENETS and SEREBRIAKOV were at the time in possession of equipment used for on-site or close access Wi-Fi compromises.

66.    On September 19, 2016, while the CCES official was staying at Lausanne Hotel 1 and connected to the hotel's Wi-Fi network, defendants MORENETS and SEREBRIAKOV, together with co-conspirators, compromised the hotel Wi-Fi network to gain unauthorized access to the CCES official's laptop.  Using that access, the conspirators accessed the CCES official's emails and placed, or attempted to place, malware, namely Gamefish, X-agent, X-Tunnel, Remcomsvc, and Responder.exe, onto the laptop.

67.    On September 20, 2016, while at Lausanne Hotel 1, the CCES official happened to check the "Sent items" email folder on his laptop.  In the folder, he or she found a message to the Chief Medical Officer of another international sporting organization that he or she had neither

21

composed nor sent. The message contained several blatant typographical errors and inaccurately attempted to mimic the cell phone signature line of the CCES officer: "Sent from my SamsunCopenhagen." The message also contained what appeared to be an embedded malicious link.

68.     Starting on September 20, 2016, the conspirators, using the CCES official's credentials, moved laterally from the CCES official's laptop to CCES' computer network in Canada. The conspirators maintained access to, and installed tools and malware Gamefish, X-agent, and Remcomsvc, on the CCES network until at least October 24, 2016, when CCES took its network offline.

69.     Forensic evidence obtained from CCES revealed that the conspirators had used a file named "vsc.exe," which was a tool used to extract hashed passwords from a victim computer network. Analysis of the metadata of this tool revealed that it had been compiled by defendant DMITRIY SERGEYEVICH BADIN.

<u>International Association of Athletics Federations (IAAF)</u>

70.     The IAAF is an international sports federation that governs track-and-field competitions and related standardized technical equipment and official world records. During the timeframe of the conspiracy, the IAAF maintained an anti-doping department and staff, which was transitioned into a newly-formed IAAF "Athletics Integrity Unit" (AIU) in April 2017. Even before the establishment of the AIU, IAAF's anti-doping staff were responsible for all aspects of the anti-doping program for international-level athletes, including education, testing, intelligence gathering, investigations, results management, prosecutions and appeals. The IAAF is headquartered in the Principality of Monaco.

71.     On November 13, 2015, shortly after WADA released its first report, the Council of the IAAF provisionally suspended the membership of the All-Russia Athletics Federation (ARAF) in response to allegations of Russian state-sponsored doping allegations.  On July 21, 2016, TAS/CAS upheld ARAF's suspension and Russian track-and-field athletes were barred from the 2016 Rio Olympics.  Since that time, IAAF has continued the suspension, in part due to the refusal by ARAF and Russian sporting officials to acknowledge the McLaren Report's findings.

72.     From January 19 to 24, 2017, three weeks before the IAAF was to release a recommendation regarding ARAF's reinstatement, the conspirators compromised the computers of at least four IAAF officials, including the head of IAAF's anti-doping department.  Specifically, through malware placed on the IAAF network, including X-agent, the conspirators were able to review keylogger results, monitor Skype communications and access file directories.  Prior to these specific events, the command and control infrastructure for the IAAF X-agent malware was managed from an IP address frequently used by MALYSHEV.

### Fédération Internationale de Football Association (FIFA)

73.     FIFA is an international sports federation that governs football (soccer).  During the timeframe of the conspiracy, FIFA maintained a Medical and Anti-Doping Unit that directly administered the anti-doping programs for all FIFA competitions through a worldwide network of doping control officers.  FIFA is headquartered in Zurich, Switzerland.

74.     A second, more detailed report released by WADA on December 9, 2016 (the "Second McLaren Report") included evidence that Russian football players may have been involved in the state-sponsored doping scandal.  As a result, FIFA announced an investigation.

75.    From at least December 6, 2016 to January 2, 2017, the conspirators compromised a computer belonging to the head of FIFA's Medical and Anti-Doping Unit. Specifically, through malware placed on the computer, including X-agent, the conspirators downloaded more than 100 documents related to the First and Second McLaren Reports, including supporting evidence, FIFA's anti-doping policy and strategy, lab results, medical reports, contracts with doctors and medical testing labs, information about medical testing procedures and TUEs. Prior to these specific events, the command and control infrastructure for the X-agent malware was managed from an IP address frequently used by defendant MALYSHEV.

<u>Influence and Disinformation Operations Using Stolen Information</u>

76.    Beginning on or about September 1, 2016, and continuing in separate installments through May 2018, the conspirators, falsely claiming to be the hacktivist group Fancy Bears' Hack Team, used online accounts and other infrastructure procured and managed, at least in part, by conspirators in GRU Unit 74455 to release data stolen from WADA, USADA, CCES, TAS/CAS, IAAF, and FIFA, as well as data that appeared to be stolen from 35 other anti-doping agencies or sporting organizations. Such data was available to and viewed by residents in the Western District of Pennsylvania.

<u>The Public Release of Stolen Information</u>

77.    The domains fancybear.org and fancybear.net were registered on September 1, 2016. On September 12, 2016, data stolen from WADA and its ADAMS database by conspirators first appeared on fancybear.net, including medical information for individual athletes, and private, official email communications. Although the initial disseminations focused on U.S. athletes, subsequent releases of stolen data included records of nearly 250 athletes from almost 30 countries.

These athlete records from WADA included testing history and TUEs for an athlete and resident of the Western District of Pennsylvania. Many of the WADA documents released by the conspirators did not accurately reflect their original form. On fancybear.net, individual athletes were named, categorized by nationality and sport, an identified as having such personal diagnoses as "ADD" (attention deficit disorder), "drug addiction," "diabetes insipidus," or "circulatory collapse." As one example, an athlete's stolen record was posted, listing the athlete's date of birth, sport, nationality, the daily dose and manner of administration of a prescribed therapeutic substance, approving physician and the results of a recent (urine) drug test.

78.     On or about October 6, 2016, emails and data that conspirators stole from USADA were released on fancybear.net. The records included personal medical information, such as testing histories and TUEs, for multiple athletes, including an athlete and resident of the Western District of Pennsylvania.

79.     On December 13, 2016, emails and data that conspirators stole from CCES network were released on fancybear.net.

80.     On or about June 22, 2017, and July 5, 2017, emails and data that conspirators stole from IAAF's network were released on fancybear.net, including emails about doping violations of non-Russian athletes.

81.     On August 28, 2017, emails and data that that conspirators stole from FIFA's network were released on fancybear.net, including lists of players who were provided TUEs before the 2010 World Cup, a list of failed drug tests, and emails between FIFA and anti-doping officials.

<u>The Conspirators Sustained Media Campaign</u>

25

82.    The conspirators released this stolen information to further one of the objectives of the conspiracy, namely to undermine and retaliate against international anti-doping officials who had exposed the Russian state-sponsored doping program at the 2014 Sochi Winter Olympics and other competitions.

83.    In some instances, the Fancy Bears' Hack Team's posts and other communications parroted or supported themes that were already found in the Russian government's narrative.  The following are examples of official Russian statements regarding the investigative findings:

    a.   On August 2, 2016, the President of the Olympic Committee of Russia claimed that "[w]e are witnessing the direct interference of politics in sport";

    b.   On August 21, 2017, the Russian Minister of Sport and the President of the Olympic Committee of Russia indicated in a joint letter to the IOC that "the problem of doping is faced not only by Russia"; and

    c.   On or about February 11, 2018, the Russian Foreign Minister claimed that the accusations of state-sponsored doping were orchestrated by the United States "because they can't beat us fairly."

84.    The Fancy Bears' Hack Team, on fancybear.net, made similar misleading statements, such as:

    a.   "U.S. and Canada Sports Officials' Secret Plot Revealed"; and

    b.   Canada and the United States "tried to further their political interests pretending to fight for clean sport";

    c.   "We have proof of American athletes taking doping"; and

26

     d.    "WADA has failed to be a viable and trusted anti-doping organization because

           its leadership and [national anti-doping agencies'] chiefs follow Anglo-Saxon

           political agenda."

85.    Between September 12, 2016 and at least January 17, 2018, the conspirators engaged in a concerted effort to draw media attention to the leaks through a proactive outreach campaign that went beyond its public social media posts. During that timeframe, the @fancybears and @fancybearHT Twitter accounts sent direct messages to the Twitter accounts of approximately 116 reporters around the world advertising the stolen information.

86.    Similarly, between September 19, 2016, and July 20, 2018, the conspirators, using the Fancy Bears' Hack Team persona, exchanged e-mails with approximately 70 reporters around the world. The only condition set forth by the conspirators in such exchanges was that reporters were required to refer to the Fancy Bears' Hack Team by name in the story and later provide a link to the story back to the conspirators. In some cases, reporters pressed for and received promises of exclusivity in such reporting, with one such reporter attempting to make arrangements for a right of first refusal for articles on all future leaks and actively suggesting methods with which the conspiracy could search the stolen materials for documents of interest to that reporter (e.g., keywords of interest).

87.    After the articles were published, conspirators used the Fancy Bears' Hack Team social media accounts to draw attention to the articles, in an apparent attempt to amplify the exposure and effect of their message.

<u>Organisation for the Prohibition of Chemical Weapons (OPCW)</u>

88.    The OPCW is the body that implements the Chemical Weapons Convention of

1997 and includes 193 member nations, including the United States. On April 7, 2018, the OPCW Executive Council convened at its headquarters in The Hague to discuss the use of toxic chemical weapons in Syria. Also, in April 2018, including on or about April 11 and 12, OPCW transmitted statements regarding its investigation of the March 4, 2018 poisoning of a former GRU officer and another Russian national in the United Kingdom with a chemical nerve agent.

89. On April 10, 2018, defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, all using Russian diplomatic passports, traveled to The Hague in the Netherlands in furtherance of another on-site operation. According to a taxi receipt found on his person, prior to his departure from Moscow on April 10, 2018, defendant MORENETS traveled by taxi from Nesvizhsky Pereulok, a street located at the rear entrance of GRU headquarters for Unit 26165, directly to Sheremetyevo Airport. (See Exhibit C).

90. Upon their arrival in the Netherlands, an identified official from the Russian Embassy escorted defendants MORENETS, SEREBRIAKOV, SOTNIKOV and MININ through customs. All four thereafter checked into a hotel situated adjacent to the OPCW headquarters in The Hague.

91. On April 11, 2018, defendants SOTNIKOV and MININ rented a car and thereafter assembled and secreted technical hacking equipment in the car's trunk. The technical equipment was capable of several techniques, including long-distance, surreptitious interception of Wi-Fi signals, as well as harvesting of Wi-Fi user credentials. The next day, all four defendants checked into a second hotel located adjacent to the OPCW headquarters in The Hague.

92. On April 13, 2018, defendants MORENETS, SEREBRIAKOV, SOTNIKOV and

MININ parked the rental car adjacent to the OPCW property, with the trunk facing the OPCW. (See Exhibit D).  The hacking equipment was deployed with an antenna (covered by a jacket) aimed at the nearby headquarters of the OPCW and configured so that it could be controlled by either an attached laptop computer or through a remote 4G connection.  (See Exhibit E).

93.     After the GRU team activated the equipment, the Dutch defence intelligence service (Militaire Inlichtingen en Veiligheidsdienst or MIVD) disrupted the GRU team's operation.   As a result, the conspirators abandoned their equipment, including defendant SEREBRIAKOV's backpack.  This backpack contained additional technical equipment that the team could also use to surreptitiously intercept Wi-Fi signals and traffic, including a "Wi-Fi Pineapple."  (See Exhibit F).  At least one item of equipment in defendant SEREBRIAKOV's possession contained technical data indicating that it had been used to connect to hotel Wi-Fi at Lausanne Hotels 1 and 2, where defendants MORENETS and SERBRIAKOV had stayed in Switzerland on September 20-22, 2016, (the dates they conducted the Wi-Fi compromise of the senior CCES official's laptop at the same hotel), as well as multiple other international destinations, including a hotel in Kuala Lumpur, Malaysia, in December 2017.   Defendant SEREBRIAKOV's equipment was also found to have contained an image that placed him at the 2016 Summer Olympics in Rio on August 14, 2016.  (See Exhibit G).

94.     Further data on defendant SEREBRIAKOV's equipment indicated that, on April 9, 2018, he had conducted online searches of the Spiez Swiss Chemical Laboratory, an accredited laboratory of the OPCW for conducting analysis of military chemical agents, including the chemical agent that United Kingdom authorities connected to the poisoning of the former GRU officer in the United Kingdom.  Defendants MORENETS, SEREBRIAKOV, SOTNIKOV and

MININ had earlier purchased train tickets from The Hague to Bern, Switzerland, dated April 17, 2018, in order to continue their operational deployment to target the Spiez laboratory.

<u>STATUTORY ALLEGATIONS</u>

95.     Beginning at least in or about 2014 and continuing until at least in or about May 2018, the exact dates being unknown to the Grand Jury, in the Western District of Pennsylvania and elsewhere, defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, did knowingly and intentionally combine, conspire, confederate, and agree together, with each other and with others known and unknown to the grand jury, to commit offenses against the United States, namely:

a.      to access a computer without authorization and exceed authorized access to a computer, and to obtain thereby information from a protected computer, in furtherance of a criminal and tortious act in violation of the laws of the Commonwealth of Pennsylvania, namely, the common law tort of Invasion of Privacy, and where the value of the information did, and would if completed, exceed $5,000, in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and 1030(c)(2)(B);

b.      to cause the transmission of a program, information, code, and command, and as a result of such conduct, to cause damage without authorization to a protected computer, and where the offense did cause and would, if completed, have caused, loss aggregating $5,000 in value to at least one person during a one-year

30

period from a related course of conduct affecting a protected computer, and damage affecting at least 10 protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B); and,

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
(Wire Fraud Conspiracy)

The grand jury further charges:

96.     The allegations contained in Paragraphs 1 through 94 of this indictment are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

THE CONSPIRACY AND ITS OBJECTS

97.     From at least approximately 2014, and continuing thereafter to in and around April 2018, in the Western District of Pennsylvania and elsewhere, defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, knowingly and willfully did conspire, combine, and agree to commit an offense against the United States, that is, wire fraud, contrary to the provisions of Title 18, United States Code, Section 1343, to wit:

> the defendants, ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ,  together with conspirators, having devised and intending to devise a scheme and artifice to defraud, and to obtain property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire

32

communication in interstate and foreign commerce, certain writings, signs,

signals, and pictures for the purpose of executing such scheme and artifice.

98.    Specifically, an object of the conspiracy was to gain unauthorized access into the

computer networks of Westinghouse Electric Company (WEC), the U.S. Anti-Doping Agency

(USADA), the World Anti-Doping Agency (WADA), and the Canadian Center for Ethics in Sport

(CCES) as well as the personal and business email accounts of their respective employees, in order

to steal user login credentials and passwords, email communications, personally identifiable

information, sensitive medical information of international athletes, proprietary information, data,

property and other information of value, by means of false and fraudulent pretenses, to further the

interests of the Russian Federation.

99.    In order to gain unauthorized access to victims' email accounts and computer

networks, defendants IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH

MALYSHEV, ALEKSEI SERGEYEVICH MORENETS and EVGENII MIKHAYLOVICH

SEREBRIAKOV, together with their conspirators, crafted and transmitted, in interstate and

foreign commerce, spearphishing emails that targeted the victims.  The spearphishing emails were

designed to appear legitimate in order to deceive recipient victims into opening the email and

clicking on a malicious attachment or link that, when clicked, enabled the conspirators to steal the

victims' login credentials to gain access to the victims' networks.  The malicious links included

"spoofed," or mimicked, domains that resembled legitimate websites associated with the victim

entities.  For example, the conspirators registered the domain "Westinqhousenuclear" on

December 10, 2014, "wada.awa.org" on August 3, 2016, and "wada.arna.org," and "tas-cass.org"

on August 8, 2016, and thereafter utilized those spoofed domains in furtherance of the fraud scheme.

All in violation of Title 18, United States Code, Sections 1349 and 3559(g)(1).

## COUNTS THREE THROUGH SEVEN
### (Wire Fraud)

The grand jury further charges:

100.   The allegations contained in Paragraphs 1 through 94 of this Indictment are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

101.   On or about the dates set forth below, in the Western District of Pennsylvania and elsewhere, the defendant, IVAN SERGEYEVICH YERMAKOV, having devised and intending to devise a scheme and artifice to defraud, and to obtain property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, and pictures for the purpose of executing such scheme and artifice; to wit, the defendant did knowingly transmit spearphishing emails, designed to appear legitimate, that contained malicious Bit.ly links, to the personal email accounts of the victims identified below, all employees of Westinghouse Electric Company (WEC), on or about the dates set forth below, with the intention of obtaining the victims' account login credentials, with each such transmission being a separate count of this indictment:

| Count | Approx. Date | Victim | Bit.ly Link | Bit.ly Account |
|-------|-------------|--------|-------------|----------------|
| 3 | December 24, 2014 | A | http://bit.ly/16Q0fWb | activqwe |
| 4 | December 24, 2014 | B | http://bit.ly/1xb8Efq | activqwe |
| 5 | December 24, 2014 | C | http://bit.ly/13vFZqx | activqwe |
| 6 | January 17, 2015 | D | http://bit.ly/1CiXN3W | activqwe |
| 7 | January 17, 2015 | E | http://bit.ly/1Cz3Fqk | activqwe |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS EIGHT AND NINE
### (Aggravated Identity Theft)

The grand jury further charges:

102.    The allegations contained in Paragraphs 1 through 94 of this Indictment are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

103.    Beginning in at least November 2014 and continuing until at least September 2016, in the Western District of Pennsylvania and elsewhere, the defendants, ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV and DMITRIY SERGEYEVICH BADIN, aided and abetted by others known and unknown to the grand jury, did knowingly transfer, possess and use without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), namely, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, knowing that the means of identification belonged to another real person who worked on behalf of the targeted victim organizations: Westinghouse Electric Company and the U.S. Anti-Doping Agency (USADA).

| Count | Approx. Date | Victim Org. | Means of Identification |
|-------|--------------|-------------|-------------------------|
| 8 | From November 2014-January 2015 | WEC | Username and passwords for multiple employee accounts |
| 9 | September 6, 2016 | USADA | Login credentials for USADA official |

In violation of Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), 1028(c)(4) and 2.

36

# COUNT TEN
### (Conspiracy to Commit Money Laundering)

The grand jury further charges:

104.    The allegations contained in Paragraphs 1 through 94 of this Indictment are repeated, re-alleged, and incorporated by reference as if fully set forth herein.

105.    To facilitate the purchase of infrastructure used in their hacking activity—targeting anti-doping and other sports-related organizations and releasing the stolen documents—defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, together with conspirators known and unknown, conspired to launder money through a web of transactions structured to capitalize on the perceived anonymity of cryptocurrencies such as bitcoin.

106.    Although the conspirators caused transactions to be conducted in a variety of currencies, including U.S. dollars, they principally used bitcoin when purchasing servers, registering domains, and otherwise making payments in furtherance of hacking activity.  Many of these payments were processed by companies located in the United States that provided payment processing services to hosting companies, domain registrars, and other vendors both international and domestic.  The use of bitcoin allowed the conspirators to avoid direct relationships with traditional financial institutions, allowing them to evade greater scrutiny of their identities and sources of funds.

107.    All bitcoin transactions are added to a public ledger called the Blockchain, but the Blockchain identifies the parties to each transaction only by alpha-numeric identifiers known as

bitcoin addresses. To further avoid creating a centralized paper trail of all of their purchases, the conspirators purchased infrastructure using hundreds of different email accounts, in some cases using a new account for each purchase. The conspirators used fictitious names and addresses in order to obscure their identities and their links to Russia and the Russian government. For example, the wada.arna.org, tas-cass.org domains and an associated virtual private server were registered and paid for using the fictitious name "Beula Town."

108. The conspirators used several dedicated email accounts to track basic bitcoin transaction information and to facilitate bitcoin payments to vendors. One of these dedicated accounts received hundreds of bitcoin payment requests from approximately 100 different email accounts. For example, on or about August 8, 2016, the account received the instruction to "[p]lease send exactly 0.012684 bitcoin to" a certain thirty-four character bitcoin address. Shortly thereafter, a transaction matching those exact instructions was added to the Blockchain.

109. On occasion, the conspirators facilitated bitcoin payments using the same computers that they used to conduct their hacking activity, including to create and send test spearphishing emails.

110. The conspirators funded the purchase of computer infrastructure for their hacking activity in part by "mining" bitcoin. Individuals and entities can mine bitcoin by allowing their computing power to be used to verify and record payments on the bitcoin public ledger, a service for which they are rewarded with freshly-minted bitcoin. The pool of bitcoin generated from the GRU's mining activity was used, for example, to pay a United States-based company to register the domain wada-arna.org through a payment processing company located in the United States.

111.    The conspirators used the same funding structure—and in some cases, the very same pool of funds—to purchase key accounts, servers, and domains used in their anti-doping-related hacking activity.  For example, the conspirators used the same pool of bitcoins to fund two operational personas which, in turn, registered the domains wada-arna.org (to target WADA), tas-cass.org (to target TAS/CAS) and the domains upmonserv.net and appexrv.com, used for command and control of X-agent malware installed on CCES network.

<u>STATUTORY ALLEGATIONS</u>

112.    From at least in or around 2015 through 2016, within the Western District of Pennsylvania and elsewhere, defendants ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, together with others, known and unknown to the grand jury, did knowingly and intentionally conspire to transport, transmit, and transfer monetary instruments and funds to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, namely, a violation of Title 18, United States Code, Section 1030, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

113. The allegations contained in Counts One through Ten of this Indictment are incorporated herein by reference as though fully set forth herein for the purpose of alleging criminal forfeitures pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i)(1)(A).

114. As a result of the commission of the violations charged in Count One, the defendants, ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, did use the following to commit or to promote the commission of said violations (hereinafter collectively referred to as the "Subject Domain Names"): fancybear.net and fancybear.org.

115. The United States hereby gives notice to the defendants, ALEKSEI SERGEYEVICH MORENETS, EVGENII MIKHAYLOVICH SEREBRIAKOV, IVAN SERGEYEVICH YERMAKOV, ARTEM ANDREYEVICH MALYSHEV, DMITRIY SERGEYEVICH BADIN, OLEG MIKHAYLOVICH SOTNIKOV and ALEXEY VALEREVICH MININ, charged in Count One that, upon their conviction of such offense, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i)(1)(B), which require any person convicted of such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense; and (b) Title 18, United States Code, Section 1030(i)(1)(A), which requires any person convicted of such offense to forfeit any personal property that was used or intended to be used to

40

commit or to facilitate the commission of the offense, including but not limited to the following

SUBJECT DOMAIN NAMES: fancybear.net and fancybear.org.


SCOTT W. BRADY
United States Attorney
PA ID No. 88352

41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. |
| v. | * | |
| | * | (18 U.S.C. §§ 2, 371, 1349, 1028A) |
| INTERNET RESEARCH AGENCY LLC | * | |
| A/K/A MEDIASINTEZ LLC A/K/A | * | |
| GLAVSET LLC A/K/A MIXINFO | * | |
| LLC A/K/A AZIMUT LLC A/K/A | * | |
| NOVINFO LLC, | * | |
| CONCORD MANAGEMENT AND | * | |
| CONSULTING LLC, | * | |
| CONCORD CATERING, | * | |
| YEVGENIY VIKTOROVICH | * | |
| PRIGOZHIN, | * | |
| MIKHAIL IVANOVICH BYSTROV, | * | |
| MIKHAIL LEONIDOVICH BURCHIK | * | |
| A/K/A MIKHAIL ABRAMOV, | * | |
| ALEKSANDRA YURYEVNA | * | |
| KRYLOVA, | * | |
| ANNA VLADISLAVOVNA | * | |
| BOGACHEVA, | * | |
| SERGEY PAVLOVICH POLOZOV, | * | |
| MARIA ANATOLYEVNA BOVDA | * | |
| A/K/A MARIA ANATOLYEVNA | * | |
| BELYAEVA, | * | |
| ROBERT SERGEYEVICH BOVDA, | * | |
| DZHEYKHUN NASIMI OGLY | * | |
| ASLANOV A/K/A JAYHOON | * | |
| ASLANOV A/K/A JAY ASLANOV, | * | |
| VADIM VLADIMIROVICH | * | |
| PODKOPAEV, | * | |
| GLEB IGOREVICH VASILCHENKO, | * | |
| IRINA VIKTOROVNA KAVERZINA, | * | |
| and | * | |
| VLADIMIR VENKOV. | ******* | |

Defendants.

**INDICTMENT**

The Grand Jury for the District of Columbia charges:

**Introduction**

1.      The United States of America, through its departments and agencies, regulates the activities

of foreign individuals and entities in and affecting the United States in order to prevent, disclose,

and counteract improper foreign influence on U.S. elections and on the U.S. political system.  U.S.

law bans foreign nationals from making certain expenditures or financial disbursements for the

purpose of influencing federal elections.  U.S. law also bars agents of any foreign entity from

engaging in political activities within the United States without first registering with the Attorney

General.  And U.S. law requires certain foreign nationals seeking entry to the United States to

obtain a visa by providing truthful and accurate information to the government.  Various federal

agencies, including the Federal Election Commission, the U.S. Department of Justice, and the U.S.

Department of State, are charged with enforcing these laws.

2.      Defendant INTERNET RESEARCH AGENCY LLC ("ORGANIZATION") is a Russian

organization engaged in operations to interfere with elections and political processes.  Defendants

MIKHAIL IVANOVICH BYSTROV, MIKHAIL LEONIDOVICH BURCHIK, ALEKSANDRA

YURYEVNA KRYLOVA, ANNA VLADISLAVOVNA BOGACHEVA, SERGEY PAVLOVICH

POLOZOV, MARIA ANATOLYEVNA BOVDA, ROBERT SERGEYEVICH BOVDA,

DZHEYKHUN NASIMI OGLY ASLANOV, VADIM VLADIMIROVICH PODKOPAEV, GLEB

IGOREVICH VASILCHENKO, IRINA VIKTOROVNA KAVERZINA, and VLADIMIR

VENKOV worked in various capacities to carry out Defendant ORGANIZATION's interference

operations targeting the United States.  From in or around 2014 to the present, Defendants

knowingly and intentionally conspired with each other (and with persons known and unknown to

2

the Grand Jury) to defraud the United States by impairing, obstructing, and defeating the lawful functions of the government through fraud and deceit for the purpose of interfering with the U.S. political and electoral processes, including the presidential election of 2016.

3.      Beginning as early as 2014, Defendant ORGANIZATION began operations to interfere with the U.S. political system, including the 2016 U.S. presidential election.   Defendant ORGANIZATION received funding for its operations from Defendant YEVGENIY VIKTOROVICH PRIGOZHIN and companies he controlled, including Defendants CONCORD MANAGEMENT AND CONSULTING LLC and CONCORD CATERING (collectively "CONCORD").  Defendants CONCORD and PRIGOZHIN spent significant funds to further the ORGANIZATION's operations and to pay the remaining Defendants, along with other uncharged ORGANIZATION employees, salaries and bonuses for their work at the ORGANIZATION.

4.      Defendants, posing as U.S. persons and creating false U.S. personas, operated social media pages and groups designed to attract U.S. audiences.  These groups and pages, which addressed divisive U.S. political and social issues, falsely claimed to be controlled by U.S. activists when, in fact, they were controlled by Defendants.  Defendants also used the stolen identities of real U.S. persons to post on ORGANIZATION-controlled social media accounts. Over time, these social media accounts became Defendants' means to reach significant numbers of Americans for purposes of interfering with the U.S. political system, including the presidential election of 2016.

5.      Certain Defendants traveled to the United States under false pretenses for the purpose of collecting intelligence to inform Defendants' operations.  Defendants also procured and used computer infrastructure, based partly in the United States, to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement.

6.      Defendant ORGANIZATION had a strategic goal to sow discord in the U.S. political system, including the 2016 U.S. presidential election.  Defendants posted derogatory information about a number of candidates, and by early to mid-2016, Defendants' operations included supporting the presidential campaign of then-candidate Donald J. Trump ("Trump Campaign") and disparaging Hillary Clinton.  Defendants made various expenditures to carry out those activities, including buying political advertisements on social media in the names of U.S. persons and entities.  Defendants also staged political rallies inside the United States, and while posing as U.S. grassroots entities and U.S. persons, and without revealing their Russian identities and ORGANIZATION affiliation, solicited and compensated real U.S. persons to promote or disparage candidates.  Some Defendants, posing as U.S. persons and without revealing their Russian association, communicated with unwitting individuals associated with the Trump Campaign and with other political activists to seek to coordinate political activities.

7.      In order to carry out their activities to interfere in U.S. political and electoral processes without detection of their Russian affiliation, Defendants conspired to obstruct the lawful functions of the United States government through fraud and deceit, including by making expenditures in connection with the 2016 U.S. presidential election without proper regulatory disclosure; failing to register as foreign agents carrying out political activities within the United States; and obtaining visas through false and fraudulent statements.

## COUNT ONE

### (Conspiracy to Defraud the United States)

8.      Paragraphs 1 through 7 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

9.      From in or around 2014 to the present, in the District of Columbia and elsewhere,

4

Defendants, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to defraud the United States by impairing, obstructing, and defeating the lawful functions of the Federal Election Commission, the U.S. Department of Justice, and the U.S. Department of State in administering federal requirements for disclosure of foreign involvement in certain domestic activities.

### Defendants

10.    Defendant  INTERNET  RESEARCH  AGENCY  LLC  (Агентство  Интернет Исследований) is a Russian organization engaged in political and electoral interference operations.  In or around July 2013, the ORGANIZATION registered with the Russian government as a Russian corporate entity.  Beginning in or around June 2014, the ORGANIZATION obscured its conduct by operating through a number of Russian entities, including Internet Research LLC, MediaSintez LLC, GlavSet LLC, MixInfo LLC, Azimut LLC, and NovInfo LLC.  Starting in or around 2014, the ORGANIZATION occupied an office at 55 Savushkina Street in St. Petersburg, Russia.  That location became one of the ORGANIZATION's operational hubs from which Defendants and other co-conspirators carried out their activities to interfere in the U.S. political system, including the 2016 U.S. presidential election.

a.    The ORGANIZATION employed hundreds of individuals for its online operations, ranging from creators of fictitious personas to technical and administrative support. The ORGANIZATION's annual budget totaled the equivalent of millions of U.S. dollars.

b.    The ORGANIZATION was headed by a management group and organized into departments, including: a graphics department; a data analysis department; a search-engine optimization ("SEO") department; an information-technology ("IT")

department to maintain the digital infrastructure used in the ORGANIZATION's
operations; and a finance department to budget and allocate funding.

c.   The ORGANIZATION sought, in part, to conduct what it called "information
warfare against the United States of America" through fictitious U.S. personas on
social media platforms and other Internet-based media.

d.   By in or around April 2014, the ORGANIZATION formed a department that went
by various names but was at times referred to as the "translator project."   This
project focused on the U.S. population and conducted operations on social media
platforms such as YouTube, Facebook, Instagram, and Twitter.   By approximately
July 2016, more than eighty ORGANIZATION employees were assigned to the
translator project.

e.   By in or around May 2014, the ORGANIZATION's strategy included interfering
with the 2016 U.S. presidential election, with the stated goal of "spread[ing] distrust
towards the candidates and the political system in general."

11.   Defendants  CONCORD  MANAGEMENT  AND  CONSULTING  LLC  (Конкорд
Менеджмент и Консалтинг) and CONCORD CATERING are related Russian entities with
various Russian government contracts.  CONCORD was the ORGANIZATION's primary source
of funding for its interference operations.   CONCORD controlled funding, recommended
personnel, and oversaw ORGANIZATION activities through reporting and interaction with
ORGANIZATION management.

a.   CONCORD funded the ORGANIZATION as part of a larger CONCORD-funded
interference operation that it referred to as "Project Lakhta."  Project Lakhta had
multiple components, some involving domestic audiences within the Russian

Federation and others targeting foreign audiences in various countries, including the United States.

b.   By in or around September 2016, the ORGANIZATION's monthly budget for Project Lakhta submitted to CONCORD exceeded 73 million Russian rubles (over 1,250,000 U.S. dollars), including approximately one million rubles in bonus payments.

c.   To conceal its involvement, CONCORD labeled the monies paid to the ORGANIZATION for Project Lakhta as payments related to software support and development.  To further conceal the source of funds, CONCORD distributed monies to the ORGANIZATION through approximately fourteen bank accounts held in the names of CONCORD affiliates, including Glavnaya Liniya LLC, Merkuriy LLC, Obshchepit LLC, Potentsial LLC, RSP LLC, ASP LLC, MTTs LLC, Kompleksservis LLC, SPb Kulinariya LLC, Almira LLC, Pishchevik LLC, Galant LLC, Rayteks LLC, and Standart LLC.

12.   Defendant YEVGENIY VIKTOROVICH PRIGOZHIN (Пригожин Евгений Викторович) is a Russian national who controlled CONCORD.

a.   PRIGOZHIN approved and supported the ORGANIZATION's operations, and Defendants and their co-conspirators were aware of PRIGOZHIN's role.

b.   For example, on or about May 29, 2016, Defendants and their co-conspirators, through an ORGANIZATION-controlled social media account, arranged for a real U.S. person to stand in front of the White House in the District of Columbia under false pretenses to hold a sign that read "Happy 55th Birthday Dear Boss." Defendants and their co-conspirators informed the real U.S. person that the sign

was for someone who "is a leader here and our boss . . . our funder." PRIGOZHIN's Russian passport identifies his date of birth as June 1, 1961.

13.    Defendant MIKHAIL IVANOVICH BYSTROV (Быстров Михаил Иванович) joined the ORGANIZATION by at least in or around February 2014.

    a.    By approximately April 2014, BYSTROV was the general director, the ORGANIZATION's highest-ranking position. BYSTROV subsequently served as the head of various other entities used by the ORGANIZATION to mask its activities, including, for example, Glavset LLC, where he was listed as that entity's general director.

    b.    In or around 2015 and 2016, BYSTROV frequently communicated with PRIGOZHIN about Project Lakhta's overall operations, including through regularly scheduled in-person meetings.

14.    Defendant MIKHAIL LEONIDOVICH BURCHIK (Бурчик Михаил Леонидович) A/K/A MIKHAIL ABRAMOV joined the ORGANIZATION by at least in or around October 2013. By approximately March 2014, BURCHIK was the executive director, the ORGANIZATION's second-highest ranking position. Throughout the ORGANIZATION's operations to interfere in the U.S political system, including the 2016 U.S. presidential election, BURCHIK was a manager involved in operational planning, infrastructure, and personnel. In or around 2016, BURCHIK also had in-person meetings with PRIGOZHIN.

15.    Defendant ALEKSANDRA YURYEVNA KRYLOVA (Крылова Александра Юрьевна) worked for the ORGANIZATION from at least in or around September 2013 to at least in or around November 2014. By approximately April 2014, KRYLOVA served as director and was the ORGANIZATION's third-highest ranking employee. In 2014, KRYLOVA traveled to the United