**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| THE TRANSPARENCY PROJECT, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:20-CV-00467-SDJ- |
| v. | § | CAN |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| JUSTICE, ET AL., | § | |
| | § | |
| Defendants. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is the Non-FBI Defendants' Motion for Summary Judgment [Dkt. 51]. Having considered the Motion, Plaintiff's Response/Cross-Motion for Summary Judgment [Dkt. 59], Defendants' Reply [Dkt. 62], and Plaintiff's Sur-Reply [Dkt. 63], and all other relevant filings, the Court recommends Non-FBI Defendants' Motion for Summary Judgment [Dkt. 51] be **GRANTED IN PART**, as set forth herein, and Plaintiff's Cross-Motion [Dkt. 59] be **DENIED**.

**INTRODUCTION**

On June 12, 2020, Plaintiff The Transparency Project ("Plaintiff") filed the instant lawsuit against the U.S. Department of Justice ("DOJ") and the National Security Agency ("NSA") to compel responses to requests filed by Plaintiff pursuant to the Freedom of Information Act ("FOIA") [Dkt. 1]. On July 20, 2020, Plaintiff filed an amended complaint, adding as Defendants the Federal Bureau of Investigation ("FBI"), the Central Intelligence Agency ("CIA"), and the Office of the Director of National Intelligence ("ODNI") [Dkt. 5]. The instant motion addresses eight individual FOIA requests by Plaintiff to these agencies seeking a wide range of documents.

Plaintiff's suit asserts one count for violation of FOIA, 5 U.S.C. § 552, alleging irreparable harm and averring Plaintiff will "continue to be irreparably harmed unless the Defendants are compelled to comply with FOIA" [Dkt. 5 at 13]. Plaintiff requests the following relief:

> (1) order the Defendants to conduct a search for any and all records responsive to the Plaintiff's FOIA requests and demonstrate that they employed search methods reasonably likely to lead to the discovery of records responsive to the Plaintiff's FOIA request; (2) order the Defendants to produce, by a date certain, any and all non-exempt records responsive to the Plaintiff's FOIA requests and a *Vaughn* index of any responsive records withheld under claim of exemption; (3) enjoin the Defendants from continuing to withhold any and all nonexempt records responsive to the Plaintiff's FOIA requests; (4) grant the Plaintiff an award of litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and (5) grant the Plaintiff such other relief as the Court deems just and proper.

[Dkt. 5 at 14].[1]

### Non-FBI Defendants' Motion for Summary Judgment

On February 22, 2022, the Non-FBI Defendants filed the instant Motion for Summary Judgment [Dkt. 51]. The Non-FBI Defendants include DOJ, NSA, CIA, and ODNI. The DOJ component entities are the National Security Division ("NSD"), the Criminal Division ("CRM"), the Executive Office of United States Attorneys ("EOUSA"), and the Office of Information Policy ("OIP") on behalf of the Offices of the Attorney General ("OAG") and the Office of Legislative Affairs ("OLA") [Dkt. 51 at 1 & n.1]. On April 5, 2022, Plaintiff filed its Response in Opposition to Non-FBI Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment [Dkt. 59]. Discussed more fully *infra*, Defendants argue Plaintiff "does not actually move for summary judgment but rather just provides conclusory arguments in response" to their motion [Dkt. 62 at 1]. On May 2, 2022, Defendants filed their reply to Plaintiff's response/"cross-motion" [Dkt. 62]. On May 3, 2022, Plaintiff filed a sur-reply [Dkt. 63].

---

[1] On April 29, 2021, this matter was referred to the undersigned for pretrial proceedings [Dkt. 23].

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency of Int'l Dev.*, 484 F. Supp. 2d 68,73 (D.D.C. 2007)). "To prevail under Rule 56, a federal agency 'must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the (FOIA) inspection requirements.'" *Buzzfeed, Inc. v. U.S. Dep't of Homeland Sec.*, No. 19-CV-03062 (DLF), 2022 WL 2303985, at *2 (D.D.C. June 27, 2022) (quoting *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (citation omitted)). "The burden is on the government agency to show that nondisclosed, requested material falls within a stated exemption." *Smith v. CIA*, 393 F. Supp. 3d 72, 78 (D.D.C. 2019) (citing *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)). "The district court conducts a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions." *Id.* (citing 5 U.S.C. § 552(a)(4)(B)). "When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 567 F. Supp. 3d 204, 210 (D.D.C. 2021) (citing *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009)).

"In FOIA cases, including those where a *Glomar* response is issued, summary judgment may be based solely on information provided in the agency's supporting declarations." *Smith v. CIA*, 393 F. Supp. 3d at 78. In ruling on a summary judgment motion, a court "may rely on non-

conclusory agency affidavits demonstrating the basis for withholding if they are not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Campaign Legal Ctr. v. U.S. Dep't of Just.*, 34 F.4th 14, 22 (D.C. Cir. 2022) (quoting *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021)).  "An agency may sustain its burden by means of affidavits, but only 'if they contain reasonable specificity of detail rather than merely conclusory statements.'" *Lindsey v. FBI*, 490 F. Supp. 3d 1, 9 (D.D.C. 2020) (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008)).  Taken together, "[i]f an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Id.* (quoting *ACLU v. DOD*, 628 F.3d 612, 619 (D.C. Cir. 2011)).  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)).

## SUMMARY JUDGMENT EVIDENCE

Defendants submit the following declarations and supporting exhibits in support of their Motion for Summary Judgment:

**CIA** – Blaine Declaration [Dkt. 51-1 at 1-39]: Declaration of Vanna Blaine, Information Review Officer, Litigation Information Review Office, Central Intelligence Agency (Feb. 10, 2022):

Exhibit A [Dkt. 51-1 at 40-102]: CIA *Vaughn* Index;

Exhibit B [Dkt. 51-1 at 103-06]: May 28, 2020 Request;

Exhibit C [Dkt. 51-1 at 107-08]: CIA Acknowledgement of May 28, 2020 Request, Reference F-2020-01504 (June 15, 2020);

Exhibit D [Dkt. 51-1 at 109-13]: June 18, 2020 Request [Reference F-2020-1646];

Exhibit E [Dkt. 51-1 at 114-16]: Interim Response to May 28 and June 18 Requests (June 4, 2021);

Exhibit F [Dkt. 51-1 at 117-20]: June 4, 2021 Interim Response, Confirmation of Mail Returned;

Exhibit G [Dkt. 51-1 at 121-23]: Final Response (July 13, 2021).

**EOUSA** – Cain Declaration [Dkt. 51-2 at 1-8]: Declaration of Kara Cain, Executive Office for United States Attorneys (Feb. 7, 2022):

Exhibit A [Dkt. 51-2 at 9-10]: EOUSA *Vaughn* Index;

Exhibit B [Dkt. 51-2 at 11-13]: October 26, 2018 Request;

Exhibit C [Dkt. 51-2 at 14-17]: Final Response to October 26, 2018 Request [Request No. EOUSA-2019-000496] (June 25, 2021);

Exhibit D [Dkt. 51-2 at 18-21]: Final Response to June 11, 2020 Request [Request No. EOUSA-2020-004715] and *Vaughn* Index (Jan. 12, 2021).

**NSA** – Kiyosaki Declaration [Dkt. 51-3 at 1-27]: Declaration of Linda M. Kiyosaki, National Security Agency (Feb. 10, 2022):

Exhibit A [Dkt. 51-3 at 28-32]: October 29, 2018 Request and June 12, 2020 Request;

Exhibit B [Dkt. 51-3 at 33-38]: Initial Response and Final Response to October 29, 2018 Request (Feb. 2, 2021);

Exhibit C [Dkt. 51-3 at 39-43]: Initial Response and Final Response to June 12, 2020 Request;

Exhibit D [Dkt. 51-3 at 44-47]: Appeal of June 12 Request Final Response (Feb. 11, 2021);

Exhibit E [Dkt. 51-3 at 48-61]: NSA Records Produced;

Exhibit F [Dkt. 51-3 at 62-75]: Reissuance of Final Response to October 29, 2018 Request, Updated Exemptions, and *Vaughn* Index (Feb. 10, 2022).

**ODNI** – Koch Declaration [Dkt. 51-4 at 1-13]: Declaration of Gregory M. Koch, Office of the Director of National Intelligence (Feb. 9, 2022):

> Exhibit A [Dkt. 51-4 at 14-17]: June 11, 2020 Request;

> Exhibit B [Dkt. 51-4 at 18-19]: ODNI Acknowledgement of June 11, 2020 Request, tracking number DF-2020-00269 (July 6, 2020);

> Exhibit C [Dkt. 51-4 at 20-22]: Final Response (Sept. 1, 2021);

> Exhibit D [Dkt. 51-4 at 23-25]: *Vaughn* Index (Jan. 12, 2021).

**FBI** – Seidel Declaration [Dkt. 51-5 at 1-12]: Third Declaration of Michael G. Seidel, Federal Bureau of Investigation, regarding request referred by CIA (Feb. 17, 2022)

**NSD** – Findlay Declaration [Dkt. 52 at 1-8]: Declaration of Patrick N. Findlay, General Counsel of the National Security Division of the United States Department of Justice (Feb. 2, 2022):

> Exhibit A [Dkt. 52 at 9-11]: October 26, 2018 Request;

> Exhibit B [Dkt. 52 at 12-14]: June 11, 2020 Request;

> Exhibit C [Dkt. 52 at 15-18]: June 15, 2020 Request;

> Exhibit D [Dkt. 52 at 19-21]: June 18, 2020 Request;

> Exhibit E [Dkt. 52 at 22-24]: NSD Acknowledgement of June 11, 2020 Request, tracking number NSD 20-341, and Notice of Request for Clarification (Sept. 2, 2020);

> Exhibit F [Dkt. 52 at 25-27]: NSD Acknowledgement of June 15, 2020 Request, tracking number NSD 20-333, and Request to Narrow Request Topics (Nov. 5, 2020);

> Exhibit G [Dkt. 52 at 28-70]: First Interim Response to June 15, 2020 Request (Mar. 9, 2021), and Produced Records;

> Exhibit H [Dkts. 52 at 71-123; 52-1 at 1-99]: Final Response to June 15, 2020 Request (Aug. 30, 2021);

> Exhibit I [Dkt. 52-1 at 100-22]: Final Response to June 18, 2020 Request (Nov. 16, 2021).

No objections have been made to the Court's consideration of any of the submitted summary judgment evidence.[2]

### Request for Judicial Notice

Plaintiff does not submit any evidence in response to Defendants' motion or in support of his "cross-motion," discussed more fully *infra* [*See* Dkt. 59]. Instead, Plaintiff requests the Court "take judicial notice of the Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Plaintiff's Cross- Motion for Summary Judgment (Doc. No. 46), *Brian Huddleston v. Federal Bureau of Investigation, et al.*, Case No. 4:20-cv-447-ALM (E.D. Tex.)" (hereinafter, "Huddleston Response") [Dkt. 59 at 9].[3]  More specifically, Plaintiff urges "[t]he Department of Justice has a very poor track record when it comes to matters pertaining to Mr. Rich" and as the Huddleston Response purportedly explains, "Mr. Rich is dead, thus he has very little privacy interest to protect" [Dkt. 59 at 9].  Plaintiff bears the burden to show judicial notice is proper as the requesting party, yet Plaintiff offers no authority that the Court may consider such factual allegations by way of judicial notice.  *See Ambler v. Williamson Cnty.*, No. 1-20-CV-1068-LY, 2021 WL 769667, at *3 (W.D. Tex. Feb. 25, 2021) (citing 21B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5108 (2d ed. 2020)) ("The burden is on the party seeking judicial notice to show that these requirements have been satisfied.").

The Court declines consideration of the factual averments in the Huddleston Response under the guise of judicial notice.  Judicial notice is limited to adjudicative facts[4] – the Court may

---

[2] The Court notes Plaintiff's request for *in camera* review of certain materials is not raised as an evidentiary objection to the Court's consideration of Defendants' exhibits in support of the motion for summary judgment.

[3] *See Huddleston v. Fed. Bureau of Investigation*, No. 4:20-cv-00447-ALM (E.D. Tex. filed June 1, 2020).

[4] Federal Rule of Evidence 201 permits judicial notice of an "adjudicative fact" where the fact is "not subject to reasonable dispute because it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998) (quoting FED. R. EVID. 201(b)).  A court may take judicial notice of publicly available documents.  *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (citing *Norris v.*

take notice that Plaintiff did indeed file the Huddleston Response, but it cannot take notice of disputed facts alleged therein.  *See Ambler*, 2021 WL 769667, at *3 (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)) ("The court's notice, however, is limited to the existence of the document, 'not to prove the truth of the documents' contents.'"); *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 664-65 (N.D. Tex. 2011) (citing *Anderson v. Dall. Cnty.*, No. 3:05–cv–1248–G, 2007 WL 1148994, at *4 (N.D. Tex. Apr. 18, 2007)) ("When a court takes judicial notice of public documents or documents from another court, it may only take notice of the undisputed facts therein, which do not include the 'facts' asserted in various affidavits and depositions.").  Arguments made by motion in another proceeding are not adjudicative facts not subject to dispute, and judicial notice is therefore not appropriate.  *See Kaye*, 453 B.R. at 665 (where asked to take judicial notice of a motion filed in another case, "the court declined to do so because 'the myriad of facts contained in [those] documents [were] neither generally known nor reasonably indisputable.'").[5]

Plaintiff also asks the Court to consider the Government's reply in *Huddleston* ("Government's Huddleston Reply") [Dkt. 63 at 2-3].  Plaintiff urges that the Government's Huddleston Reply shows the Government, in that case, "provided supplemental declarations to address the absent search terms," which Plaintiff believes "contrasts markedly" with the reply in this case, where "Defendants did not respond at all" to his response/"cross-motion" [Dkt. 63 at 2].

---

*Hearst Tr.*, 500 F3d 454, 461 n.9 (5th Cir. 2007)).  However, only facts "not subject to reasonable dispute" within such documents may be noticed in this manner.  *SB Int'l, Inc. v. Jindal*, No. 3:06-CV-1174-G, 2007 WL 1411042, at *1 (N.D. Tex. May 14, 2007); *Mabile v. BP, P.L.C.*, No. 11-1783, 2016 WL 5231839, at *17 (E.D. La. Sept. 22, 2016).
[5] To the extent Plaintiff intended the request for judicial notice to effectuate incorporation by reference, this is not proper.  *See Kaye*, 453 B.R. at 666 (similarly finding judicial notice is not a proper vehicle to "incorporate" a filing from another case into a dispositive motion).  Further, under the Local Rules, Plaintiff did not attach the other filing as an exhibit, so it is not part of the briefing in support of the instant response/cross-motion.  *See* Local Rule CV-7(c), (d) ("The motion and any briefing shall be contained in one document. . . . The response and any briefing shall be contained in one document.").  "A party's failure to oppose a motion in the manner prescribed herein creates a presumption that the party does not controvert the facts set out by movant and has no evidence to offer in opposition to the motion."  Local Rule CV-7(d).

It is not clear what exactly Plaintiff asks the Court to take notice of, beyond its speculation as to why Defendants filed different replies in each case.[6]  *See SB Int'l, Inc. v. Jindal*, No. CIV A 306-CV-1174-G, 2007 WL 1411042, at *2 (N.D. Tex. May 14, 2007) ("the defendant fails to explain in his motion what exactly he wishes the court to take judicial notice of.").  The Court will take notice of the filing of the Government's Huddleston Reply.[7]  *See id.* (citation omitted) (citing *Taylor*, 162 F.3d at 830) ("If the defendant wishes the court to take judicial notice of the fact that these documents exist and were filed . . . the court takes such notice. If, however, [the defendant] wishes the court to take judicial notice of the contents of those documents, the court concludes that any 'facts' contained in the petitions, counterclaims, and motion are subject to reasonable dispute and, therefore, not appropriate for judicial notice.").  However, the facts raised by the Government's Huddleston Reply, as summary judgment evidence in that proceeding, are not properly taken by judicial notice.  *See e.g.*, *DeFranceschi v. Seterus, Inc.*, No. 4:15-CV-870-O, 2016 WL 6496319, at *2 (N.D. Tex. Apr. 18, 2016) ("The facts contained in the petition and in Defendants' summary judgment evidence, however, are subject to dispute and are not appropriate for judicial notice.").

---

[6] The Court does not consider Plaintiff's implication that Defendants' decision to file a shorter reply than the Government's Huddleston Reply *ipso facto* means Defendants' instant reply is deficient or otherwise concedes Plaintiff's augments.  Defendants' short reply refutes this implication directly by explaining its briefing decision:

> The Non-FBI Defendants do not want to burden the Court with a reply to Plaintiff's Opposition to the Non-FBI Defendants' Motion for Summary Judgment when one is not necessary here, as Plaintiff's opposition is admittedly poorly briefed and conclusory.

[Dkt. 62 at 1 n.2].  Courts must exercise judicial notice "with caution" and "[e]very reasonable doubt upon the subject should be resolved promptly in the negative.'"  *See Ambler*, 2021 WL 769667, at *3 (quoting *Brown v. Piper*, 91 U.S. 37, 43 (1875)).  On the present record, the Court declines to consider the substance of the filings in *Huddleston*.

[7] To be clear, the Court is taking judicial notice limited to the fact the Huddleston Response and Government's Huddleston Reply were filed because Plaintiff so requests, though this result is of no import.  *See In re Xtreme Power Inc.*, 563 B.R. 614, 631 (Bankr. W.D. Tex. 2016) ("although it fails to see the value in this request, the Court will judicially notice the fact that the Veritas Suit exists. The Court will not take judicial notice of any references to the factual allegations or pleadings from that suit.").

*Summary of Eight Disputed FOIA Requests*

### October 26, 2018 – DOJ (Request #1)

On October 26, 2018, Plaintiff submitted a FOIA request to component entities of DOJ,

seeking records concerning Imran Awan, Abid Awan, Jamal Awan, Hini Alvi, Rao Abbas, and

Seth Rich.  The request was submitted to OAG, NSD, CRM, OLA, EOUSA, and FBI.  Specifically,

Plaintiff requested:

1. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Imran Awan.
2. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Abid Awan.
3. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Jamal Awan.
4. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Hina Alvi.
5. Documents, files, records, and communications (regardless of electronic, paper or other format) referencing Rao Abbas.
6. From the National Security Division only, I request documents, files, records, and communications (regardless of electronic, paper or other format) referencing Seth Conrad Rich or "Seth Rich," who is deceased.

[Dkt. 5 at 16-17].

### October 29, 2018 – NSA (Request #2)

On October 29, 2018, Plaintiff submitted a FOIA request to NSA seeking communications

with members of Congress regarding various individuals. Specifically, Plaintiff requested:

1. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Seth Conrad Rich.
2. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Julian Assange.
3. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Wikileaks.
4. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Kim Dotcom.

5. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Aaron Rich.

6. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Shawn Lucas.

7. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Kelsey Mulka.

8. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Imran Iwan.

9. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Abid Awan.

10. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Jamal Awan.

11. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Hina Alvi.

12. All correspondence received from or sent to any member of Congress (or anyone representing a member of Congress or Congressional committee) since January 1, 2016 regarding or referencing Rao Abbas.

[Dkt. 5 at 19-20].

### *May 28, 2020 – CIA (Request #3)*

On May 28, 2020, Plaintiff submitted a FOIA request to CIA seeking various records related to the "2016 Data Breach."[8]  Specifically, Plaintiff requested:

1. I request the opportunity to view all metadata, communications (internal or external), records, documents, reports or other evidence regarding whether the CIA, its Directorate of Digital Innovation, or any of the CIA's foreign or domestic affiliates, agents, employees or contractors played a role in inserting Russian "fingerprints" (e.g., "COZY BEAR" or "FANCY BEAR") into data from the 2016 Data Breach. In other words, the CIA should produce all evidence indicating whether the CIA, its Directorate of Digital Innovation or any of the CIA's foreign or domestic affiliates, agents, employees or contractors inserted or fabricated evidence to make it appear that Russians or other third parties were responsible for the 2016 Data

---

[8] Plaintiff's request defines "2016 Data Breach" as the events related to the "the removal, transfer, copying or stealing of data from Democratic National Committee (hereinafter "DNC") computer servers in 2016, data which was later published by Wikileaks" [Dkt. 5 at 22].

Breach. This includes, for example, any and all evidence that the Directorate of Digital Innovation created or operated the "Guccifer 2.0" or "DCLeaks" profiles or any other online profile used to promote or distribute data from the 2016 Data Breach.

2. I request the opportunity to view all tangible evidence indicating whether the 2016 Data Breach was the result of (1) outside forces (e.g., Russian agents, Pakistani agents, etc.) who hacked the servers from a remote location or (2) an individual or individuals who were present at or inside DNC facilities and copied the data onto a storage device. If, for example, the CIA obtained any communications between Seth Rich and Julian Assange or Wikileaks (e.g., from the National Security Agency, the United Kingdom's Government Communications Headquarters, or any other person or entity), then those communications should be produced. If the CIA has any evidence whatsoever that the DNC servers were hacked externally or that DNC data was leaked from an internal source, that evidence should be produced.

3. Former CIA Director John Brennan testified that in the summer of 2016, he convened a task force / working group involving the CIA, NSA and FBI to investigate intelligence showing contact between Russian officials and Trump affiliates. I wish to view all documents, records, and/or communications that (1) identify the name and agency affiliation of each member of the task force / working group as well as (2) the dates that each such person began and ceased working with the group. I also wish to view all documents, records, and/or communications indicating whether the task force / working group fabricated or attempted to fabricate evidence of collusion between Donald Trump (or his presidential campaign) and Russian officials. If, for example, individuals from the task force tried to create the false impression that Trump campaign officials were acting at the behest of Russian officials, any and all evidence of that should be produced.

4. For the period from January 20, 2009 until the present, I wish to see all documents, records, communications, and guidelines reflecting any plans or efforts by the CIA to gain, cultivate or exercise influence over any U.S. journalist or journalism entity. This request includes, but is not limited to, documents or communications that reflect an attempt to insert CIA personnel, contractors, or allies into U.S. media companies. This request further includes, but is not limited to, documents reflecting payments (direct or indirect) to U.S. journalists or journalism entities.

5. For the period from January 20, 2009 until the present, I wish to see all documents, records, communications, and guidelines reflecting any plans or efforts by the CIA to gain, cultivate or exercise influence over any U.S. social media company (e.g., Facebook or Twitter) for purposes of influencing its algorithms or the prevalence of (1) particular posts or publications or (2) particular types of posts or publications. This request includes, but is not limited to, documents or communications that reflect an attempt to insert CIA personnel, contractors, or allies into such a company.

6. For the period from January 20, 2009 until the present, I wish to see all documents, records, communications, and guidelines reflecting any plans or efforts by the CIA to gain, cultivate or exercise influence over any U.S. search engine company (e.g., Google) for purposes of influencing its algorithms or the prevalence of search results. This request includes, but is not limited to, documents or communications that reflect an attempt to insert CIA personnel, contractors, or allies into such a company.

7. For the period from January 20, 2009 until the present, I wish to see all documents, records, communications, and guidelines reflecting any plans or efforts by the CIA to surveil journalists and/or journalism companies in the United States. This request includes, but is not limited to, (1) plans or efforts to hack into the computer systems, online accounts, or electronic devices of journalists or journalism companies in the United States, and (2) any documents, records, or communications obtained as a result of such hacking efforts. This request further includes, but is not limited to, documents, records, or communications identifying (1) the CIA affiliates, agents, employees or contractors involved in such activities, and (2) the targets of any such activities.

8. For the period from January 20, 2009 until the present, I wish to see all documents, records, communications, and guidelines reflecting any plans or efforts by the CIA to influence the contents of any entertainment production in the United States, e.g., movies, television programs, radio programs, podcasts, Netflix productions, etc.

[Dkt. 5 at 22-24].

### *June 11, 2020 – ODNI (Request #4)*

On June 11, 2020, Plaintiff submitted a FOIA request to ODNI seeking various records.[9]

Specifically, Plaintiff requested:

1. I request the opportunity to view all tangible evidence indicating whether the 2016 Data Breach was the result of (1) outside forces (e.g., Russian agents, Pakistani agents, etc.) who hacked the servers from a remote location or (2) an individual or individuals who were present at or inside DNC facilities and copied the data onto a storage device. If, for example, ODNI possesses any communications between Seth Rich and Julian Assange or Wikileaks (e.g., from the National Security Agency, the United Kingdom's Government Communications Headquarters, or any other person or entity), then those communications should be produced. If the ODNI has any evidence whatsoever that the DNC servers were hacked externally or that

---

[9] Defendants' motion mistakenly refers to this as the "June 5, 2020 Request" [Dkt. 51 at 12]; however, the Government's exhibits contain the same copy of the request as Plaintiff included in the amended complaint, which both indicate June 11, 2020 is the correct date of request [*See* Dkt. 51-4 at 16].

DNC data was leaked from an internal source, that evidence should be produced.

2. Former CIA Director John Brennan testified that in the summer of 2016, he convened a task force / working group involving the CIA, NSA and FBI to investigate intelligence showing contact between Russian officials and Trump affiliates. I wish to view all documents, records, and/or communications that (1) identify the name and agency affiliation of each member of the task force / working group as well as (2) the dates that each such person began and ceased working with the group. I also wish to view all documents, records, and/or communications indicating whether the task force / working group fabricated or attempted to fabricate evidence of collusion between Donald Trump (or his presidential campaign) and Russian officials. If, for example, individuals from the task force tried to create the false impression that Trump campaign officials were acting at the behest of Russian officials, any and all evidence of that should be produced.

3. All data, documents, records, or communications (electronic or otherwise) created, received or obtained since January 1, 2016 that discuss or reference Seth Conrad Rich ("Seth Rich") or Aaron Nathan Rich ("Aaron Rich").

4. All data, documents, records, or communications regarding any person or entity's attempt to hack into Seth Rich's electronic or internet accounts (e.g., email) after his death.

5. All data downloaded from all electronic devices that belonged to Seth Rich as well as all data, documents, records or communications indicating how the devices were obtained and who was responsible for downloading the information.

6. All data, documents, communications, records or other evidence indicating whether Seth Rich, Aaron Rich, or any other person or persons were involved in transferring data from the Democratic National Committee to Wikileaks in 2016, either directly or through intermediaries. This request includes, but is not limited to, any reports from CrowdStrike, Inc..

7. All documents, records, or communications exchanged with Congress or any other government agencies (or representatives of such agencies) since January 1, 2016 regarding (1) Seth Rich's murder or (2) Seth Rich's or Aaron Rich's involvement in transferring data from the Democratic National Committee to Wikileaks.

[Dkt. 5 at 29-30].

### *June 11, 2020 – DOJ (Request #5)*

On June 11, 2020, Plaintiff submitted a FOIA request to various components of DOJ seeking records related to investigations of former congressional IT support staffers. The request was submitted to OAG, NSD, CRA, OLA, EOUSA, and FBI. Specifically, Plaintiff requested:

1. Any and all records related to any investigations or preliminary investigations involving former congressional IT support staffers Abid Awan, Imran Awan, Jamal A wan, and Hina R. Alvi. As part of this request, searches should of records [ sic] should include, but not be limited to, the FBI automated indices, its older manual indices, and its Electronic Surveillance (EL SUR) Data Management System (EDMS), as well as cross-referenced files.

2. Any and all records of communication sent to or from FBI employees, officials or contractors involving the subjects in [the item above].

[Dkt. 5 at 32-33].

### *June 12, 2020 – NSA (Request #6)*

On June 12, 2020, Plaintiff submitted a FOIA request to NSA seeking records related to

the 2016 Data Breach.   Specifically, Plaintiff requested:

1. I request the opportunity to view all metadata, communications (internal or external), records, documents, reports or other evidence regarding whether the National Security Agency ("NSA"), the Central Intelligence Agency ("CIA"), any "Five Eyes" allies, and/or affiliates, agents, employees or contractors of those agencies or any other government entity played a role in inserting Russian "fingerprints" (e.g., "COZY BEAR" or "FANCY BEAR") into data from the 2016 Data Breach. In other words, the NSA should produce all evidence indicating whether any U.S. Government or "Five Eyes" entities, affiliates, agents, employees or contractors inserted or fabricated evidence to make it appear that Russians or other third parties were responsible for the 2016 Data Breach. This includes, for example, any and all evidence that U.S. Government or "Five Eyes" entity, affiliate, agent, employee, or contractor created or operated the "Guccifer 2.0" or "DCLeaks" profiles or any other online profile used to promote or distribute data from the 2016 Data Breach.

2. I request the opportunity to view all tangible evidence reflecting the person, persons, or entities involved in 2016 Data Breach. This request includes, but is not limited to, evidence indicating whether the breach was the result of (1) outside forces (e.g., Russian agents, Pakistani agents, etc.) who hacked the servers from a remote location or (2) an individual or individuals who were present at or inside DNC facilities and copied the data onto a storage device. If, for example, NSA intercepted or obtained any communications between Seth Rich and Julian Assange or Wikileaks (e.g., from the United Kingdom's Government Communications Headquarters, or any other person or entity), then those communications should be produced. If the NSA has any evidence whatsoever that the DNC servers were hacked externally or that DNC data was leaked from an internal source, that evidence should be produced.

3. I request the opportunity to view all communications exchanged (either directly or indirectly) between Seth Conrad Rich ("Seth Rich") and/or Aaron Nathan Rich ("Aaron Rich") and the following: Julian Assange, Wikileaks, and/or any agents or representatives of Wikileaks.

[Dkt. 5 at 35-36].

### *June 15, 2020 – NSD (Request #7)*

On June 15, 2020, Plaintiff submitted a FOIA request to NSD seeking records about the

DNC email hack.  Specifically, Plaintiff requested:

1. All documents, records, communications, and other tangible evidence supporting Gen. Demers's claims to 60 minutes above, i.e., about Russian involvement in obtaining the DNC emails in 2016.
2. All documents, records, communications, and other tangible evidence relied on by Gen. Demers, Adam Hickey, Sean Newell, and Heather Alpino in support of their conclusions that Russians were responsible for obtaining the DNC emails in 2016.
3. All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning Seth Conrad Rich and/or Aaron Nathan Rich.
4. All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division concerning other entities or individuals who may have played a role in stealing, hacking, leaking or improperly obtaining the DNC emails in 2016.
5. All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division indicating whether the DNC emails were hacked externally, leaked from a source inside the DNC, or otherwise transmitted to third parties such as Wikileaks. If there was one or more than one instance of hacking, leaking, or other unauthorized transmission of DNC emails in 2016, please provide details for each such incident, e.g., the dates, persons and entities involved, the data that was hacked, leaked, or otherwise transmitted, and the means by which it was hacked, leaked, or transmitted.
6. All documents, records, communications, and other tangible evidence in the possession or control of the National Security Division or the FBI regarding whether Debbie Wasserman-Shultz or any other member of Congress was blackmailed or extorted, whether directly or indirectly, as a result of information procured by any of the following: Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, or anyone affiliated with the government of Pakistan.

[Dkt. 5 at 39-40].

### *June 18, 2020 – CIA, DOJ, NSA (Request #8)*

On June 18, 2020, Plaintiff submitted a FOIA request to CIA, DOJ, and NSA seeking records related to surveillance of Edward Butowsky or Matt Couch, as well as CIA Director David Petraeus.  Specifically, Plaintiff requested:

1. I request the opportunity to view all documents, records, communications and/or other tangible evidence reflecting or pertaining to surveillance of Edward Butowsky of Texas or Matt Couch of Arkansas. The term "surveillance" includes, but is not limited to, any attempt to hack into the computers, phones, other electronic devices, and/or online accounts of Mr. Butowsky or Mr. Couch. If any information obtained by surveillance was relayed to third parties, that information should be produced for inspection.
2. I request the opportunity to view all documents, records, communications and/or other tangible evidence pertaining to whether former Central Intelligence Agency Director David Petraeus mishandled classified information or sold such information during his tenure as CIA director. This request includes, but is not limited to, documents, records, communications and/or other tangible evidence in the possession of the Office of the Inspector General of the CIA and/or the Office of the Intelligence Community Inspector General. This request further includes, but is not limited to, any draft indictments, draft arrest warrants, actual arrest warrants, and/or records of arrest.

[Dkt. 5 at 42-43].

### *Summary of Agency Responses & Related Procedural Background*

#### *EOUSA Responses (October 26, 2018 & June 11, 2020 Requests)*

October 26, 2018 Request

EOUSA acknowledged receipt of Plaintiff's October 26, 2018 request and assigned it request number EOUSA-2019-000496 [Dkt. 51 at 17].  Because Plaintiff did not submit an authorization of release for the individuals identified in this request,[10] on November 2, 2018, EOUSA directed the United States Attorney's Office for the District of Columbia ("USAO-DC")

---

[10] The Cain Declaration explains "EOUSA Policy dictates that if a requester obtains the written authorization and consent of the third parties for release of records, the requester may submit a new request for the documents accompanied with the written authorization"; however, no such authorization was ever received [Dkt. 51-2 at 3].

to conduct a search for any public records responsive to the October 26 request [Dkt. 51 at 17]. EOUSA submitted a second request to USAO-DC on August 14, 2020, and on April 16, 2021, USAO-DC provided records to EOUSA response to the October 26, 2018 request [Dkt. 51 at 17].

EOUSA issued its final response on June 25, 2021, and released eight pages in full and ten in part [Dkts. 51 at 17; 51-2 at 3, 15-17]. The *Vaughn* index[11] for this request identifies the two records; the document released in part is the Unsealed Affidavit in Support of Criminal Complaint Charging Imran Awan, and certain information was withheld pursuant to Exemption 6 and Exemption 7(C) [Dkt. 51-2 at 10]. Certain information was withheld by way of redaction from this document pursuant to Exemptions 6 and 7(C) because the information consists of third-party names, personal email addresses, and DOJ employee names [Dkt. 51-2 at 5-8].

<u>June 11, 2020 Request</u>

EOUSA avers it learned of this request a result of the instant litigation. The request "was submitted as a follow-up request" [Dkt. 51 at 18]. It was assigned request number EOUSA-2020-004715. On January 21, 2021, EOUSA issued a Misdirected Request Letter explaining that the records requested is not information maintained by EOUSA but by FBI. EOUSA informed Plaintiff it forwarded the request to the FBI and to direct any contacts to FBI [Dkt. 51-2 at 19-20]. The Misdirected Request Letter is the final action as to this request [Dkt. 51-2 at 19]. Defendants aver "Plaintiff has indicated that he is not challenging EOUSA's disposition of the June 11, 2020, request" [Dkt. 51 at 18].[12]

---

[11] "A *Vaughn* index describes documents identified as responsive to a FOIA request but not produced and explains why they have been withheld." *Jobe v. Nat'l Transp. Safety Bd.*, 1 F.4th 396, 402 n.5 (5th Cir. 2021) (citing *Cooper Cameron Corp. v. U.S. Dep't of Labor*, 280 F.3d 539, 544 n.12 (5th Cir. 2002); *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973)).

[12] The Court is uncertain of where this representation is reflected in the record, if at all; however, Plaintiff does not challenge this claim in response.

### *NSD (October 26, 2018, June 11, 2020, June 15, 2020 & June 18, 2020 Requests)*

Plaintiff submitted a total of four requests to NSD, the first on October 26, 2018, the second on June 11, 2020, the third on June 15, 2018, and the fourth on June 18, 2020.  Defendants note the first request, dated October 26, 2018, and the third request, dated June 15, 2020, sought the same records [Dkt. 51 at 18].[13]

June 11, 2020 Request

On September 2, 2020, NSD acknowledged receipt of Plaintiff's June 11, 2020 request and assigned it tracking number NSD 20-341 [Dkts. 51 at 18; 52 at 23-24].  In this response, NSD informed Plaintiff it does not maintain FBI records and sought further clarification of the request, indicating that if no clarification was received within 30 days, the request would be administratively closed [Dkts. 51 at 18-19; 52 at 23-24].  No such response was received, and NSD 20-341 was administratively closed [Dkt. 51 at 19].

June 15, 2020 Request & October 26, 2018 Request

On November 5, 2020, NSD acknowledged receipt of Plaintiff's June 15, 2020 request and assigned it tracking number NSD 20-333 [Dkts. 51 at 19; 52 at 26-27].  NSD issued an interim response on March 9, 2021, releasing one 40-page record in part, with redactions pursuant to Exemption 6 [Dkt. 52 at 3, 29-70].  On August 30, 2021, NSD issued a final response, releasing a single, additional 149-page record, with redactions pursuant to Exemption 6 [Dkts. 52 at 3, 71-123; 52-1 at 1-99].

---

[13] The declaration of Findlay mistakenly identifies the October 26 first request and the June 18 fourth request as seeking the same information [Dkt. 52 at 2].  Review of the exhibits confirms the motion correctly states the duplicative requests are the October 26 first request and the June 15 third request [Dkt. 51 at 18; *compare* Dkt. 52 at 10-11, *with* Dkt. 52 at 16-18].

June 18, 2020 Request

On November 16, 2021, NSD issued a final response to the June 18, 2020 request, issued tracking number NSD 20-338 [Dkt. 52 at 3].  This request has two parts; NSD released one record in full in response to part two of the request [Dkts. 52 at 3; 52-1 at 101-22].  NSD also informed Plaintiff that it had found one additional record that originated in the Office of the United States Attorney for the Eastern District of Virginia, and referred this component of part two of the request to EOUSA for review and response [Dkt. 51 at 19; 52-1 at 102].  In response to part one of the request, NSD issued a *Glomar* response, declining to confirm or deny the existence of any records to this part of the request pursuant to Exemption 1, as the information is properly classified pursuant to Executive Order 13526 [Dkts. 52 at 3-7; 52 at 3; 52-1 at 101-02].

### *NSA (October 29, 2018 & June 12, 2020 Requests)*

October 29, 2018 Request

On October 31, 2018, NSA acknowledged receipt of Plaintiff's October 29, 2018 request and assigned it Case Number 105508 [Dkts. 51 at 20; 51-3 at 34-35].  On February 2, 2021, NSA issued its response and produced five records released in part, totaling thirteen pages, and six records totaling sixteen pages, withheld in full pursuant to Exemptions 1, 3, 5, and 6 [Dkts. 51 at 20; 51-3 at 36-38].  The *Vaughn* index for this request identifies the eleven total records and the specific Exemption(s) that apply to each record either released in part or withheld in full [Dkt. 51-3 at 74-75].  Certain information was withheld as properly classified under Executive Order 13526, specifically Section 1.4(c), as this information remains classified TOP SECRET [Dkts. 51 at 20; 51-3 at 37].  This same information is protected by statute, thus Exemption 3 also exempts it from release, and the letter identifies three applicable statutes: 18 U.S.C. § 798, 50 U.S.C. § 3024(i), and Section 6 of Public Law 86-36 (50 U.S.C. § 3605) [Dkts. 51 at 20; 51-3 at 37-38].  Certain

information was withheld pursuant to Exemption 5, specifically regarding inter-agency or intra-agency memoranda or letters that is protected as part of the deliberative process privilege [Dkts. 51 at 20; 51-3 at 38].[14]   Finally, certain personal identifying information was withheld under Exemption 6 based on NSA's determination that the individual's privacy interests outweigh any public interest in the information.  On February 10, 2022, NSA reissued the documents produced in response to the October 29 request to correct the Exemptions invoked, producing the documents again with the proper redactions cited [Dkts. 51 at 20; 51-3 at 63-73].  The *Vaughn* index reflects the updated production and Exemptions [Dkt. 51-3 at 74-75].

June 12, 2020 Request

On June 19, 2020, NSA sent an initial response to the June 12 request, assigning it Case Number 109745 [Dkts. 51 at 21; 51-3 at 40-41].  On January 20, 2021, NSA issued a *Glomar* response based on Exemptions 1 and 3 of the FOIA, citing Executive Order 12333 and executive Order 13526, Section 1.4(c) [Dkts. 51 at 21; 51-3 at 42-43].  On February 11, 2021, Plaintiff appealed NSA's *Glomar* response [Dkts. 51 at 21; 51-3 at 45].[15]

### *CIA (May 28, 2020 & June 18, 2020 Requests)*

On June 15, 2020, CIA acknowledged receipt of Plaintiff's May 28, 2020 request and assigned it Reference Number F-2020-01504 [Dkts. 51 at 21; 51-1 at 108].  Plaintiff's June 18, 2020 request was assigned Reference Number F-2020-01646 [*See* Dkt. 51-1 at 115].  On June 4, 2021, CIA issued an interim response to both requests [Dkts. 51 at 21; 51-1 at 115-16].  The interim response letter was returned to CIA unclaimed [Dkts. 51 at 21; 51-1 at 118-20].

---

[14] Although NSA asserted Exemption 5 in its response letter, "after further review, NSA determined that Exemption 5 was inappropriate" [Dkt. 51 at 20].  However, Defendants contend this information was still properly redacted pursuant to Exemption 1 and Exemption 3, specifically under Section 6 of the National Security Agency Act (NSAA) (Pub. L. No. 86-36, codified at 50 U.S.C. § 3605) [Dkt. 51 at 20 & n.2].

[15] Neither party states the result of this appeal or explains the significance of an appeal to consideration of the instant Motion.

On July 13, 2021, CIA issued its final response [Dkt. 51 at 21; 51-1 at 121-23].  CIA submitted a *Vaughn* index describing each document, the release decision, and the Exemptions invoked [Dkt. 51-1 at 41-102].  In response to requests denoted Items 1(a), 1(b), 1(c)(3), 1(d)-(h), and 2(a), CIA issued a *Glomar* response [Dkts. 51 at 21; 51-1 at 123].[16]  Exemption 1 was invoked pursuant to Executive Order 13526, Section 3.6(a), on the basis the intelligence sources and methods are classified, as well as Exemption 3, as the information is protected by statute, specifically Section 6 of the Central Intelligence Agency Act of 1949 ("CIAA"), codified as amended at 50 U.S.C. § 3507, and Section 102A(i)(l) of the National Security Act of 1947, codified as amended at 50 U.S.C. § 3024(i)(l) [Dkts. 51 at 21; 51-1 at 123].  With regard to Items 1(c)(1)-(2),[17] CIA withheld six responsive documents in full, citing Exemptions 1, 3, 5, and 6 as the basis for withholding [Dkts. 51 at 21; 51-1 at 123].  As for Exemption 3, the statutes identified are the CIAA (50 U.S.C. § 3507), and Section 102A(i)(l) of the National Security Act of 1947 (50 U.S.C. § 3024(i)(l)) [Dkt. 51-1 at 123].  Regarding Item 2(b), CIA found 161 responsive documents of which 157 were withheld in full, citing Exemptions 1, 3, 5, 6, 7(C), and 7(E) as the basis for withholding [Dkts. 51 at 21-22; 51-1 at 123].  Four documents were determined to contain segregable information with redactions pursuant to Exemptions 1, 3, 5, 6, 7(C), and 7(E) [Dkt. 51-1 at 123].  For Exemption 3, the statutes cited are Section 6 of the CIAA of 1949, 50 U.S.C. § 3507, noted as exemption "(b)(3)CIAAct", and Section 102A(i)(l) of the National Security Act of 1947, noted as exemption "(b)(3)NatSecAct" on the documents released [Dkt. 51-1 at 123].  The response should have also indicated these redactions were made pursuant to Exemption 7(D), as

---

[16] Defendants' motion refers to these components as "Parts 1, 2, 3(3), 4, 5, 6, 7, and 8 of the May 2020 CIA Request, and Part 1 of the June 2020 CIA Request" [Dkt. 51 at 22].

[17] CIA's response letter denotes these as Items 1(c)(1) and 1(c)(2); Defendants' motion refers to them as request 3(1) and 3(2) of the May 28, 2020 request [Dkts. 51 at 21; 51-1 at 123].  They refer to the same components of the requests.

explained in the Blaine Declaration submitted by CIA [Dkts. 51 ta 22; 51-1 at 8].[18]  Additional documents belonging to another agency were also located, and CIA referred these documents to the appropriate agency as a direct request for Plaintiff [Dkt. 51-1 at 123].

### *ODNI (June 11, 2020 Request)*

On July 6, 2020, ODNI acknowledged receipt of Plaintiff's June 11, 2020 request and assigned it tracking number DF-2020-00296 [Dkts. 51 at 22; 51-4 at 19].  On September 1, 2021, ODNI issued its final response indicating that nineteen documents were withheld in full, four documents were withheld in part, and three documents were referred to other agencies [Dkts. 51 at 22; 51-4 at 21-22].  ODNI submitted a *Vaughn* index describing each document, the release decision, and the Exemptions invoked [Dkt. 51-4 at 24-25].  Regarding ODNI's review, of the four documents released in part and nineteen documents withheld in full, ODNI cited Exemption 1, specifically information classified pursuant to Executive Order 13526, Section 1.4(c); Exemption 3, identifying relevant statutes as the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i) and 50 U.S.C. § 3024(m), which protects intelligence sources and methods and identifying information of ODNI personnel respectively; Exemption 5 which protects inter-agency communications subject to legal privileges; and Exemption 6 on the basis that release of the information would constitute an unwarranted invasion of privacy [Dkt. 51-4 at 21].  ODNI further indicated "other agencies reviewed their equities within the documents and their withholdings" are as follows:

- • The Department of Homeland Security withheld information pursuant to FOIA exemption (b)(1), Section 1.4(c) of E.O. 13526.
- • The Defense Intelligence Agency withheld information pursuant to FOIA exemptions (b)(1) and (b)(3) and Sections 1.4(a), (b), and (c) of E.O. 13526. DIA (b)(3) withholdings were pursuant to statute 50 U.S.C. § 3024(i).

---

[18] On June 4, 2021, CIA mailed a CD with the three documents produced but it was returned unopened [Dkt. 51-1 at 123].  The documents were sent again as an enclosure to the final response letter.

- U.S. European Command (EUCOM) withheld information pursuant to FOIA exemptions (b)(1), (b)(3), and (b)(5) and section 1.4(c) of E.O. 13526. EUCOM's (b)(3) withholding were pursuant to statute 10 U.S.C. § 130(c), which protects sensitive information of foreign governments and international organizations.
- The Federal Bureau of Investigation (FBI) withheld information pursuant to FOIA exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E) and Section 1.4(c) of E.O. 13526. FBI's (b)(3) withholdings were pursuant to statute 50 U.S.C. § 3024(i). Exemption (b)(7)(A) applies to investigatory records, release of which could interfere with law enforcement proceedings; (b)(7)(C) applies to investigatory records, release of which could constitute an unwarranted invasion of the personal privacy of others; (b)(7)(D) applies to investigatory records release of which could disclosure the identity of a confidential source; and (b)(7)(E) applies to investigatory records, release of which would disclose investigative techniques and procedures.
- That Naval Criminal Investigative Service (NCIS) withheld information pursuant to FOIA exemption (b)(1), Sections 1.4(c) and (d) of E.O. 13526.
- The Department of State withheld information pursuant to FOIA Exemptions (b)(1) and (b)(6) and Sections 1.4(b), (c), and (d) of E.O. 13526.

[Dkt. 51-4 at 21-22]. Additional documents belonging to another agency were also located, and ODNI referred these documents to the appropriate agency as a direct request for Plaintiff [Dkt. 51-4 at 22].

### *OIP on behalf of OLA/OAG (October 26, 2018 & June 11, 2020 Requests)*

Defendants aver that OIP, on behalf of the requests made to OIG and OLA within DOJ, issued "no records" responses to both the October 26, 2018 and June 11, 2020 requests, and that "Plaintiff has indicated that he is not challenging OIP's searches" and the "no records" responses to both [Dkt. 51 at 22].

### *CRM (October 26, 2018 & June 11, 2020 Requests)*

October 26, 2018 Request

Defendants aver Plaintiff has conceded exhaustion as to this request [Dkt. 51 at 22] (citing ECF No. 28). On May 25, 2021, the Parties submitted a Joint Stipulation Regarding Status or

Requests to United States Department of Justice Criminal Division, stating "[a]s to the October 26, 2018 request, Plaintiff concedes exhaustion and agrees that this claim is due to be dismissed" [Dkt. 28 at 1].  At the time of that status report, DOJ-CRM conceded however that, as to the June 11, 2020 request, this claim is properly before the Court" [Dkt. 28 at 1].

> June 11, 2020 Request

Defendants aver that CRM later issued a "no records" response to the June 11, 2020 request, and that "Plaintiff has indicated that he is not challenging CRM's search" or its "no records" response to this request [Dkt. 51 at 22].

## NON-FBI DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Plaintiff's non-FBI claims under FOIA.  More specifically, Defendants urge each agency conducted (1) reasonable searches, (2) properly issued *Glomar* responses where applicable, and (3) properly withheld information pursuant to FOIA's Exemptions where applicable.

### *Conceded Grounds – Summary Judgment for Defendants*

Because Plaintiff concedes or abandons certain claims against specific agencies, or otherwise does not address a properly invoked Exemption, summary judgment on them is proper. *See Rasco v. Potter*, No. H-05-0034, 2007 WL 9758165, at *2 (S.D. Tex. Jan. 4, 2007) (granting summary judgment in favor of the defendant on the claims the plaintiff abandoned), *aff'd*, 265 F. App'x 279 (5th Cir. 2008).  Thus, at the outset of its analysis, the Court notes Plaintiff concedes its claims against OIP on behalf of OLA/OAG within DOJ and has not contested the "no records" responses; therefore, summary judgment is proper for DOJ component entities OLA and OAG. Similarly, summary judgment is proper for CRM; Plaintiff concedes exhaustion as to his first request, and Defendants represent Plaintiff does not challenge CRM's "no records" response to

the second request.  Summary judgment should be granted to CRM.

***The Freedom of Information Act***

"Congress created FOIA 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  *Shapiro v. CIA*, 170 F. Supp. 3d 147, 153 (D.D.C. 2016) (quoting *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011)).  Despite this broad mandate, FOIA contains a set of exceptions to the general obligation to provide government records to the public.  5 U.S.C. § 552(b).  Upon receiving a FOIA request, an agency must disclose all responsive records to the requestor unless those records fall within one of nine statutory exemptions.  *100Reporters v. U.S. Dep't of State*, No. CV 19-1753 (RDM), 2022 WL 1223709, at *4 (D.D.C. Apr. 26, 2022); *see Jobe v. Nat'l Transp. Safety Bd.*, 1 F.4th 396, 403 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 757 (2022).  "These exemptions are in place 'to balance the public's interest in governmental transparency against the legitimate governmental and private interests [that] could be harmed by release of certain types of information.'"  *Shapiro*, 170 F. Supp. 3d at 153 (quoting *United Techs. Corp. v. DOD*, 601 F.3d 557, 559 (D.C. Cir. 2010)) (cleaned up).  Nonetheless, "FOIA mandates a strong presumption in favor of disclosure, and its statutory exemptions, which are exclusive, are to be narrowly construed."  *Id.* (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (cleaned up).

**I.      *Reasonable Searches & Adequacy of Declarations***

When the Government moves for summary judgment, a threshold matter is whether the agency fielding the request conducted a reasonable search for responsive records.  "An agency's search for documents in response to a FOIA request is adequate if it is 'beyond material doubt that its search was reasonably calculated to uncover all relevant documents.'"  *Jackson v. U.S. Dep't of Just.*, 270 F. Supp. 3d 90, 94 (D.D.C. 2017) (quoting *Ancient Coin Collectors Guild v. U.S.*

*Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)) (cleaned up).  When courts "consider the adequacy of a search in response to a FOIA request, the burden is on the agency to demonstrate that it made a 'good faith effort to conduct a search ... using methods which can be reasonably expected to produce the information requested.'"  *DiBacco v. Dep't of the Army*, 926 F.3d 827, 832 (D.C. Cir. 2019) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *Batton v. Evers*, 598 F.3d 169, 176 (5th Cir. 2010) (quoting the same).  "The adequacy of an agency's search for documents under FOIA 'is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case.'"  *Negley v. U.S. Dep't of Just.*, 305 F. Supp. 3d 36, 43-44 (D.D.C. 2018) (quoting *Weisberg v. Dep't of Just.,* 745 F.2d 1476, 1485 (D.C. Cir. 1984)).

        "To demonstrate that it has performed an adequate search, an agency must submit a reasonably detailed affidavit describing the search."  *Jackson*, 270 F. Supp. 3d at 95 (citing *Oglesby*, 920 F.2d at 68).  "That showing can be made through declarations that detail 'what records were searched, by whom, and through what process.'"  *Am. Oversight v. U.S. Dep't of Just.*, 401 F. Supp. 3d 16, 23 (D.D.C. 2019) (quoting *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994)).  As long as the agency "explain[s] 'in reasonable detail the scope and method of the search conducted,'" the declaration "'will suffice to demonstrate compliance' with FOIA."  *Kidd v. Dep't of Just.*, 362 F. Supp. 2d 291, 295 (D.D.C. 2005) (quoting *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).  Furthermore, "[a]gency affidavits—so long as they are 'relatively detailed and non-conclusory'—are 'accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  *Taylor Energy Co. LLC v. U.S Dep't of Interior Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 86 (D.D.C. 2017) (quoting *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015)).

"Only where 'a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials,' should summary judgment be denied." *Id.* (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003)); *DiBacco v. Dep't of the Army*, 926 F.3d at 832 (citing *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)).

Defendants urge the searches by EOUSA, NSA, CIA, and ODNI are adequate, and the declarations submitted on behalf of each agency describe "in detail the particular records searched and the search methods used to locate records responsive to the particular request" [Dkt. 51 at 26-32].

### EOUSA Adequacy of Search

EOUSA submits Kara Cain's declaration to substantiate the adequacy of its search [Dkt. 51 at 26-27].  The Cain Declaration explains that any records pertaining to a criminal investigation of Imran Awan, Abid Awan, Jamal Awan, Hina Alvi, Rao Abbas, and Seth Rich would be maintained in the United States Attorney's Office where any such prosecutions took place, which in this case is the U.S. Attorney's Office for the District of Columbia ("USAO-DC") [Dkts. 51 at 26; 51-2 at 1-3].  On November 2, 2018, EOUSA directed USAO-DC to conduct a public records search responsive to Plaintiff's request [Dkt. 51-2 at 2-4].  USAO-DC conducted a search "initiated by reviewing the online case management system using the names and subject matter provided in the original request" using the online tracking system used by USAOs, known as CaseView [Dkts. 51 at 27; 51-2 at 4-5].  The CaseView database "is used to track cases and retrieve files related to cases and investigations by using district court case numbers, defendants' name, and the internal number assigned by each USAO" [Dkt. 51-2 at 5].  After a search of CaseView, on April 16, 2021, USAO-DC provided EOUSA's FOIA office with unsealed, public records responsive to the

request [Dkt. 51-2 at 5].   Plaintiff does not contest the adequacy of the search by EOUSA specifically, instead challenging whether the withholdings are proper [Dkt. 59 at 9-10], which the Court will consider together with Plaintiff's other challenges to the FOIA Exemptions.

### NSA Adequacy of Search

NSA submits Linda M. Kiyosaki's declaration to substantiate the adequacy of its search [Dkt. 51 at 27-29].  The Kiyosaki Declaration states NSA personnel from NSA's Office of General Counsel ("OGC") directed and assisted in the search for responsive records.   NSA's OGC determined that NSA's Legislative, State, Local, and Academic Engagement Office ("LSLA") "was the most likely NSA organization to possess responsive records, to the extent responsive records existed, and that no other components of NSA were reasonably likely to possess additional materials responsive to Plaintiff's request" [Dkts. 51 at 27; 51-3 at 9].   Regarding Plaintiff's October 29, 2018 request, NSA's OGC directed LSLA to search the office's records "in all places where records responsive to the October 2018 FOIA request were most likely to be found" and recommended LSLA search its records for "[e]ach of the 12 names as written" as well as "[v]ariations on each of the 12 names including: last name only, first and last name, and first, middle (if known), and last name" [Dkt. 51-3 at 9-10].   NSA's OGC reviewed all potentially responsive records from LSLA to "determine if they were, in fact, responsive to Plaintiff's request" [Dkt. 51-3 at 10].   A second level of review of review by NSA's OGC was conducted, again for responsiveness and segregability, "ultimately determining that there were eleven records responsive to Plaintiff's October 2018 FOIA request" [Dkt. 51-3 at 10].   In regard to Plaintiff's June 12, 2020 Request, NSA issued a *Glomar* response, "explaining that the fact of the existence or nonexistence of responsive records was currently and properly classified in accordance with E.O. 13526 and was thus exempt from disclosure based upon Exemption 1" [Dkts. 51 at 21; 51-3

at 8].  Plaintiff does not contest the adequacy of the search by NSA specifically, instead challenging whether the *Glomar* response was proper and whether the withholdings are proper under the Exemptions cited [Dkt. 59 at 4-8].  These challenges will be addressed together with the Court's analysis of Defendants' *Glomar* responses and the Exemptions invoked.

### CIA Adequacy of Search

CIA submits Vanna Blaine's declaration to substantiate the adequacy of its search [Dkt. 51 at 29-30].  Blaine is an Information Review Officer for the Litigation Information Review Office at CIA [Dkt. 51-1 at 1].  CIA issued one Final Response addressing both of Plaintiff's two FOIA requests, which the Blaine Declaration refers to as the "May 2020 CIA Request" (Plaintiff's May 28, 2020 request) and the "June 2020 CIA Request" (Plaintiff's June 18, 2020 request) [Dkt. 51 at 29; 51-1 at 4-8].  CIA searched for and processed documents responsive to parts 3(1) and 3(2) of the May 2020 CIA Request and part 2 of the June 2020 CIA Request [Dkt. 51-1 at 7-8].  The Blaine Declaration summarizes the requests it searched as follows:

> The CIA processed documents in response to parts 3(1) and 3(2) of the May 2020 CIA Request. These requests relate to the task force/ working group convened by former CIA Director John Brennan. In particular, parts 3(1) and 3(2) request records that the CIA "(1) identify the name and agency affiliation of each member of the task force/ working group as well as (2) the dates that each such person began and ceased working with the group." The CIA also processed documents in response to part 2 of the June 2020 CIA Request, which requested records "pertaining to whether former Central Intelligence Agency Director David Petraeus mishandled classified information or sold such information during his tenure as CIA director."

[Dkt. 51-1 at 17].[19]  CIA first "identified the offices that were most likely to maintain responsive Materials," which were "the Office of the Director, the Office of Congressional Affairs, the Office of the Inspector General (OIG), the Office of General Counsel, and the Office of Security"

---

[19] Plaintiff does not argue the CIA's search is inadequate or unreasonable on the grounds it overly narrowed the scope of its search related to these requests.

[Dkt. 51-1 at 17].  CIA "[a]gency professionals" conducted searches "spanning the pertinent time frame for each of these two requests," and these searches "included emails, internal share drives, relevant databases, and paper files" [Dkt. 51-1 at 17-18].  Additionally, CIA also "queried CADRE, the Agency's repository for records that have been previously disclosed to the public" [Dkt. 51-1 at 18.  CIA identified 6 responsive records to parts 3(1) and 3(2) of the May 2020 CIA Request and 161 records responsive to part 2 of the June 2020 CIA Request, and the withholdings invoked are explained by the Blaine Declaration and documented in CIA's *Vaughn* Index [Dkt. 51-1 at 18].  Regarding Plaintiff's remaining requests, CIA issued a *Glomar* response [Dkt. 51-1 at 8-16.].  Similar to NSA and EOUSA's responses, Plaintiff does not contest the adequacy of the search by CIA specifically, instead challenging whether the *Glomar* response was proper and whether the withholdings are proper under the Exemptions cited [Dkt. 59 at 4-8].

### ODNI Adequacy of Search

ODNI submits Gregory M. Koch's declaration to substantiate the adequacy of its search [Dkt. 51 at 30-31].  Koch is Chief of the Information Management Office ("IMO") of ODNI, and IMO is the entity responsible for processing FOIA requests made to ODNI [Dkt. 51-4 at 1-5].  The Koch Declaration explains that it first "assesses whether intelligence information is sought and if the acknowledgment of whether or not ODNI possesses such information would itself reveal classified information or intelligence sources or methods" – that is, whether to issue a *Glomar* response [Dkt. 51-4 at 5].  Where ODNI can conduct a search for responsive records, IMO tasks the relevant ODNI component entities and records custodians "who are likely to have responsive records to conduct a search" [Dkt. 51-4 at 5].  Notably, as the Director of National Intelligence is head of the intelligence community, ODNI records often "include information from other agencies who contribute to the all-source intelligence often provided by the DNI," and accordingly, "when

IMO locates a responsive record that contains another agency's information, IMO sends the record to that agency for consultation to help determine if the other agency's information is exempt from disclosure" [Dkt. 51-4 at 5].  Because this consultative process allows other agencies to review and make determination as to their own information, responsive documents produced by ODNI "may include ODNI's and other agencies' redactions" [Dkt. 51-4 at 5].

More specifically, IMO identified two ODNI components, Mission Integration and the National Counterintelligence and Security Center, to search for potentially responsive records, and the Koch Declaration explains these entities were chosen because they are "most likely to have information responsive to the Request" [Dkt. 54-1 at 6].  Because the documents ODNI identified as being responsive included information from other agencies, ODNI consulted with the Department of Homeland Security, the Defense Intelligence Agency, U.S. European Command, the FBI, the Naval Criminal Investigative Service, and the Department of State to identify and apply the relevant and appropriate Exemptions on behalf of these agencies [Dkt. 54-1 at 7].  As with each other agency, Plaintiff does not contest the adequacy of the search by ODNI specifically, instead challenging whether the withholdings are proper [Dkt. 59 at 6-9], which the Court will consider together with Plaintiff's other challenges to the FOIA Exemptions.

### NSD Adequacy of Search

NSD submits Patrick N. Findlay's declaration to substantiate the adequacy of its search [Dkt. 52 at 1-8].  Defendants do not brief whether the Findlay Declaration addresses the scope or manner of the search for responsive records to Plaintiff's June 15, 2020 request, or to part 2 of the June 18, 2020 request [*See* Dkt. 52 at 3].[20]  Despite the lack of briefing by either party as to the adequacy NSD's search, the Court is obligated to review the record to determine if summary

---

[20] NSD asserted a *Glomar* response to part 1 of the June 18 request, but it conducted a records search for part 2, related to the investigation of General Petraeus [Dkt. 52-1 at 101-02].

judgment for Defendants is proper as to FOIA inquires to NSD. *See Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F. Supp. 3d 306, 312 (D.D.C. 2020) (quoting *Tokar v. DOJ*, 304 F. Supp. 3d 81, 94 n.3 (D.D.C. 2018)). ("Even when the adequacy of a search, use of a particular exemption, or the segregability requirement is not challenged, 'the Court still has an independent duty to determine for itself whether the record and any undisputed material facts justify granting summary judgment.'").

The Court has reviewed the Findlay Declaration and finds it lacks sufficient detail to show an adequate search. *See Elec. Priv. Info. Ctr. v. DOJ Crim. Div.*, 82 F. Supp. 3d 307, 315 (D.D.C. 2015) (citation omitted) (citing *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)) ("Instead of explaining how its search was conducted, NSD's *ex parte* declaration focuses on the fruits of its search. However, the adequacy of a FOIA search is not determined by the fruits of the search, but by the appropriateness of the methods used to carry out the search."). "Agency affidavits that 'do not denote which files were searched, or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requester] to challenge the procedures utilized' are insufficient to support summary judgment." *Schaerr v. DOJ*, 435 F. Supp. 3d 99, 120 (D.D.C. 2020) (quoting *Weisberg v. DOJ*, 627 F.2d 365, 371 (D.C. Cir. 1980)).

Regarding the June 15 request, Plaintiff requested records related to six distinct topics. NSD sent a letter to Plaintiff requesting it narrow the scope of three of the six specific items because they "are too broad for us to craft a search for records" or to determine whether a *Glomar* response is appropriate [Dkt. 52 at 27]. More specifically, NSD stated:

> Portions of your request are too broad in scope to identify any responsive records. Specifically, items (b), (d), and (f) are too broad for us to craft a search for records or to conclusively determine that we would neither confirm nor deny their existence

> without conducting a search. . . . Please provide your response regarding items (b),
> (d), and (e) within 30 days of the date of this letter clarifying these items.

[Dkt. 52 at 27].   However, NSD's letter represented that it would conduct searches for records

regarding three other items, (a), (c), and (f) [Dkt. 52 at 27].   NSD's First Interim Response

references communication between Plaintiff and NSD regarding the request to narrow, evidencing

an agreement to "limit the initial search to Mr. Demers" [Dkt. 52 at 29-30].   Mr. Demers is one of

several individuals named in item (b).   Whether Plaintiff addressed narrowing items (d) and (f) is

unclear based on the present record.   The Findlay Declaration does not indicate if any search was

conducted for items (d) and (f), and further muddying the waters, NSD's Interim Response states

it would nonetheless search beyond the narrow scope of Mr. Demers and would continue to process

responsive records:

> We have conducted a search of the records of Mr. John Demers and located a record
> that is responsive to your request. We are withholding portions of that record
> pursuant to the following FOIA exemption set forth in 5 U.S.C. 552(b):
> > (6) Which permits the withholding of personnel and medical files and
> > similar files the disclosure of which would constitute a clearly unwarranted
> > invasion of personal privacy.
> NSD is continuing to process remaining records that are responsive to your request.
> Please note that NSD is also conducting searches and processing records that are
> beyond the narrowed scope of just the records of Mr. Demers. We will provide you
> with an update, to include a possible supplemental production prior to the next
> (after the March 16, 2021) Joint Status Report in this matter.

[Dkt. 52 at 30].   NSD's June 15 Final Response does not describe the efforts taken after the Interim

Response, stating only that it was withholding one record in part under Exemption 6 [Dkt. 52 at

72-73].   While NSD did include its standard boilerplate *Glomar* explanation [Dkt. 52 at 73],

neither the Final Response nor the Findlay Declaration indicate if NSD actually invoked *Glomar*

regarding any of the six items in the June 15 request.   Again, the Findlay Declaration only explains

its *Glomar* response to part 1 of the June 18 request [Dkt. 52 at 3].   The Declaration is silent as to

whether *Glomar* was invoked for any item from the June 15 request.   Of the 3 records ultimately

produced, Findlay states only that two records were produced in response to the June 15 request, and one record was produced in response to part 2 of the June 18 request [Dkt. 52 at 3].

Based on the present record, the Court finds the Findlay Declaration lacks detail and a sufficiently precise summary of its searches to determine whether NSD's search was adequate. The Court cannot ascertain whether NSD searched for all 6 items in June 15 request, whether it conducted a search but no records were found for certain items, or whether it declined to search under *Glomar*. *See Schaerr*, 435 F. Supp. 3d at 124 (finding inadequate NSD's declaration where it omitted an explanation for a single item) ("NSD did not confirm that it searched for or identified locations for last part of item 1 of plaintiff's FOIA request").  Further, for the records NSD did produce, the Findlay Declaration lacks *any* description of the scope and methods of search for the June 15 items, and the Final Response only identifies the database searched for part 2 of the June 18 request.  This is far from sufficient.  *See Elec. Priv. Info. Ctr. v. DOJ Crim. Div.*, 82 F. Supp. 3d at 316 (quoting *Oglesby*, 920 F.2d at 68) ("The Court finds that NSD's affidavit does not provide sufficient details to support an adequate search. Any future search must 'reflect a systematic approach to document location.'"); *Pinson v. DOJ*, 145 F. Supp. 3d 1, 12 (D.D.C. 2015) ("Affidavits that 'do not denote which files were searched or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the plaintiff] to challenge the procedures utilized' are insufficient to support a motion for summary judgment.").  Unlike the declarations submitted by the other agencies, the Findlay Declaration contains no section on the adequacy of NSD's search at all.  *See Reps. Comm. for Freedom of Press v. Fed. Bureau of Investigation*, 877 F.3d 399, 404 (D.C. Cir. 2017) (reversing grant of summary judgment based on failure to show the adequacy of searches) ("the Hardy declarations are utterly silent as to which files or record systems were examined in connection with

the targeted searches and how any such searches were conducted, including, where relevant, which search terms were used to hunt within electronically stored materials.").

Because the Court is unable to determine on the present record whether NSD conducted an adequate search, Defendants' motion for summary judgment is denied without prejudice as to NSD's search for records responsive to the June 15 request's items, properly narrowed, and its search as to part 2 of the June 18 request. *See Pinson*, 145 F. Supp. 3d at 13 n.9 (quoting *Wiesner v. FBI*, 577 F.Supp.2d 450, 458 n.4 (D.D.C. 2008)) ("Because the Court 'cannot yet determine' whether the EOUSA's searches were adequate or reasonably calculated to locate all responsive documents, 'the agency's request for summary judgment is not yet ripe and must be denied without prejudice as a consequence.'").  The Court will permit NSD to submit an additional affidavit to address the adequacy of its search. *See Pinson v. DOJ*, 70 F. Supp. 4 199, 205 n.3 (D.D.C. 2014) ("[the court] would be inclined to request that the DOJ submit an additional affidavit as the current affidavit describing the search responsive to FOIA Request No. 11–159 does not provide any description of the NSD searching for documents concerning the [topics of such request].")

### *Plaintiff's Challenges to the Adequacy of Agency Searches*

Plaintiff urges generally only one challenge to the adequacy of Defendants' searches, arguing the declarations "are conclusory or lack detail" [Dkt. 59 at 3].  The only specific basis for the inadequacy of Defendants' searches offered is that "the declarations fail to identify the search terms used for some of the Plaintiff's requests," which it claims is "fatal" to the summary judgment motion [Dkt. 59 at 3].  But an agency's "burden [is] to show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requester." *DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015).  The detailed affidavit "requirement exists as a matter of common sense: its purpose is to 'afford a

FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.'" *Hall v. CIA*, No. 1:04-CV-814-RCL, 2022 WL 2528102, at *2 (D.D.C. July 7, 2022) (quoting *Oglesby*, 920 F.2d at 68). "Agencies generally have 'discretion in crafting a list of search terms' as long as they are 'reasonably tailored to uncover documents responsive to the FOIA request.'" *Tushnet v. ICE*, 246 F. Supp. 3d 422, 434 (D.D.C. 2017) (quoting *Bigwood v. DOD*, 132 F.Supp.3d 124, 140-41 (D.D.C. 2015)). The authority cited by Plaintiff in fact supports the proposition that exclusion of specific search terms in a declaration renders it inadequate only where the declaration lacks other indicia of a thorough search. In *SAI vs. Transportation Security Administration*, the court explained that an agency can show a thorough search by submitting "[a]ffidavits that include search methods, locations of specific files searched, descriptions of searches of all files likely to contain responsive documents, and names of agency personnel conducting the search are considered sufficient." 315 F. Supp. 3d 218, 246 (D.D.C. 2018) (quoting *Ferranti v. Bureau of Alcohol, Tobacco & Firearms*, 177 F.Supp.2d 41, 47 (D.D.C. 2001)). Regarding identifying search terms, the court continued that "in *the absence of other indicia* of a thorough search, a declaration that 'fail[s] to document the search terms used' in an electronic search will not provide the Court with sufficient basis to grant summary judgment in favor of the agency." *Id.* (quoting *Anderson v. U.S. Dep't of State*, 661 F.Supp.2d 6, 10 (D.D.C. 2009)) (emphasis added). "[T]he agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records." *Id.* at 241 (citing *Agility Public Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015)).

In this case, the EOUSA and NSA declarations do identify the search terms used, and Plaintiff does not take issue with such terms.  The Cain Declaration describes the search terms used by EOUSA, specifically that the "district court case numbers, defendants' name, and the internal number assigned by each USAO" were used [Dkt. 51-2 at 4-5].  As well, the Kiyosaki Declaration details the search terms used by NSA, specifically that it searched its records for "[e]ach of the 12 names as written," as well as "[v]ariations on each of the 12 names including: last name only, first and last name, and first, middle (if known), and last name" [Dkt. 51-3 at 9-10].  Only the Blaine Declaration describing CIA's search [Dkt. 51-1 at 17-18] and the Koch Declaration describing ODNI's search omit an itemized list of the search terms used.  However, again, "[t]here is no bright-line rule requiring agencies to use the search terms proposed' by a plaintiff." *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015) (quoting *Physicians for Human Rts. v. DOD*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009)).[21]  Plaintiff does not point to any inadequacies related to the scope of the search by CIA or ODNI specifically. *See id.* ("Although the defendant used different search terms for different databases, this discrepancy does not undermine the conclusion that the search was reasonable given that the search terms were used after consultation with employees familiar with the databases and were reasonably designed to yield responsive information.").  CIA's search returned the most records of any agency's search – over 160 documents – and although only four were produced, the Blaine Declaration and *Vaughn* Index explain in detail the reasons for withholding in part or in whole.  ODNI's search also produced a number of responsive documents, nearly 25, three of which were referred to other agencies and the remaining are recorded in ODNI's *Vaughn* Index [*See* Dkts. 51

---

[21] "Defendants have discretion in crafting a list of search terms that 'they believe[ ] to be reasonably tailored to uncover documents responsive to the FOIA request.'"  *Liberation Newspaper*, 80 F. Supp. 3d at 146 (quoting *Physicians for Human Rts.*, 675 F.Supp.2d at 164).  "Where the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior."  *Id.* at 146-47.

at 22; 51-4 at 6-7, 24-25].  Plaintiff does not point to any other specific manner in which the CIA or ODNI Declarations are conclusory or lacking in detail, and the lack of specific search terms alone is not dispositive of whether the agencies conducted an adequate search.  *See DiBacco v. U.S. Army*, 795 F.3d at 191 (finding the Army's search adequate where it produced many responsive documents and the plaintiff "provided no further information on [the] request—such as its scope or the number of pages received—or any other basis for concluding that the Army is holding back documents."); *Liberation Newspaper*, 80 F. Supp. 3d at 146-47 (granting summary judgment where the only argument advanced as to the inadequacy of the agency's search was the plaintiff's "speculative" claims regarding the search terms used).[22]

### Summary of Findings – Adequacy of Searches

Regarding whether the declarations are each conclusory and lacking in detail, the Court finds these challenges lack merit with respect to the declarations in support of the adequacy of the searches by EOUSA, NSA, CIA, and ODNI.  As Defendants correctly note, Plaintiff attempts to counter the good faith declarations with nothing more than speculation as to the adequacy of the searches by these agencies.  *See Berk v. Exec. Off. of U.S. Att'ys*, No. 3:18-CV-1349-M-BK, 2021 WL 1877068, at *1 (N.D. Tex. Feb. 2, 2021) (quoting *Negley v. FBI*, 589 F. App'x 726, 730 (5th Cir. 2014)) ("Once the agency meets its burden, the burden shifts to the plaintiff to introduce

---

[22] This case is unlike the other authority cited by Plaintiff.  There, the court found the agency's declaration inadequate because it lacked any meaningful detail at all, and the plaintiff put forth evidence of missing records.  *See Manatt v. U.S. Dep't of Homeland Sec.*, 473 F. Supp. 3d 409, 416-17 (E.D. Pa. 2020) ("But Ms. Eggleston's declaration does not describe the scope or methods of USCIS's search for responsive documents. It provides no search terms, does not identify the custodians or systems searched, or provide any other information about USCIS's search methodology. Instead, Ms. Eggleston's declaration focuses on the results of the search—the number of documents identified and the process used to review those documents. But that information does not answer the question of whether the search was reasonable. The Court has no way to assess whether the documents that USCIS located are all, most, some, or only a small portion of the universe of responsive documents. Merely reciting the number of documents identified is not enough to meet the agency's burden to show that its search was reasonably calculated to uncover all relevant documents. . . . But there's more. Plaintiffs have pointed to facts indicating that materials exist, in the form of missing email attachments.").

'evidence that creates a genuine dispute as to the adequacy of the search.'"), *report and recommendation adopted*, No. 3:18-CV-1349-M-BK, 2021 WL 1866548 (N.D. Tex. May 10, 2021); *Fischer v. U.S. Dep't of Just.*, 596 F. Supp. 2d 34, 43 (D.D.C. 2009) ("*Fischer I*") ("Plaintiff has failed to rebut the FBI's showing of a good faith search. Accordingly, the Court finds that the FBI has demonstrated that FBIHQ conducted an adequate search.").

However, the Court finds at present that the Findlay Declaration in support of the NSD's search lack sufficient description of the scope and manner of search to determine whether the NSD's search was adequate. *See Berk*, 2021 WL 1877068, at *1 (citing *Cooper Cameron Corp. v. U.S. Dep't of Labor, OSHA*, 280 F.3d 539, 543 (5th Cir. 2002)) ("the agency renders this explanation in an affidavit although a conclusory or vague affidavit is insufficient even if the FOIA requester has not controverted the assertions."). The Court will provide an opportunity for NSD to supplement the record about the search it conducted. *See Swick v. U.S. Dep't of the Army*, No. CV 18-1658 (JDB), 2020 WL 6561360, at *4 (D.D.C. Nov. 9, 2020) (requiring the defendant "to clarify through sworn affidavit or declaration, or through relevant documentation, the exact nature of the electronic search by [the agencies] for [Plaintiff's request], including a specific description of which databases were searched and which search terms were used. That submission should also 'describe at least generally the structure' of [the agency's] electronic file systems, and provide 'the agency's rationale in identifying any specific databases.'") (citations omitted) (quoting *Int'l Counsel Bureau v. DOD*, 657 F. Supp. 2d 33, 40 (D.D.C. 2009)) (cleaned up); *Manatt v. U.S. Dep't of Homeland Sec.*, 473 F. Supp. 3d 409, 417 (E.D. Pa. 2020) ("The Court will not, at this point, conclude that USCIS's search was inadequate, though that possibility exists. Instead, the Court will give USCIS an opportunity to supplement the record with additional detail about the

search that it conducted. Plaintiffs can then renew their motion if the additional detail does not satisfy them that USCIS has conducted an adequate search.").

**II.      *Responses Withheld Pursuant to FOIA Exemptions***

Defendants move for summary judgment, urging each agency's withholdings are proper pursuant to the FOIA Exemption invoked.  Numerous Exemptions are at issue.  Defendants argue EOUSA "properly withheld information pursuant to FOIA Exemptions 6 and 7(c)"; NSD "properly withheld information pursuant to FOIA Exemption 6"; NSA "properly withheld information pursuant to FOIA Exemptions 1, 3, and 6"; CIA "properly withheld information pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E)"; and ODNI "properly withheld information pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D) and 7(E)" [Dkt. 51 at 52]. Defendants aver that each agency "processed all documents responsive to Plaintiff's requests to achieve maximum disclosure"; that "[e]very effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable, non-exempt information"; and the "Non-FBI Defendants did not withhold any reasonably segregable, non-exempt portions from Plaintiff" [Dkt. 51 at 53].

**       *Standard for Reviewing Exemptions***

"An agency withholding responsive documents from a FOIA release bears the burden of proving the applicability of claimed exemptions."  *ACLU v. DOD*, 628 F.3d at 619.  "For the sake of efficiency, the burden may be satisfied by submission of a '*Vaughn* Index' and supporting declarations, which are intended to provide a court with an adequate description of documents that are being withheld from production pursuant to a specified FOIA exemption and justification for the applicability of the exemption invoked."  *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 337 F. Supp. 2d 146, 161 (D.D.C. 2004) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)); *Batton*, 598

F.3d at 178 (citing *Stephenson v. IRS*, 629 F.2d 1140, 1144 (5th Cir. 1980)) (In the Fifth Circuit, "a *Vaughn* index or similar procedure must be utilized to determine the factual nature of the information sought and whether that information fell within the statutory exemption asserted."). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. DOD*, 628 F.3d at 619. "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Lindsey*, 490 F. Supp. 3d at 9 (citing *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011)). "Because courts 'lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case,' we 'must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'" *ACLU v. DOD*, 628 F.3d at 619 (first quoting *Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993); then quoting *Wolf*, 473 F.3d at 374 (quotations omitted)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.*

"To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with specific facts demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld [ ] agency records." *Competitive Enter. Inst. v. U.S. Dep't of State*, 486 F. Supp. 3d 171, 178 (D.D.C. 2020) (quoting *Span v. U.S. Dep't of Just.*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (cleaned up)). For redactions unchallenged by Plaintiff or Exemptions left unaddressed, "[i]t is therefore proper to treat defendant's argument as conceded,' with regard to the exemptions and categories not challenged by plaintiff." *See Fischer*

*v. U.S. Dep't of Just.*, 723 F. Supp. 2d 104, 110-11 (D.D.C. 2010) ("*Fischer II*") (quoting *Franklin v. Potter*, 600 F.Supp.2d 38, 60 (D.D.C. 2009) (collecting cases)).  Where Plaintiff does not contest the Exemptions applied by Defendants, the Court should grant summary judgment as to the assertion of those exemptions.  *Id.* at 111 ("Accepting the unchallenged exemptions as conceded, the Court need not address their applicability and will grant summary judgment for defendant with respect to all records withheld or redacted under those exemptions."); *Negley v. U.S. Dep't of Just.*, 305 F. Supp. 3d at 47-48 ("Because Plaintiff [did] not contest the exemptions as they apply to the documents uncovered by Defendant," the district court granted the Government's "motion for summary judgment regarding defendant's assertion of exemptions 5, 6, 7(C), and 7(E)."), *aff'd*, No. 18-5133, 2018 WL 4148608 (D.C. Cir. Aug. 14, 2018).

***Summary of Relevant Exemptions***

### *Exemption 1 – Classified Information*

Exemption 1 applies where the requested information is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and is "properly classified" under the Executive Order.  5 U.S.C. § 552(b)(1)(A). Executive Order 13,526 governs proper classification under Exemption 1 and requires that "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security ... and the original classification authority is able to identify or describe the damage."  Exec. Order No. 13,526 § 1.1(a)(4); 75 Fed. Reg. 707 (2007).  Once an agency by declaration attests that a record meets the classification criteria of Executive Order 13526, Plaintiff must raise more than "doubt" to raise a genuine issue of fact and show summary judgment is not warranted.  *Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 502 (D.D.C. 2015) (citations omitted) ("Because the Department has

offered declarations attesting that the classification criteria in EO 13526 are satisfied, it is Plaintiffs' burden to raise a genuine question of fact regarding the documents' classification. Plaintiffs' 'doubt' on this score is insufficient.").

Here, Defendants frequently invoke Executive Order 13526 as the basis for Exemption 1. Executive Order 13526 allows an original classification authority to classify information only if the below conditions are satisfied:

> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

75 Fed. Reg. at 707, Exec. Order. 13526 § 1.1(a). "When evaluating whether an agency has properly withheld information under [E]xemption 1 'the only question is whether the disputed document is properly classified under the applicable Executive Order.'" *Smith v. U.S. Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d 85, 93 (D.D.C. 2019) (quoting *Ctr. for Int'l Envtl. Law v. Off. of U.S. Trade Representative*, 718 F.3d 899, 904 (D.C. Cir. 2013)). This is a low bar to meet, as "[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified." *Id.* (quoting *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007)). "'Because courts lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case,' the Court 'must accord substantial weight to an agency' s affidavit concerning the details of the classified status of the disputed record." *Lindsey*, 490 F. Supp. 3d at 11 (quoting *ACLU v. DOD*, 628 F.3d at 619).

### *Exemption 3 – Information Protected by Statute*

"FOIA Exemption 3 states that an agency need not disclose any documents 'specifically exempted from disclosure by statute' if the statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue' or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'"  *Batton*, 598 F.3d at 177 (citation omitted) (quoting 5 U.S.C. § 522(b)(3) (2006)).  "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage."  *DiBacco v. U.S. Army*, 795 F.3d at 197 (citing *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007)).

### *Exemption 5 – Privileged Information (and Segregation)*

"Exemption 5 states that an agency may withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *Batton*, 598 F.3d at 183 (citation omitted) (quoting 5 U.S.C. § 522(b)(5)).  "The exemption thus provides the agency with the same privilege protections it would ordinarily have in civil discovery, 'including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege.'"  *Competitive Enter. Inst. v. U.S. Dep't of State*, 486 F. Supp. 3d at 178 (quoting *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015)).

### *Exemption 7(A) – Pending Law Enforcement Proceedings*

Exemption 7(A) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

... could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

### Exemptions 6 & 7(C) – Unwarranted Invasion of Personal Privacy

"Exemption 6 provides that an agency need not disclose 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'" *Batton*, 598 F.3d at 180 (quoting 5 U.S.C. § 552(b)(6)). "FOIA Exemption 7(C) protects from disclosure 'records or information compiled for law enforcement purposes' to the extent that disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" *Fischer I*, 596 F. Supp. 2d at 46 (quoting 5 U.S.C. § 552(b)(7)(C)). "To determine whether Exemption 7(C) applies, the Court must 'balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information.'" *Id.* (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)). "Where a legitimate privacy interest exists, the requester must '(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show the information is likely to advance that interest.'" *Id.* (quoting *Boyd v. Crim. Div. of the U.S. Dep't of Just.*, 475 F.3d 381, 387 (D.C. Cir. 2007)). "The D.C. Circuit has consistently held that Exemption 7(C) protects the privacy interests of all persons mentioned in law enforcement records, including investigators, suspects, witnesses, and informants." *Id.* at 47 (citing *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003) (citing cases)).

"Exemption 7(C) 'affords broad[ ] privacy rights to suspects, witnesses, and investigators.'" *Kowal v. U.S. Dep't of Just.*, 490 F. Supp. 3d 53, 70 (D.D.C. 2020) (quoting *SafeCard Servs.*, 926 F.2d at 1205). "On the privacy side of the ledger, our decisions have

consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants." *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003) (collecting cases). The D.C. Circuit has gone as far as "adopt[ing] a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Id.* (quoting *SafeCard Services, Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)). "And the public interest in that information is 'not just less substantial, it is insubstantial' unless there is 'compelling evidence that the agency denying the FOIA request is engaged in illegal activity' and 'access to the names of private individuals appearing in the agency's law enforcement files" is necessary to confirm or refute that evidence.'" *Kowal*, 490 F. Supp. 3d at 70 (citations omitted) (quoting *SafeCard Servs.*, 926 F.2d at 1205-06) (cleaned up).

### *Exemption 7(D) – Confidential Source Information*

Exemption 7(D) protects from disclosure agency records "compiled for law enforcement purposes…by criminal law enforcement authority in the course of a criminal investigation" if release of those records "could reasonably be expected to disclose" the identity of, or information provided by, a "confidential source." 5 U.S.C. § 552 (b)(7)(D). "Under 7(D), the government has clear statutory authority to withhold both the source and the information with respect to criminal investigations." *Cooper Cameron Corp.*, 280 F.3d at 550. "The Supreme Court has emphasized that the issue under exemption 7(D) is 'not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential.'" *Id.* (quoting *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993)).

### *Exemption 7(E) – Investigative Techniques & Procedures*

Exemption (7)(E) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... '(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.'" *Clevenger v. U.S. Dep't of Just.*, No. 18 CV 1568 (LB), 2020 WL 1846565, at *13 (E.D.N.Y. Apr. 3, 2020) (quoting 5 U.S.C. § 552(b)(7)(E)).  "Under Exemption (7)(E), Courts have 'set[ ] a relatively low bar for [an] agency to justify withholding.'"  *Id.* (quoting *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 42 (D.C. Cir. 2011)).

### *Analysis of Withholdings by Agency*

### *EOUSA Withholdings – Exemptions 6 & 7(C)*

Defendants urge EOUSA properly invoked Exemptions 6 and 7(C) in its withholding decisions [Dkt. 51 at 58-60].  Recall that EOUSA produced two records, one released in full, and another, the unsealed affidavit in support of the criminal complaint charging Imran Awar was released in part, as shown by the EOUSA's *Vaughn* Index [Dkt. 51-2 at 10].  The Cain Declaration identifies the specific nature of the private information withheld for the "purposes of both Exemptions 6 and 7(C)," specifically that "[i]n this instance the information being protected from public disclosure consists of third-party names, personal email addresses, and DOJ employee names" [Dkt. 51-2 at 6-7].  EOUSA describes that the third-party individuals have "a substantial privacy interest in avoiding disclosure of their personal information in the requested documents" under both Exemptions because "the release of personally identifiable information could subject the users to an unwarranted invasion of their personal privacy by leading to efforts to contact them

directly, gain access to their personal information, or subject them to harassment or harm" [Dkt. 51-2 at 7-8]. The Cain Declaration also considers the public interest that is weighed against the private interests at stake, explaining "[t]here is no countervailing public interest that warrants the release of an individual's personally identifiable information, and its dissemination would not help explain the government's activities or operations" [Dkt. 51-2 at 8]. Correctly noting that "Plaintiff bears the burden of establishing that disclosure will advance the public interest," EOUSA urges "[t]here has been no showing of public interest in the records requested" [Dkt. 51-2 at 6].

With regard to Exemption 7(C) in particular, EOUSA notes that "identification of government personnel involved in criminal investigations could subject them to harassment both in the conduct of their official duties and their private lives," and private individuals also "have a strong interest in not being unfairly associated publicly with alleged criminal activity" [Dkt. 51-2 at 7]. The Cain Declaration goes beyond conclusory assertions about privacy, explaining why the withholdings for this specific court document are warranted, given that "[i]n the underlying matter in particular, several measures were taken by the court to seal pleadings to protect third parties, and to prevent harassment of the associated families" [Dkt. 51-2 at 7]. Further, the Cain Declaration attests to the segregability effort, stating that "[a]fter EOUSA considered the segregability of the requested records, no reasonably segregable non-exempt information was withheld from Plaintiff" [Dkt. 51-2 at 8].

The Cain Declaration, together with the *Vaughn* Index, are sufficient to justify the withholding in part of the third-party names, email addresses, and DOJ employee names, which have been redacted, pursuant to the Exemptions cited. *See Clevenger*, 2020 WL 1846565, at *11 ("the request for individuals' identifying information, such as their names, personal cellular numbers, and email addresses certainly implicate a privacy interest, and the Court finds that

disclosure of the information would not advance 'the core purpose of the FOIA.'").  Plaintiff does

not challenge the segregability of the personal information withheld by redaction; nonetheless, the

Court has reviewed the Cain Declaration and *Vaughn* Index and finds EOUSA has demonstrated

that no additional segregable information was not disclosed.  *Id.* at *19 ("Plaintiff fails to rebut

defendants' declarations. The Court finds that defendants have adequately demonstrated that no

additional, segregable information remains to be disclosed.").

Plaintiff raises one argument in opposition to EOUSA's withholding, urging it "no basis

for withholding records about Seth Rich" [Dkt. 59 at 9-10].[23]  Plaintiff does not address whether

Exemption 6 or 7(C) is improper, instead asserting generally that the Cain Declaration is

conclusory.  But Plaintiff does not contest that it requested information wholly relating to third

parties,[24] nor that the third parties have a privacy interest in the specific information at issue here,

namely "third-party names, personal email addresses, and DOJ employee names," nor that "[s]uch

information provides more insight into said third parties than government activities" [Dkt. 51-2 at

6].  No further explanation is provided to describe the nature of the public interest in disclosing

the information redacted in the EOUSA records.

Plaintiff has not identified the public interest in releasing the private information of the

third parties named in the request, as well as other third parties identified in the documents found

responsive to the request, nor has it pointed to any illegal activity by EOUSA, let alone put forth

"compelling evidence" of any such activity by EOUSA.  *See Kowal*, 490 F. Supp. 3d at 70 ("Since

Kowal does not point to any illegal activity implicating the ATF's redactions under Exemptions 6

---

[23] Plaintiff also requests the Court here take judicial notice of its Huddleston Response, which the Court has explained *supra* is not proper for judicial notice [Dkt. 59 at 9-10].  Plaintiff raises no other objections or challenges to Defendants' grounds for summary judgment in favor of EOUSA.
[24] As the Cain Declaration states, "EOUSA Policy dictates that if a requester obtains the written authorization and consent of the third parties for release of records, the requester may submit a new request for the documents accompanied with the written authorization. EOUSA never received such authorization" [Dkt. 51-2 at 3].

and 7(C) of names, addresses, and other identifiers of suspects, witnesses, and investigators mentioned in investigatory files, the Court cannot find fault with the balance struck by the ATF."). Plaintiff's only argument is that because "Rich is dead, thus he has very little privacy interest to protect" [Dkt. 59 at 9]. Whether a deceased person's privacy interest is low is not relevant where no public interest in the disclosure of the information has been shown. *See Fischer I*, 596 F. Supp. 2d at 47 ("Although the D.C. Circuit has held that 'the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased,' this factor is irrelevant where, as here, plaintiff has not identified any public interest in disclosure.") (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C.Cir.2003)). This is because "[s]omething, even a modest privacy interest, outweighs nothing every time." *Id.* (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)). Therefore, the Court finds EOUSA's withholdings under Exemptions 6 and 7(C) are proper, and Plaintiff has not shown any public interest outweighs the privacy interests identified by EOUSA. *See Fischer I*, 596 F. Supp. 2d at 47 ("Therefore, the Court finds that the privacy interests in withholding the identifying information outweigh the public interest in disclosure and that disclosure of this information would constitute an unwarranted invasion of personal privacy within the meaning of Exemption 7(C).").

### NSD Withholdings – Exemption 6

Because the Court finds NSD's declaration insufficient to establish the adequacy of its search, the Court cannot consider whether NSD's withholdings are proper [Dkt. 51 at 60-61]. *See Elec. Priv. Info. Ctr. v. Dep't of Just. Crim. Div.*, 82 F. Supp. 3d at 316 n.6 ("The Court will not consider whether exemptions apply to NSD until an adequate search is conducted."). The Court does note however that Plaintiff does not raise any substantive objection or challenge to NSD's application of Exemption 6 to the records it did locate in its search.

*NSA Withholdings – Exemptions 1, 3, & 6*

Defendants argue NSA properly invoked Exemptions 1, 3, and 6 to withhold 5 documents in part and 6 records in full [Dkt. 51 at 61-73].  The Kiyosaki Declaration explains in detail the basis for invoking each of these Exemptions, and is accompanied by NSA's *Vaughn* Index.

**Redactions – Exemptions 1, 3, & 6**

Regarding Exemption 1, Kiyosaki explains that EO 13526 is the applicable Executive Order that addresses the classification of the records at issue.  Kiyosaki confirms she reviewed the "the categories of redacted information pursuant to this FOIA request and determined that those categories are currently and properly classified in accordance with E.O. 13526," and further, that "the responsive material at issue was properly redacted, as this information is currently and properly classified in accordance with E.O. 13526" [Dkt. 51-3 at 12-13].  More specifically,

> The release of the redacted material would disclose information that is currently and properly classified TOP SECRET pursuant to Section 1.2(a)(l) of E.O. 13526, because the information could reasonably be expected to cause exceptionally grave damage to the national security. Any disclosure of this information would obviously and immediately affect the ability of NSA to counter threats to the national security of the United States.
> . . . .
> Here, the redacted information is currently and properly classified. In fact, these redactions protect information that is classified as TOP SECRET, underscoring the exceptionally grave damage that would be implicated by its release. These redactions protect specific information concerning and derived from NSA SIGINT reporting, which plainly cannot be released to the public without exceptionally grave damage to national security. This redacted information, if revealed, would show specific topics that are the subject of NSA SIGINT reports. These intelligence reports are some of the most closely held and protected products that NSA creates, and cannot be disclosed without risk to national security given the insights they provide.

[Dkt. 51-3 at 12-13] (footnote omitted).  The Kiyosaki Declaration attests that "in accordance with Section 1.7 of E.O. 13526, no information was classified or withheld in order to conceal violation of law, or to prevent embarrassment to the Agency" [Dkt. 51-3 at 13].

Regarding Exemption 3, Kiyosaki explains the "redacted material subject to this exemption plainly falls within NSA's unique statutory privilege: Section 6 of the National Security Agency Act of l959, 50 U.S.C. § 3605" (hereinafter, "Section 6") [Dkt. 51-3 at 14].[25]   The Declaration explains of Section 6 that "[t]he protection provided by this statute is, by its very terms, absolute, as Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities" [Dkt. 51-3 at 14]. To properly invoke Section 6 as the basis for withholding under Exemption 3, "NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege, rather, NSA need only to show that the information falls within the scope of Section 6" [Dkt. 51-3 at 14]. Notably, the Kiyosaki Declaration highlights that Section 6 protects "NSA's organization, functions, activities, and nonpublic personnel [and] are therefore protected from disclosure regardless of whether or not the information is classified" [Dkt. 51-3 at 14].   Therefore, the Court may find NSA's withholdings proper under Exemption 3 even if Exemption 1 were found not to apply.

Applying Exemption 3 to the specific information withheld, the Kiyosaki Declaration describes the redacted information in two categories, first addressing information derived from NSA SIGINT:

> these redactions protect information concerning and derived from NSA SIGINT reporting. Collecting intelligence information and providing it to principals, advisors, and leaders in the United States government, including Congressional oversight committees, is a core function and primary activity of NSA. Additionally, these redactions protect information revealing NSA's intelligence assessments, another central function and activity of NSA. Finally, these redactions protect information describing NSA's role in the Vulnerabilities Equities Process ("VEP") that have not been publicly acknowledged. The details of NSA's involvement in the VEP is also an NSA function/activity. Congress's intent with respect to the protection of NSA's organization, functions, and activities is manifest by the plain

---

[25] NSA's *Vaughn* Index refers to Section 6 as "P.L. 86-36" [Dkt. 51-3 at 74-75], which refers to the Public Law that enacted § 3605 as codified.

language of Section 6; where, as here, the disclosure of the requested information would improperly reveal aspects of NSA's mission, the invocation of Exemption 3 pursuant to this statute is proper.

[Dkt. 51-3 at 15].  Regarding the second category of redacted information, NSA also redacted the standard identifier of an NSA employee pursuant to Exemption 3, which the Kiyosaki Declaration explains is protected by statute under Section 6.  Specifically,

> NSA employees' standard identifiers contain some or all of a particular employee's name. NSA protects the standard identifiers of its personnel pursuant to Section 6, which, as noted, protects from disclosure the organization of NSA and the names and titles of those employed with NSA. This material is appropriately redacted pursuant to Exemption 3 of the FOIA, as it reflects information that squarely falls within the express protections of Section 6.

[Dkt. 51-3 at 15].  Any disclosure of this information would obviously and immediately affect the ability of NSA to counter threats to the national security of the United States" [Dkt. 51-3 at 17].

Regarding the withholdings made pursuant to Exemption 6, the Kiyosaki Declaration explains attests that "a careful examination of the redacted material reveals that the public interest in disclosure is minimal and clearly outweighed by the privacy interest involved" as "the only material redacted pursuant to Exemption 6 contains the full names and phone numbers of members of the SSCI staff" [Dkt. 51-3 at 16].  "There is no public interest in the release of these staff members' personal information, specifically their names and phone numbers," and "[t]hese individuals have an obvious privacy interest in their personal information" [Dkt. 51-3 at 16]. Indeed, review of NSA's *Vaughn* Index reveals only three instances of redactions under Exemption 6 [Dkt. 51-3 at 74-75].  Further, because the redacted documents are part of the record, the Court's review confirms that the only redactions designated as made pursuant to Exemption 6 are in fact the names and contact information in the released records [Dkt. 51-3 at 50, 56, 60].

**Records Withheld in Full – Exemptions 1 & 3**

NSA also withheld from disclosure six documents, totaling 16 pages, pursuant to Exemptions 1 and 3.  Kiyosaki explains the basis for these withholdings and attests that she has "have reviewed the material withheld in full and determined that no reasonably segregable portions can be released" [Dkt. 51-3 at 16].  As to segregability, the Kiyosaki Declaration states that "[m]ost, if not all, of this material is classified and non-segregable for that reason alone . . . and thus NSA is unable to produce any non-exempt portions of the responsive materials" [Dkt. 51-3 at 16].

Regarding records withheld in full under Exemption 1, of "eight specifically enumerated categories of information" eligible for classification under EO 13526, at issue here are "intelligence activities (including covert action), intelligence sources and methods, or cryptology" [Dkt. 51-3 at 17].  The Kiyosaki Declaration confirms this information is "properly classified as set forth in Section 1.4(c) of E.O. 13526" [Dkt. 51-3 at 17].  "The release of the material withheld in full would disclose information that is currently and properly classified TOP SECRET pursuant to Section 1.2(a)(1) of E.O. 13526, because the information could reasonably be expected to cause exceptionally grave damage to the national security" [Dkt. 51-3 at 17].  In fact, all of the documents withheld are classified TOP SECRET, "underscoring the exceptionally grave damage that would be implicated by their release" [Dkt. 51-3 at 18].  This information is non-segregable for several reasons, including that "in many instances, the withheld material does not contain any non-classified material"; "even in those documents where there are stray lines containing unclassified" information, "that material, without more, is not meaningful or substantive"; and as to other records, the "documents concern specific topics the very existence of which are classified"

[Dkt. 51-3 at 18].  The Kiyosaki Declaration distinguishes this withholding from NSA's *Glomar*

response, explaining that

> While NSA is prepared to state, on the public record, that it has withheld a specified
> number of materials responsive to Plaintiff's request, namely, ''correspondence
> received from or sent to any member of Congress ( or anyone representing a
> member of Congress or Congressional committee) since January 1, 2016 regarding
> or referencing'' either Seth Conrad Rich, Julian Assange, Wikileaks, Kim Dotcom,
> Aaron Rich, Shawn Lucas, Kelsey Mulka, Imran Iwan, Abid Awan, Jamal Awan,
> Hina Alvi, or Rao Abbas, it cannot provide additional detail concerning the
> withheld material without risking exceptionally grave damage to national security.

[Dkt. 51-3 at 18].   This information is "derived from SIGINT and associated analysis or

explanation, which plainly cannot be released to the public without exceptionally grave damage to

national security. The information from these intelligence reports, which are some of the most

closely held and protected products that NSA creates, cannot be disclosed without risk to national

security given the insights they provide" [Dkt. 51-3 at 19].  For this reason, Kiyosaki attests that

this information is non-segregable because "this classified material does not contain meaningfully

segregable portions, and, in most instances the very existence of the specific material withheld is

classified" [Dkt. 51-3 at 19].

Regarding records withheld in full pursuant to Exemption 3, several statutes apply.

"[U]nder Exemption 3 the NSA need only show that the statute claimed is one of exemption as

contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson*, 565

F.3d at 868.  Section 6, discussed *supra*, applies, as well as 18 U.S.C. § 798 and Section 102A(i)(1)

of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024.  18 U.S.C. §

798 "prohibits the unauthorized disclosure of classified information: (i) concerning the

communication intelligence activities of the United States, or (ii) obtained by the process of

communication intelligence derived from the communications of any foreign government"

[Dkt. 51-3 at 20].  Communication intelligence "means the 'procedures and methods used in the

interception of communications and obtaining the information from such communications by other than the intended recipients'" [Dkt. 51-3 at 20] (quoting l8 U.S.C. § 798(b)).  The Kiyosaki Declaration explains that NSA's SIGINT information, while classified, "is also plainly protected by the strictures of § 798" [Dkt. 51-3 at 20].  Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004 requires that NSA, as a member agency of the U.S. intelligence community, "must also protect intelligence sources and methods" [Dkt. 51-3 at 21].  Kiyosaki attests that this "protection afforded to intelligence sources and methods is absolute" and "[w]hether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by" Section 102A(i)(1) [Dkt. 51-3 at 21].  The "details of the withheld material responsive to Plaintiff's request concerning correspondences with Congress regarding or referencing specific individuals implicates critical sources and methods," and the requested information includes "[d]etailed discussions about circulated intelligence reports and NSA capabilities, both of which generally describe the type of information present in these withheld materials, reflect the very sources and methods this statute is designed to protect"  [Dkt. 51-3 at 21].  Because all three statutes invoked fall within the scope of Exemption 3, NSA must show that the information withheld falls under the purview of one or more of these statutes.[26]

The Kiyosaki Declaration concludes that all three statutes apply to protect the withheld information from disclosure, and review of NSA's *Vaughn* Index confirms all three statutory bases are identified as applying to the records withheld pursuant to Exemption 3.  Again, Kiyosaki explains that these bases for withholding the identified records are independent of any protections

---

[26] All three statutes are Exemption 3 statutes.  *See Larson*, 565 F.3d at 868 ("Section 6 qualifies as an Exemption 3 statute," and "section 798 [of Title 18] qualifies as an Exemption 3 statute"); *Lindsey*, 490 F. Supp. 3d at 15 ("It is undisputed that 50 U.S.C. § 3024(i)(1) [the Intelligence Reform and Terrorism Prevention Act of 2004] is an "exemption statute.").

warranted by Exemption 1, but Exemption 3 alternatively and separately covers the withheld records [Dkt. 51-3 at 21-22].

Plaintiff primarily raises its objections and challenges to Defendants' grounds for summary judgment in favor of NSA in its response to NSA's *Glomar* response.  However, Plaintiff argues that Section 6 the National Security Act of 1959 "certainly exempts some NSA records, but by no means all of them" and "the NSA cannot categorically refuse to search for or produce records solely on the basis of 50 USC § 3606"[27] [Dkt. 59 at 8].[28]  As the Kiyosaki Declaration makes clear, no record was withheld solely on the basis of Section 6.  The *Vaughn* Index, again, shows that all three statutes are invoked under Exemption 3.  "Where, as here, one statute provides 'ample support for the propriety of the NSA's invocation of Exemption 3,' the Court 'need not opine about the sufficiency of ... alternative bases.'"  *See Blake v. NSA*, No. CV 21-1085 (RC), 2022 WL 3016714, at *6 n.7 (D.D.C. July 29, 2022) (citing *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 n.7 (D.D.C. 2015); *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 424 F. Supp. 3d 36, 42 n.10 (D.D.C. 2020), *aff'd*, 11 F.4th 810 (D.C. Cir. 2021)).  And, each record withheld pursuant to Section 6 is also protected from release by Exemption 1.  *See Larson*, 565 F.3d at 862-63 ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").  Even if Plaintiff is correct that Section 6 cannot be the sole basis for withholding a record in full,[29] that is not what NSA has done, and Plaintiff has not shown that any

---

[27] The Court addresses 50 U.S.C. § 3605, as that is the statute invoked by NSA and § 3606 does not exist.

[28] Whether Exemption 3 can serve as a basis to refuse to search for records will be addressed with NSA's *Glomar* responses.

[29] The authority cited by Plaintiff for the claim that Section 6 cannot be the sole basis for an Exemption 3 withholding is not instructive.  Most importantly, the facts are meaningfully distinct, as the *Shapiro* court found that Section 6 could not be the sole justification for a *Glomar* response, where NSA had improperly narrowed the scope of the FOIA request to only search for SIGINT information.  *See Shapiro v. CIA*, 170 F. Supp. 3d 147, 159 (D.D.C. 2016) ("Because the agency misinterpreted Shapiro's original request, the Court finds that the NSA is statutorily obligated to address

record was improperly withheld in full under all of the possible bases for its protection. Because Plaintiff has not called the Kiyosaki Declaration into question by showing bad faith or the existence of contravening information, the Court finds NSA has properly invoked Exemption 3. *See James Madison Project v. CIA*, 344 F. Supp. 3d 380, 389-90 (D.D.C. 2018) (citing *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978)) ("Because each agency's declaration both identifies the statute that excludes the information and establishes that the information falls within the statute's scope, the Court finds that FOIA Exemption 3 was properly invoked.").

### *CIA Withholdings – Exemptions 1, 3, 5, 6, & 7*

Defendants argue CIA properly invoked numerous Exemptions in its Final Response to Plaintiff's two requests to the agency [Dkt. 51 at 73-89]. CIA withheld six documents in full in response to parts 3(1) and 3(2) of Plaintiff's May 2020 Request, pursuant to Exemptions 1, 3, 5 and 6 [Dkt. 51 at 73-74]. In response to part 2 of the June 202 Request, CIA released four documents in part and withheld in full 157 documents pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), 7(D), and 7(E) [Dkts. 51 at 74; 51-1 at 37].[30] The remaining parts of the two requests are addressed by CIA's *Glomar* responses. Blaine attests CIA "released all reasonably segregable, nonexempt information that could be released without potentially compromising classified or privilege information, or other information protected by the FOIA" [Dkt. 51-1 at 38].

---

his outstanding request for all records in the NSA's possession that do not reveal whether Nelson Mandela was a SIGINT target or of SIGINT interest to the NSA"). Plaintiff raises no similar challenge to the scope of NSA's search in this case, thus *Shapiro* does not compel a finding that any Section 6 basis for an Exemption 3 here is also improper.
[30] Many of the withheld records are protected by multiple, overlapping exemptions, as the Blaine Declaration explains:

> Much of the information is protected by several overlapping FOIA exemptions. For example, the interview notes and memoranda withheld under Exemption (b)(5) pursuant to the deliberative process privilege contain discrete pieces of classified information withheld pursuant to Exemption (b)(1), and intelligence sources and methods withheld under Exemption (b)(3) pursuant to the National Security Act. They also contain the names of employees, withheld under Exemption (b)(3) pursuant to the CIA Act, and Exemption (b)(6). They further contain identifying information about those involved in the investigation or information provided by individuals interviewed, which is withheld under Exemptions (b)(7)(C) and (b)(7)(D) respectively.

[Dkt. 51-1 at 38].

The Blaine Declaration explains in detail the basis for invoking each of these Exemptions and is accompanied by CIA's *Vaughn* Index.  Plaintiff primarily challenges CIA's *Glomar* response, raising only one challenge to any specific Exemption invoked by CIA, specifically Exemption 5.  Plaintiff also generally complains that the CIA has not justified why its records cannot be redacted [Dkt. 59 at 8].[31]  The Blaine Declaration attests that CIA applied reductions to all documents when it could and confirmed all segregable was disclosed.[32]  Together with the descriptions in the *Vaughn* Index of each record and the basis for the Exemptions invoked, this is sufficient to satisfy CIA's obligation to justify its disclosures and withholdings.  *See Kowal*, 490 F. Supp. 3d at 72 ("The ATF also provided descriptions for the documents it withheld in their entirety in its Vaughn index. . . . The ATF has thus shown with 'reasonable specificity' as to why the 30 documents cannot be segregated.").  Plaintiff otherwise does not challenge any Exemption, except where noted for Exemption 5.

### **Exemption 1**

Regarding Exemption 1, the Blaine Declaration attests that the records responsive to parts 3(1) and 3(2) of the May 2020 CIA Request, and part 2 of the June 2020 CIA Request are "currently and properly classified, or contain information that is currently and properly classified" [Dkt. 51-1 at 18].  The records withheld pursuant to Exemption 1 contain classified information under classification category § 1.4(c) of EO 13526, specifically information that "consists of (i)

---

[31] While Plaintiff challenges CIA's redactions when addressing Defendants' *Glomar* responses, the Blaine Declaration addresses as the question of redaction and segregability primarily in context of withholdings under the Exemptions. The Court addresses redaction and CIA's segregability determinations here, as redaction is only relevant to identified records, which do not exist where CIA invokes a *Glomar* response.

[32] "FOIA requires that 'even if some materials from the requested record are exempt from disclosure, any reasonably segregable information from those documents must be disclosed after redaction of the exempt information unless the [non-]exempt portions are inextricably intertwined with exempt portions.'"  *Fischer I*, 596 F. Supp. 2d at 44 (quoting *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002)) (cleaned up).  "The agency is 'entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material.'"  *Kowal*, 490 F. Supp. 3d at 72 (quoting *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (alteration in original)).

identifying information regarding covert personnel; (ii) identifying information regarding covert locations; and (iii) information that would tend to reveal specific intelligence sources, methods, and or activities" [Dkt. 51-1 at 18-19].  Blaine describes the national security risks associated with each category of information as follows.  Regarding covert personnel,

> The CIA considers the identities of its covert employees and their activities to constitute intelligence sources and methods. In order to carry out its mission of gathering and disseminating intelligence, the CIA places certain employees under cover to protect the fact, nature, and details of the Agency's interest in foreign activities as well as the intelligence sources and methods employed to assist in those activities. Disclosing the identity of a covert employee could expose the intelligence activities with which the employee has been involved and the sources with whom the employee has had contact. Additionally, disclosing the identity of a covert employee could jeopardize the safety of the employee, his or her family, his or her sources, and even other persons with whom he or she has had contact. In order for the Agency to carry out effectively its foreign-intelligence gathering mission, it is imperative that the identities of these covert personnel be protected.

[Dkt. 51-1 at 19-20].  Regarding covert locations,

> The records at issue also contain details related to covert CIA locations. The places where the CIA maintains a presence constitute classified intelligence methods of the Agency. The CIA1 s covert overseas facilities are critical to the CIA's mission, as they provide a base for the CIA's foreign intelligence activities. Acknowledging the location of such covert facilities can endanger the physical safety of covert CIA officers who work at those locations by, among other things, significantly increasing the likelihood that those facilities could be targeted for attacks.

[Dkt. 51-1 at 20].  Regarding intelligence methods, sources, and activities,

> The documents at issue also contain information concerning CIA intelligence methods as well as details of specific intelligence activities.
> The CIA must guard against the disclosure of the clandestine methods it uses to collect and analyze intelligence. Intelligence methods are the techniques and means by which an intelligence agency accomplishes the mission, and the classified internal regulations, approvals, and authorities that govern the conduct of CIA personnel. In this case, the CIA withheld information related to the methods that it uses to collect and analyze intelligence. This includes certain classified details regarding the Agency's information technology and security of those systems.
> The manner in which the Agency protects its intelligence on its information systems is itself a method—indeed, one that is critical to the CIA's mission of collecting and analyzing foreign intelligence. Disclosure of different details regarding the Agency's information technology and information security may

complicate or completely disrupt CIA communications. For example, a disruption to the Agency's computer network could hinder active operations or allow for the interception of classified communications by adversaries. The Agency must protect identifying information regarding its information systems, its information security protocols, and details regarding its technical capabilities concerning this information systems from disclosure. The Agency must do so in order to prevent adversaries, terrorist organizations, and others from learning about how the CIA operates, which would allow them to use countermeasures to undermine U.S. intelligence capabilities and render collection efforts ineffective.

[Dkt. 51-1 at 21-22].

Blaine "determined that this information remains currently and properly classified pursuant to the criteria of Executive Order 13526 as its disclosure could reasonably be expected to cause damage to national security" [Dkt. 51-1 at 22].  The Blaine Declaration attests that "none of the information at issue has been classified in order to conceal violations of law," or to "prevent embarrassment to a person," or to prevent release of information "that does not require protection in the interest of national security" [Dkt. 51-1 at 19].

### Exemption 3

CIA invokes Exemption 3 pursuant to two statutes: "Section 102A(i)(1) of the National Security Act, and Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507" (hereinafter, the "CIA Act"),[33] both of which are "widely recognized" as withholding statutes for Exemption 3 [Dkt. 51-1 at 22-23].

The National Security Act invoked under Exemption 3 "applies co-extensively" to the information protected by Exemption 1 as it relates to classified sources and methods; however, the National Security Act is broader and "there are some aspects of the Agency's intelligence sources and method that are unclassified, but would nevertheless reveal intelligence sources and methods protected by the National Security Act if disclosed" [Dkt. 51-1 at 23].  An example of information

---

[33] Section 6 of the CIA Act is a different statute than the Section 6 invoked by NSA.

protected by the National Security Act are "details related to the Agency's information technology systems", which "would show the types of equipment relied upon by Agency personnel to carry out the CIA's objectives" [Dkt. 51-1 at 23].  Two other specific categories of information are protected by the Act: (1) classification and dissemination control markings, and (2) code words and pseudonyms [Dkt. 51-1 at 23].  Although no showing of national security risk is required to properly invoke Exemption 3, as the declaration correctly notes, Blaine nonetheless explains why this information is sensitive and must be protected [Dkt. 51-1 at 23-25].

Section 6 of the CIA Act protects "the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency" from disclosure [Dkt. 51-1 at 25-26] (quoting 50 U.S.C. § 3507).  This applies to protect both CIA officers and contractors.  The Blaine Declaration explains "the Agency withheld names and other personally-identifying information of Agency personnel, such as Agency identification numbers, telephone numbers, email addresses, locations, and core job functions" [Dkt. 51-1 at 26].  Again, although "no harm rationale is required," Blaine attests that disclosure of this information "would expose the identities of CIA personnel, and possibly their job duties and contact information, which could subject them to harassment, embarrassment, or unwanted contact," as well as "highlight the capabilities and possible limitations of the Agency's intelligence activities, which could hinder the Agency's efforts to fulfill its intelligence-gathering mission" [Dkt. 51-1 at 26].

### Exemption 5

The Blaine Declaration first clarifies that CIA is "no longer asserting" Exemption 5 in relation to the documents responsive to parts 3(1) and (3) (2) of the May 2020 CIA Request, only "in relation to the documents responsive to part 2 of the June 2020 CIA request" [Dkt. 51-1 at 26-27].  Regarding the June 2020 request, Blaine attests that all of the information withheld pursuant

to Exemption 5 "has been circulated either within the Agency or with other agencies within the federal government, and therefore satisfies the intra- and inter-agency threshold of the exemption," and as the *Vaughn* Index describes, Exemption 5 is asserted to discussions that are protected by attorney–client privilege, attorney work–product privilege, or the deliberative process privilege [Dkt. 51-1 at 27].

CIA invoked the deliberative process privilege for the majority of the records responsive to part 2 of the June 2020 CIA Request related to the request for records concerning whether former CIA Director Petraeus mishandled classified information.  The Blaine Declaration describes why the withheld information properly falls under this privilege:

> many of the records consist of OIG investigation case progress reviews, logs of investigative activity, correspondence with DOJ regarding deliberations at different stages of the investigation, and witness interview notes. Each of these communications reflect the CIA's internal and confidential decision-making process at interim stages of the investigation related to former CIA Director Petraeus. Some of the documents withheld are draft versions, which were not finalized, contain no date, or have no signature. Also, some of these drafts have embedded comments, or contain recommendations and edits as well as discussions about wording, accuracy, and other deliberative ancillary matters. These communications do not convey final Agency viewpoints on a particular matter, but rather reflect different considerations, opinions, options, and approaches that preceded the Department of Justice's final decision to pursue prosecution.

[Dkt. 51-1 at 28-29].  "[T]he documents withheld in full or in part pursuant to the deliberative process privilege do not reveal a final decision, but reflect the investigative, deliberative process that the Agency undertook," and if one were to compare records protected by such privilege with publicly-filed documents, it "ultimately would open the Agency's deliberative process to public scrutiny on decisions that were not final" and "would chill the free flow of discussion in agency decision-making" [Dkt. 51-1 at 29-30].  Blaine attests that "to the extent the documents contain any factual material, that content is part and parcel of the deliberations, and its disclosure would expose or cause harm to the Agency's deliberations" [Dkt. 51-1 at 30].  As well, disclosure of this

information "could mislead or confuse the public by disclosing rationales that did not for the basis for the Agency's final decisions" [Dkt. 51-1 at 31].

The attorney work–product privilege was invoked to protect 8 documents in order to "withhold communications from or between Agency attorneys discussing the then-ongoing investigation, legal issues, and deliberations regarding the future progression of the investigation" [Dkt. 51-1 at 31]. All of the communications withheld under this privilege were created in reasonable anticipation of litigation, primarily criminal prosecutions, which is the type of information the work–product privilege is meant to protect [Dkt. 51-1 at 31]. Attorney–client privilege was invoked to protect one document that contains "confidential communications between senior Agency officials and senior attorneys within the CIA's Office of General Counsel," and Blaine attests that this information meets the requirements for attorney–client privilege, namely that it is communication made in connection with a request for legal advice and the confidentiality of these communications were maintained [Dkt. 51-1 at 31-32].

Plaintiff objects to CIA's invocation of any privilege under Exemption 5 on the grounds that CIA has failed to properly brief these issues and therefore they are waived [Dkt. 59 at 9]. Plaintiff argues waiver because CIA's explanation of Exemption 5 privileges are "conclusory" and lack legal authority [Dkt. 59 at 9]. The Court disagrees that Defendants have not briefed this argument as a matter of procedure, as Defendants' motion explicitly brief the issue, states the statutory basis for each privilege, and is supported by a sufficient declaration from the agency. The Blaine Declaration explains in sufficient detail why each of the privileges applies, and the *Vaughn* Index provides further explanation of which privilege was invoked for each record and why. Plaintiff cites no authority that these privileges may be *waived* by substantively deficient briefing, as opposed to the Court determining summary judgment is not warranted on the basis of

this Exemption.  No other specific challenges are raised by Plaintiff to the Exemptions invoked by CIA, except to the extent they overlap with its objections to CIA's *Glomar* responses.

### Exemption 6

Exemption 6 was invoked to withhold information responsive the May 2020 Request and the June 2020 Request.  The Blaine Declaration explains that Exemption 6, which protects personnel files and "similar files" covers "any personally identifying information of covert and overt CIA personnel and other individuals mentioned in the documents, such as names, positions, contact information, social security numbers, unique Agency identifiers (such as pseudonyms and Agency identification numbers), and similar identifying details" [Dkt. 51-1 at 32-33].  Addressing the balancing of the privacy interests of the individuals' personal information against the public interest in disclosure, Blaine explains that the privacy interests are high:

> The individuals named in the records are CIA employees, non-agency government personnel, and other third parties unaffiliated with the Agency. These persons maintain a strong privacy interest in this information because its release could subject them to harassment, embarrassment, or unwanted contact by virtue of their association with the subject matters of the FOIA requests.

[Dkt. 51-1 at 33].  Regarding the public interest, "The Transparency Project has not set forth, and I am unable to identify in each of these instances, any qualifying countervailing public interest that would be served by such a disclosure," nor would it serve FOIA's purpose of informing the public as to the activities of the agency [Dkt. 51-1 at 33-34].  Blaine notes that the information protected by Exemption 6 is also protected by the CIA Act pursuant to Exemption 3 [Dkt. 51-1 at 34].

### Exemptions 7(C), 7(D), & 7(E)

Exemption 7 protects information and records generated by CIA's Office of Inspector General that were compiled for law enforcement purposes [Dkt. 51-1 at 34].  The Blaine Declaration explains that in November 2012, OIG opened an investigation into activities involving

former CIA Director Petraeus, and while FBI eventually took over the investigation, OIG continued to assist the investigation [Dkt. 51-1 at 35]. Related to Plaintiff's June 2020 Request, CIA asserts Exemptions 7(C) and 7(D) "to protect the privacy of those involved in the investigation and information provided by confidential sources to the OIG during the course of its investigation" [Dkt. 51-1 at 35].

Regarding Exemption 7(C), CIA withheld identifying information regarding the individuals involved in the investigation [Dkt. 51-1 at 35]. The Blaine Declaration notes this information is also protected by Exemption 6 for the same personal identifying information, and "the Agency withheld the names of CIA employees and other federal government personnel pursuant to Exemption (b)(7)(C) because these persons maintain a strong privacy interest" in information whose release would subject them to harassment or unwanted contact by the media or other interested parties [Dkt. 51-1 at 35]. No countervailing public interest in revealing the names of these individuals could be identified, and consequently, Blaine attests that "disclosure of this information could reasonably be expected to constitute an unwarranted invasion of personal privacy pursuant to Exemption (b)(7)(C)" [Dkt. 51-1 at 36].

Exemption 7(D) is asserted by CIA to protect confidential source interviews, specifically "the interview notes of OIG investigators and memoranda drafted from those notes" [Dkt. 51-1 at 36]. The Blaine Declaration attests that, "[a]s a matter of Agency policy, the OIG does not disclose the identities of persons it interviews or the substance of their statements unless such disclosure is determined to be necessary for the full reporting of a matter or the fulfillment of other OIG or Agency responsibilities" [Dkt. 51-1 at 36]. Interviewees are under either an express or implied promise of confidentiality, and review of the *Vaughn* Index reveals CIA noted whether the basis was implied or express confidentiality for each record withheld pursuant to 7(D) [*See* Dkt. 51-1 at

48].  The notes withheld "contain details that would tend to identify the individuals interviewed by revealing their position in the Agency or their role in, or knowledge of, the underlying events" [Dkt. 51-1 at 36].  Blaine attests that all of the withheld information relates to an investigation criminal in nature, and thus it properly falls within Exemption 7(D), and "no part of the interview notes or the memoranda is segregable" [Dkt. 51-1 at 36-37].

Exemption 7(E) is invoked for a limited amount of information [Dkt. 51-1 at 37].  The CIA *Vaughn* Index reveals fewer than five records withheld pursuant to Exemption 7(E) [Dkt. 51-1 at 46, 48, 58, 102] (Entry Nos. 22, 29, 57, and 167).  CIA invoked Exemption 7(e) "to protect information related to some of the techniques and procedures used by the OIG in relation to the OIG's investigation into former CIA Director Petraeus," which if disclosed, "would reveal the extent to which the OIG records, catalogs, or otherwise compiles specific information as part of its investigations" [Dkt. 51-1 at 37].  Blaine attests that the information protected by Exemption 7(E) is also protected by the National Security Act pursuant to Exemption 3 [Dkt. 51-1 at 37].

### ODNI Withholdings – Exemptions 1, 3, 5, 6, & 7

Defendants argue ODNI properly invoked numerous Exemptions in determining what records must be withheld [Dkt. 51 at 89-92].  ODNI withheld nineteen documents in full, withheld four documents in part, and referred three documents to other agencies, pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E).  The Koch Declaration explains in detail the basis for invoking each of these Exemptions and is accompanied by ODNI's *Vaughn* Index.  Plaintiff objects generally to the ODNI exemptions on the grounds "they are complete conclusory" [Dkt. 59 at 9].  No further explanation is provided as to why the Koch Declaration or the *Vaughn* Index are insufficiently detailed and specific.

Koch attests ODNI "redacted only the information subject to the foregoing exemptions, and released all other reasonably segregable, non-exempt information" [Dkt. 51-4 at 12-13]. "With regard to the nineteen documents withheld in full, ODNI determined that, pursuant to the foregoing exemptions, neither the records themselves nor portions of the records may be released. As explained in this declaration, doing so would reveal classified and statutorily-protected information that is itself exempt from disclosure" [Dkt. 51-4 at 13].  Based on his personal review of the documents identified in ODNI's Vaughn Index, Koch "determined that no other reasonably segregable information can be released" [Dkt. 51-4 at 13].

### **Exemption 1**

Regarding Exemption 1, the Koch Declaration attests that "each invocation of Exemption 1 in those documents [identified in the *Vaughn* Index] is proper and consistent with E.O. 13526" [Dkt. 51-4 at 8].   Of the categories of information subject to classification under § 1.4, the information withheld under Exemption 1 "falls under several classification categories listed within E.O. 13526", such as "(a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources" [Dkt. 51-4 at 8-9].   "As an original classification authority," Koch "determined that the information withheld under Exemption 1 that is responsive to Plaintiff's request is currently and properly classified" [Dkt. 51-4 at 8].   Koch attests that "unauthorized disclosure of the information withheld under Exemption 1 could reasonably be expected to result in at least serious damage to the national security," and the "information was therefore properly withheld under FOIA Exemption 1" [Dkt. 51-4 at 9].  The Koch Declaration further states "none of the information withheld under Exemption 1 has been classified in order to conceal violations

of law," or to "prevent embarrassment to a person, organization or agency" or to "prevent or delay the release of information that does not require protection in the interests of national security" [Dkt. 51-4 at 9].

### Exemption 3

The Koch Declaration explains that three statutes justify withholdings under Exemption 3. Under the National Security Act, "the [DNI] shall protect intelligence sources and methods from unauthorized disclosure," which "has long been held to qualify as a withholding statute" under Exemption 3 [Dkt. 51-4 at 9] (quoting 50 U.S.C. § 3024(i)(1)).  The second is a separate statutory provision of the National Security Act, "provides that ODNI is exempt from provisions of law which require the disclosure of the "organization, functions, names, official titles, salaries, or number of personnel employed" [Dkt. 51-4 at 10] (citing 50 U.S.C. § 3507).[34]  The third applicable withholding statute is "10 U.S.C § 130c exempts from disclosure 'sensitive information of foreign governments,' which is defined to include information that 'was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization'" [Dkt. 51-4 at 10] (citing 10 U.S.C. §§ 130c(a), (b)(1)).  Koch attests that each of these three statutes applies in some regard, as noted in the *Vaughn* Index:

> Based on my personal review of the documents identified in the attached *Vaughn* index, I have determined that each invocation of Exemption 3 in those documents is proper and consistent with the "intelligence sources and methods" provision of the National Security Act (50 U.S.C. § 3024(i)(1)) the "personnel" provision of the National Security Act (50 U.S.C. § 3024(m)), 10 U.S.C § 130c, or some combination thereof. The information behind the "(b)(3)" redactions in this case was therefore properly withheld under FOIA Exemption 3.

[Dkt. 51-4 at 10].

---

[34] *See also* 50 U.S.C. § 3024(m) (incorporating by reference 50 U.S.C. § 3507, which applies to the CIA, into the National Security Act and thereby conferring same authority on the DNI) [Dkt. 54-1 at 10].

**Exemption 5**

ODNI invokes the deliberative process privilege under Exemption 5.  The Koch declaration states: "Based on my personal review of the documents identified in the attached *Vaughn* index, I have determined that each invocation of Exemption 5 is proper and consistent with the deliberative process privilege because the information at issue is both pre-decisional and deliberative. Such information was therefore properly withheld under Exemption 5" [Dkt. 51-4 at 11].

**Exemption 6**

The Koch Declaration attests that information was properly withheld under Exemption 6 based upon his "personal review of the documents identified in the attached Vaughn index".  More specifically, Koch states: "I have determined that each invocation of Exemption 6 is proper because: (1) it protects a personnel, medical, or "similar" file or piece of information; (2) there is a significant privacy interest in the underlying information; and (3) such privacy interest outweighs the requester's asserted public interest in the information" [Dkt. 51-4 at 11].

**Exemption 7**

Although ODNI is not a law enforcement agency, it receives, assesses, and uses intelligence and other information from agencies that do have a law enforcement mission [Dkt. 51-4 at 12].  "In such situations, as in this case, ODNI consults with the originating agency or agencies to determine if FOIA Exemption 7 applies to their information" [Dkt. 51-4 at 12].  The Koch Declaration explains:

> As a result of that consultation process, the FBI requested ODNI invoke Exemptions 7(A), 7(C), 7(D), and 7(E) over certain information contained within ODNI records that are responsive to the Plaintiff's Request. Respectively, these exemptions apply when the release of law enforcement records "could reasonably be expected to": "interfere with enforcement proceedings;" "constitute an unwarranted invasion of personal privacy;" "disclose the identity of a confidential source;" and disclose investigative techniques and procedures. 5 U.S.C. § 552(b)(7)(A), (C), (D), (E).

[Dkt. 51-4 at 12].  Koch attests, based on his personal review of the documents identified in the Vaughn Indez, determined that "each invocation of Exemption 7 requested by the FBI is proper because the underlying information is subject to one or more of the exemptions contained in Exemptions 7(A), 7(C), 7(D), or 7(E)" and that "[s]uch information was thus properly withheld under Exemption 7" [Dkt. 51-4 at 12].

Review of the ODNI *Vaughn* Index shows that each record is identified by a brief description, a list of the Exemptions invoked, and indication of which records were referred to other agencies to identify their equities in the records [Dkt. 54-1 at 24-25].  Further, ODNI's Response Letter provides additional detail and explanation as to the specific bases for the Exemptions identified, providing a "key" to the Exemption designations listed in the Vaughn Index, as well as explaining the Exemptions invoked for the records ODNI sought consultation from other agencies [Dkt. 54-1 at 21-22].

### III.    Glomar *Responses by NSD, NSA, and CIA Are Proper*

Defendants urge the Glomar responses of NSD, NSA, and CIA were proper; NSD asserted a Glomar response under Exemption 1 and NSA and CIA each asserted Glomar responses based on Exemptions 1 and 3.[35]

"Agency refusal to confirm or deny the existence of records responsive to a request is known as a *Glomar* response."  *Larson*, 565 F.3d at 861.  "[T]o the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents."  *Lindsey,* 490 F. Supp. at 10 (quoting *People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014)).

---

[35] Defendants' motion contains a typographical error indicating NSD invoked Glomar under Exemptions 1 and 3 [Dkt. 51 at 37]; however, the briefing and the Findlay Declaration make clear that only the basis is Exemption 1

A *Glomar* response "is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf,* 473 F.3d at 374. "In the *Glomar* context, the 'specific information' at issue is not the contents of a particular record, but rather 'the existence *vel non*' of any records responsive to the FOIA request." *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013) ("*ACLU II*") (quoting *Wolf*, 473 F.3d at 374). "Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Id.* at 426 (quoting *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1178 (D.C. Cir. 2011)). "Because courts lack the expertise necessary to second-guess such agency opinions in the typical national security FOIA case," the Court "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Lindsey*, 490 F. Supp. 3d at 11 (quoting *ACLU v. DOD*, 628 F.3d at 619).

Courts may grant summary judgment "on the basis of agency affidavits that contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Id.* (quoting *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012)). "The supporting affidavit must justify the *Glomar* response based on general exemption review standards established in non-*Glomar* cases." *Id.* (quoting *Elec. Privacy Info. Ctr.*, 678 F.3d at 931 (internal quotation marks omitted)). Therefore, the same Exemption 1 and Exemption 3 requirements apply here. "When addressing an agency's *Glomar* response, courts must accord 'substantial weight' to agency determinations." *Lindsey*, 490 F. Supp. 3d at 10 (citing *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 89 (D.D.C.  2016)). "

### *NSD's Glomar Response – Exemption 1*

NSD invokes Exemption 1 as the basis for its *Glomar* response, which is asserted solely as to part one of Plaintiff's June 18, 2020 request, which states:

> I request the opportunity to view all documents, records, communications and/or other tangible evidence reflecting or pertaining to surveillance of Edward Butowsky of Texas or Matt Couch of Arkansas. The term "surveillance" includes, but is not limited to, any attempt to hack into the computers, phones, other electronic devices, and/or online accounts of Mr. Butowsky or Mr. Couch. If any information obtained by surveillance was relayed to third parties, that information should be produced for inspection.

[Dkt. 52 at 3-4]. The Findlay Declaration explains that NSD interpreted such request as "seeking NSD records regarding surveillance that, should they exist, would have been authorized under the Foreign Intelligence Surveillance Act of 1978 (FISA)" [Dkt. 52 at 4]. "Information in NSD records is frequently, though not exclusively, classified under section 1.4(c) of Executive Order 13526 which covers intelligence activities, sources, and methods" [Dkt. 52 at 4]. "Several enumerated categories of information in the NSICG, designated for protection under section 1.4(c) of Executive Order 13526, would apply to records responsive to part one of this request, if any such records were to exist" [Dkt. 52 at 5]. Findlay attests that "[a]s an [Original Classification Authority], I confirm that the guidance provided in the NSICG is appropriate in requiring the classification of FISA-related records responsive to part one of Plaintiff's request, should they exist, as they would implicate section 1.4 (c) of Executive Order 13526" [Dkt. 52 at 5]. Disclosure of such information "would cause harm to national security as it could permit hostile intelligence services to use FOIA to acquire information about United States intelligence investigations," as "[o]nce a particular source or method, or the fact of its use in a particular situation is disclosed, its continued usefulness may be degraded." Confirmation of the existence or nonexistence of such

information "would provide intelligence analysts of foreign intelligence services with individual pieces of information that could be compiled into a catalogue of FISA activities" [Dkt. 52 at 5-6]. The Findlay Declaration explains

> revealing the absence of responsive records pertaining to particular individuals would tend to indicate that persons within the scope of the request were not targets of surveillance conducted pursuant to FISA. That fact could be extremely valuable to foreign powers and hostile intelligence services who could use it to carry out intelligence activities with some comfort that the U.S. Government is either not monitoring certain people and may not even suspect them or otherwise is not concerned with their activities.

[Dkt. 52 at 6]. Findlay attests that information pertaining to operational FISA work is properly classified under §1.4 of EO 13526, and that NSD's Glomar response is not made to conceal violations of the law [Dkt. 52 at 6-7].

Plaintiff objects to NSD's *Glomar* response on the basis that NSD improperly narrowed the search to FISA records in response to part 1 of the June 18, 2020 request [Dkt. 59 at 7], demanding that "[i]f the NSD obtained surveillance records from other sources, then those records should be identified and produced" [Dkt. 59 at 7]. Findlay's Declaration explains why NSD interpreted the June 18 Request as one for FISA-related records, namely based on the context of the request seeking records related to domestic surveillance, which "should they exist, would have been authorized under" FISA [Dkt. 52 at 4]. Further, as stated in NSD's June 18 Final response, "NSD, Office of Intelligence represents the government before the Foreign Intelligence Surveillance Court and is responsible for preparing and filing all applications for Court orders pursuant to FISA and maintains files documenting those applications and orders" [Dkt. 52-1 at 101]. In response to Plaintiff's June 11, 2020 FOIA request, NSD informed Plaintiff that "it does not maintain FBI records" [Dkt. 52 at 2]. Given Plaintiff submitted the June 18 Request to NSD

as the DOJ component entity after having notice NSD does not maintain FBI records,[36] it is logical

that NSD would respond and produce records within its purview.  *See Eddington v. U.S. Dep't of*

*Just.*, 581 F. Supp. 3d 218 (D.D.C. 2022) ("Eddington's FOIA request was for records kept *by the*

*NSD*. . . . Eddington's speculation that FBI records might be at the NSD fails to show a 'match'

between the information previously acknowledged and the information now sought.") (emphasis

in original).  Plaintiff asserts "surveillance records" obtained "from other sources" should have

been identified, but it provides no explanation for how else these records may have originated.

Findlay is General Counsel for the NSD and lead of the Office of General Counsel for NSD, and

NSD's FOIA unit is a constituent entity within OGC [Dkt. 52 at 1-2].  Plaintiff's objection that

NSD did not conduct a broader search is based on speculation, whereas Findlay explains why NSD

FOIA interpreted his request in this manner.  *See, e.g.*, *Santana v. Dep't of Just.*, 828 F. Supp. 2d

204, 208 n.6 (D.D.C. 2011) ("Santana also claims that the EOUSA should have 'construed his

request more broadly'. . . . But, plaintiff explains neither what other documents he wishes the

EOUSA would have provided nor how the EOUSA's interpretation of his specific requests was

unreasonable."); *Ellis v. United States Dep't of Just.*, 110 F. Supp. 3d 99, 106 (D.D.C. 2015) ("This

position is unconvincing, as DOJ, through its declaration, has articulated which databases were

---

[36] As the DOJ explains, a FOIA requester should determine whether a DOJ component is likely to have the records sought prior to sending the request:

> Initially, it is important to understand that there is no central office in the government that processes FOIA requests for all federal departments and agencies. Each federal department and agency responds to requests for its own records. Therefore, *before sending a request to DOJ you should determine whether DOJ is likely to have the records you are seeking*. Each federal department and agency is required to provide reference material to assist those who wish to request records from them. Accordingly, you should view the websites of any federal agency which might have records you seek. By doing so you will learn what records are already available on the agency's website and *you will also be able to determine which agency is likely to maintain the records you are seeking*.

U.S. DEP'T OF JUST., *The Department of Justice Freedom of Information Act Reference Guide (Reference Guide)* (last updated   Dec. 3,   2021),   https://www.justice.gov/oip/department-justice-freedom-information-act-reference-guide (emphasis added).

searched, *why those databases were selected*, and what documents were located.") (emphasis added), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016).   Finally, the Final Response, on its face, invokes NSD's *Glomar* response broadly, stating "[*a]ny* such information is properly classified" under Exemption 1.   The Court finds NSD's Glomar response proper as to part 1 of the June 18, 2020 request.

### NSA's Glomar Response - Exemptions 1 & 3

NSA asserted a *Glomar* response based on Exemptions 1 and 3.   The Kiyosaki Declaration explains the basis for these Glomar responses [Dkt. 51-3 at 22-27].   NSA invokes Glomar under on the basis that "NSA interpreted Plaintiffs' request as one seeking intelligence records; specifically COMINT which includes intercepted foreign government communications. To the extent a Plaintiff seeks intelligence information, NSA's response is to state that it cannot confirm or deny publicly in any case whether or not it has such records, as doing so would reveal whether or not NSA engaged in certain, or any, intelligence activities, and/or did or did not target individual communications for collection" [Dkt. 51-3 at 22].

NSA invokes Exemption 1, urging that confirming or denying the existence of information properly classified pursuant to EO 13526 "reasonably could be expected to cause exceptionally grave damage to national security" [Dkt. 51-3 at 23].   The Kiyosaki Declaration attests that "[a]cknowledgment of the existence or nonexistence of operational intelligence information concerning the who, what, when, and bow of NSA's SIGINT collection efforts would reveal information that is currently and properly classified as set forth in Sections 1.4(c) of E.O. 13526" [Dkt. 51-3 at 23].   More specifically, confirming the existence or nonexistence of records containing information classified as TOP SECRET "could reasonably be expected to harm national security because it would reveal NSA intelligence capabilities, activities, and priorities, which in

tum could inhibit SIGINT collection and affect NSA's ability to counter threats to the national

security of the United States" [Dkt. 51-3 at 23].   This applies equally to "Acknowledging the

existence or nonexistence of responsive records on particular individuals or organizations that may

be subject to surveillance" [Dkt. 51-3 at 23].   The Kiyosaki Declaration explains why Glomar

responses must be categorically invoked under these circumstances:

> Confirmation by NSA that a person's activities are not of foreign intelligence
> interest or that NSA is unsuccessful in collecting foreign intelligence information
> on their activities on a case-by-case basis would allow our adversaries to
> accumulate information and draw conclusions about NSA's technical capabilities,
> sources, and methods. For example, if NSA were to admit publicly in response to a
> FOIA request that no information about Persons X or Y exists, but in response to a
> separate FOIA request about Person Z state only that no response could be made,
> this would give rise to the inference that Person Z is or has been a target. Over time,
> the accumulation of these inferences would disclose the targets and capabilities,
> and therefore the sources and methods, of NSA's SIGINT activities and functions,
> and inform our adversaries of the degree to which NSA is aware of some of their
> operatives or can successfully exploit particular communications.

[Dkt. 51-3 at 23-24].   A case-by-case approach "could reasonably be expected to cause

exceptionally grave and irreparable damage to the national security by providing our adversaries

a road map that instructs them on which communication modes or personnel remain safe or are

successfully defeating NSA's capabilities" [Dkt. 51-3 at 24].   Kiyosaki attests "determination that

the existence or nonexistence of the requested records is classified has not been made to conceal

violations of law" and "the fact of the existence or nonexistence of intelligence information

requested by Plaintiffs is a currently and properly classified matter in accordance with E.O. 13526

[Dkt. 51-3 at 25].

Regarding Exemption 3, the Kiyosaki Declaration explains that NSA's Glomar response

was raised pursuant to the same three statutes invoked to withhold records under Exemption 3:

Section 6 of the National Security Agency Act of 1959 (50 U.S.C. § 3605), 18 U.S.C. § 798, and

the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism

Prevention Act of 2004 (50 U.S.C. § 3024) [Dkt. 51-3 at 26].   More specifically, information

requested by Plaintiff falls under these statutes for the following reasons:

> (1) Section 6 of the National Security Act of 1959, 50 U.S.C. § 3605, because the information concerns the organization, function, and activities of the NSA as described above; (2) 18 U.S.C. § 798, because disclosure would reveal classified information derived from NSA's exploitation of foreign communications; and (3) Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, because the information concerns intelligence sources and methods. For these reasons, acknowledgement of the existence or nonexistence of intelligence information requested by Plaintiffs is prohibited by statute and has been properly determined to be exempt from disclosure pursuant to the FOIA.

[Dkt. 51-3 at 27].   As explained *supra*, Congress enacted these statutes to "specifically prohibit[]

the disclosure of information related to NSA's functions and activities and its communications

intelligence activities, as well as the sources and methods used by the IC as a whole" [Dkt. 51-3 at

26].   Kiyosaki attests "I have determined that NSA's SIGINT activities and functions, and its

intelligence sources and methods, would be revealed if NSA confirmed or denied the existence of

information responsive to Plaintiff's FOIA request" [Dkt. 51-3 at 26].   She further declares that the

information protected by a *Glomar* response under this Exemption is also protected under

Exemption 1 [Dkt. 51-3 at 27].

Plaintiff objects to NSA's *Glomar* response on the grounds that "records sought by the

Plaintiff may have originated with other agencies and yet found their way to the NSA, therefore

such records would not disclose any function of the NSA or information about its activities" and

that "the NSA cannot categorically refuse to search for or produce records solely on the basis of

50 USC § 3606" [Dkt. 59 at 8].   Plaintiff's challenge to this Glomar response is speculative and is

not sufficient to overcome the response.   "A plaintiff 'can overcome a *Glomar* response by

showing that the agency has already disclosed the fact of the existence (or nonexistence) of

responsive records, since that is the purportedly exempt information that a *Glomar* response is

designed to protect.'" *Willis v. NSA*, No. 17-CV-2038 (KBJ), 2019 WL 1924249, at *5 (D.D.C.

Apr. 30, 2019) (citing *ACLU II*, 710 F.3d at 427).  Plaintiff points to no information or records that

originated from another agency where NSA has already disclosed the existence (or non-existence)

of such record.  Aside from failing to make a showing that defeats a Glomar response, Plaintiff

does not provide any authority that supports its claim that documents that originate outside of NSA

are not "information about its activities".[37]   The Kiyosaki Declaration also explains that

information from other sources in fact implicates NSA's sources and methods:

> the details of the withheld material responsive to Plaintiff's request concerning
> correspondences with Congress regarding or referencing specific individuals
> implicates critical sources and methods. Detailed discussions about circulated
> intelligence reports and NSA capabilities, both of which generally describe the type
> of information present in these withheld materials, reflect the very sources and
> methods this statute is designed to protect.

[Dkt. 51-3 at 21].  This rationale for NSA's *Glomar* response is logical, and the Court must defer

to the agency's expertise.  *See Shapiro v. CIA*, 170 F. Supp. 3d 147, 158 (D.D.C. 2016) ("Courts

must sustain an agency's Glomar response predicated on a FOIA exemption when the justification

for nondisclosure "appears 'logical' or 'plausible.'") (quoting *ACLU II*, 710 F.3d at 427).  Even if

the National Security Act alone does not justify a Glomar response for records originating outside

of NSA, Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act – a separate

statutory source – does cover records from other agencies; whether information is "properly

withheld under § 102(A)(i)(1)" turns on whether the  material "can reasonably be expected to lead

to unauthorized disclosure of intelligence sources and methods."  *Smith v. CIA*, 393 F. Supp. 3d at

---

[37] The language of Section 6 is broad, "as it exempts from disclosure any 'information with respect to the activities'
of that agency." *Wilner v. NSA*, 592 F.3d 60, 75 (2d Cir. 2009).  Indeed, collecting information that does not originate
with NSA is one of its core missions, as explained by Koch in the context of the nature and purpose of NSA's SIGINT
activities.

83.   Even further, should Exemption 3 not apply at all, the Kiyosaki Declaration avers that Exemption 1 is an independent and sufficient basis for NSA's *Glomar* response.

### CIA's Glomar Response – Exemptions 1 & 3

CIA offered a Glomar response to most portions of Plaintiff's requests to CIA – specifically in response to Parts 1, 2, 3(3), 4, 5, 6, 7, and 8 of the May 2020 CIA Request, and Part 1 of the June 2020 CIA Request – on the grounds that "acknowledging the existence or nonexistence of records responsive to those portions would reveal classified or statutorily-protected information" protected by Exemption 1 and Exemption 3 [Dkt. 51-1 at 8-9].  CIA's unique role in

Under Exemption 1, the Blaine Declaration attests that "the fact of the existence or nonexistence or the requested records is currently and properly classified and pertains to "intelligence activities (including covert action), [or] intelligence sources or methods" within the meaning of section 1.4(c) of the Executive Order" [Dkt. 51-1 at 9].  "There has been no official acknowledgment by the CIA on the topics in the portions of the May 2020 CIA Request or the June 2020 CIA Request for which the CIA offers a Glomar response" [Dkt. 51-1 at 11].  Blaine therefore states that "confirming or denying the existence of a responsive record in this particular case, as to certain portions of the plaintiff's requests, could reasonably be expected to cause damage to national security by disclosing intelligence activities, sources, and methods" [Dkt. 51-1 at 11]. The Declaration offers part 2 of the May 2020 Request as an example of why an Exemption 1 *Glomar* response is proper:

> For example, part 2 of the May 2020 CIA Request seeks "evidence indicating whether the 2016 Data Breach was the result of (1) outside forces (e.g., Russian agents, Pakistani agents, etc.) who hacked the servers from a remote location or (2) an individual or individuals who were present at or inside DNC facilities and copied the data onto a storage device." If the CIA were to confirm the existence of records responsive to this item in the request, such confirmation would show that the Agency devoted resources to this subject, and determined the cause of the 2016 data breach. Conversely, if the_ CIA denied possessing records containing such an

assessment, that response would show that the Agency did not determine the cause or did not consider the subject to be of sufficient intelligence interest to warrant analysis or assessment. In either case, disclosing whether or not the CIA possesses responsive records would reveal which topics are the subjects of CIA analysis and study. Such a disclosure would reveal aspects of the Agency's intelligence collection, which itself constitutes an intelligence method.

[Dkt. 51-1 at 11-12].

Plaintiff objects to CIA's classification of any documents related to "surveillance of journalists in the United States" [Dkt. 59 at 5]. The Blaine Declaration explicitly justifies the Glomar response in regard to this request:

As another example, parts 4-8 of the May 2020 CIA Request seek records reflecting CIA plans or efforts with journalists, U.S. social media companies, U.S. search engine companies, and entertainment productions. If the CIA were to confirm the existence of responsive records to any of these parts of the request, such confirmation would disclose Agency intelligence activities, sources, and methods. Conversely, if the CIA denied possessing any responsive records, that response would disclose, for example, that the CIA does not have contact with those types of entities. Disclosing this type of information would provide our adversaries with insight into the Agency's sources, relationships, priorities, and capabilities. They could exploit this information by using it to determine how to operate against our national security

[Dkt. 51-1 at 12-13]. Plaintiff also objects to the CIA's *Glomar* response to "whether it surveilled Edward Butowsky of Texas or Matt Couch of Arkansas" [Dkt. 59 at 8]. Blaine also addresses this request in defense of CIA's *Glomar* response:

Additionally, part 1 of the June 2020 CIA Request seeks records "reflecting or pertaining to surveillance of Edward Butowsky of Texas or Matt Couch of Arkansas." A primary function of the CIA is to gather intelligence from around the world that can be used by the President and other Government officials in making important decisions. To fulfill this responsibility, the Agency targets certain individuals as part of its foreign intelligence collection efforts. Revealing the identity of a potential foreign intelligence target of collection could cause the exposure of Agency tradecraft, human sources, and specific intelligence interests and activities. As such, confirming or denying the existence of records on any particular individual reasonably could be expected to cause serious damage to national security by indicating whether or not CIA maintained any human intelligence sources related to an interest in the subject of the request.

[Dkt. 51-1 at 13].  *Glomar* responses are proper where the request seeks records related to specific individuals, and selective responses to requests like Plaintiff's undermine the utility of *Glomar* responses across-the-board:

> if the CIA were to assert a Glomar response only in cases where responsive records exist, over time the Glomar response would serve to identify the particular cases in which the CIA has an intelligence interest in the subject. As a result, the CIA could not effectively offer a Glomar response in other cases seeking records on other individuals where the CIA does have a classified interest, including requests seeking information about intelligence sources and targets. This would hinder the CIA's ability to fulfill its intelligence-gathering responsibilities, which reasonably could be expected to cause damage to national security.

[Dkt. 51-1 at 14].  In light of these considerations, Blaine "determined that confirming the existence or nonexistence of records responsive to parts 1, 2, 3(3), 4, 5, 6, 7, and 8 of the May 2020 CIA Request, and part 1 of the June 2020 CIA Request reasonably could be expected to cause damage to national security, and are therefore currently and properly classified facts exempt from disclosure" under Exemption 1 [Dkt. 51-1 at 14].

Regarding Exemption 3, CIA cites the National Security Act as the basis for its *Glomar* response, specifically Section 102A(i)(1) of the National Security Act (as amended, 50 U.S.C. § 3024) [Dkt. 51-1 at 15].[38]  The Blaine Declaration attests that "acknowledging the existence or nonexistence of records responsive to parts 1, 2, 3(3), 4, 5, 6, 7, and 8 of the May 2020 CIA Request, and part 1 of the June 2020 CIA Request, would reveal intelligence sources and methods, which the National Security Act is designed to protect" [Dkt. 51-1 at 15-16].  "The CIA's *Glomar* response to the abovementioned parts of The Transparency Project's FOIA requests is also grounded in the National Security Act's protection for intelligence sources and methods. As a

---

[38] Blaine also explains of Section 102A(i)(1) that "[u]nder the direction of the DNI pursuant to section 102A, and consistent with section 1.6(d) of Executive Order 12333, the CIA is authorized to protect CIA sources and methods from unauthorized disclosure" [Dkt. 51-1 at 15].

result, exemptions (b) (1) and (b) (3) thus apply independently and co-extensively to those parts of the requests" [Dkt. 51-1 at 16].

Plaintiff objects to the CIA's invocation of a *Glomar* response to its request for records related to the 2016 DNC data breach, claiming "it is already matter of public record that the CIA devoted resources to this subject" on the grounds "the CIA has no authority to surveil U.S. citizens on U.S. soil, therefore it has no legitimate claim to an exemption" [Dkt. 59 at 7].  Plaintiff's claim of prior public record is addressed by "the 'official acknowledgment' line" of cases, "which provide[] that when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *ACLU II*, 710 F.3d at 426-27 (quoting *Wolf*, 473 F.3d at 378) ("when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim.'").

To find official acknowledgment, "three prerequisites must be met: 'the information requested must be as specific as the information previously released,' 'match the information previously disclosed,' and 'already have been made public through an official and documented disclosure.'"  *Gov't Accountability Project v. CIA*, 548 F. Supp. 3d 140, 156 (D.D.C. 2021) (quoting *Leopold v. CIA*, 987 F.3d 163, 170 (D.C. Cir. 2021)).  "In the *Glomar* context, then, if the prior disclosure establishes the existence (or not) of records responsive to the [information] request, the prior disclosure necessarily matches both the information at issue ... and the specific request for that information." *Leopold*, 987 F.3d at 170 (quoting *Wolf*, 473 F.3d at 379).  This test is "strict." *Id.*  (citing *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011)).  "[S]ince *ACLU II*, the D.C. Circuit has reaffirmed the need to satisfy both the specificity and matching requirements in the *Glomar* context." *James Madison Project v. CIA*, 344 F. Supp. 3d 380, 396 (D.D.C. 2018).

"A plaintiff mounting an official acknowledgment argument 'must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.'" *ACLU II*, 710 F.3d at 426-27 (quoting *Wolf*, 473 F.3d at 378).  "The court must analyze only whether the prior disclosure acknowledges the existence of the records sought, not whether the content of the records has been disclosed."  *Smith v. United States Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d at 95 (citing *Marino v. DEA.*, 685 F.3d 1076, 1081 (D.C. Cir. 2012)).

Here, Plaintiff fails to meet the burden required to show "official acknowledgement" by CIA of any of the requested information.  Regarding CIA's *Glomar* response, Plaintiff cites one news article to attempt to show the records requested are already a "matter of public record," a Vox.com article from 2017 breaking down an ODNI report about Russia's involvement in the 2016 election.[39]   This falls far short of meeting Plaintiff's initial burden to point to specific information in the public domain includes records responsive to its request.  *See Smith v. United States Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d at 97 (quoting *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 59 (D.D.C. 2015)) ("[S]peculation by the press—no matter how widespread—and disclosures in the press from unnamed sources are not sufficient to waive an agency's right to withhold information under FOIA.").  The article provides a high-level summary of an ODNI report which references CIA's involvement in investigating Russia's role in the 2016 DNC data breach but identifies no specific public records of CIA.  *See Fischer I*, 596 F. Supp. 2d at 48 ("Because plaintiff does not allege that the information withheld is identical to information available in the public domain, the FBI's withholding of the identities of FBI agents and others was proper."); *Leopold*, 987 F.3d at 171 (finding that where public information "revealed *some*

---

[39] *See* Zack Beauchamp, *The Key Findings from the US Intelligence Report on the Russia Hack, Decoded*, VOX (Jan. 6, 2017),  https://www.vox.com/world/2017/1/6/14194986/russia-hack-intelligence-report-election-trump  (last visited Sept. 6, 2022).

program, it did not reveal the existence of Agency records about that alleged program. [Plaintiff] has failed to point to specific information that matches the information sought — the existence of Agency records and, therefore, its intelligence interest and capabilities."); *Gov't Accountability Project*, 548 F. Supp. 3d at 157 ("GAP has adduced no evidence that the CIA itself—or any other executive agency or department for that matter—has ever acknowledged vel non the records that GAP now seeks.").[40]

### *Plaintiff's Challenge to Classifications Pursuant to Section 1.7 of EO 13526*

Plaintiff challenges the invocation of Exemption 1 to protect classified information from release, urging "question in this case is whether any such documents are legitimately classified" [Dkt. 59 at 4-7].   Against CIA, NSA, and ODNI generally, Plaintiff alleges any classification would be prohibited by Section 1.7 of EO 13526 if records revealed unlawful activity "on the part of intelligence agencies" [Dkt. 59 at 6].

"Section 1.7 of Executive Order 13,526 bars classifying information in order to conceal violations of the law." *Smith v. U.S. Nat'l Archives & Recs. Admin*., 415 F. Supp. 3d at 97 (citing Exec. Order 13,526 § 1.7(1), 75 Fed. Reg. 707 (Jan. 5, 2010)).  "A plaintiff alleging that an agency has classified information to conceal a violation of law 'must provide something more than conjecture to show that the agency's withholding decision violates Executive Order 13,526.'" *Id.* (quoting *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96-97 (D.D.C. 2017)).  "Credible evidence is required." *Id.*  "Plaintiff's speculative allegations regarding agency mistakes and bad faith do not constitute evidence of illegal activity nor do they raise an inference that the government is improperly withholding information." *Fischer I*, 596 F. Supp. 2d at 47 n.18.  Plaintiff offers no credible evidence that any agency identified – CIA, NSA, or ODNI – classified information for

---

[40]

the purpose of concealing violations of the law.  Moreover, Plaintiff is simply incorrect that purportedly "illegal" activities cannot produce classified documents that are properly withheld under Exemption 1.  *See ACLU v. DOD*, 628 F.3d 612, 622 (D.C. Cir. 2011) ("there is no legal support for the conclusion that illegal activities cannot produce classified documents. In fact, history teaches the opposite. Documents concerning surveillance activities later deemed illegal may still produce information that may be properly withheld under exemption 1.").  All Section 1.7(a) of EO 13,526 prohibits is classifying information for the *purpose* of concealing illegal activity.  *See People for the Am. Way Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 462 F. Supp. 2d 21, 33 (D.D.C. 2006) ("Even if the TSP were ultimately determined to be illegal, it does not follow that the NSA's decision regarding the classification of materials relating to the TSP was made "in order to ... conceal violations of law." Because of the deference due to the NSA in matters of national security, and in the absence of any evidence to the contrary, the Court must accept defendant's reasonable explanation that the materials were classified in order to prevent damage to the national security.").  Plaintiff has not shown that *any* information was classified *in order to conceal* illegal activity, and the Court defers to each agency's declaration that attests to this fact.

## *IN CAMERA* REVIEW

Plaintiff requests the Court review all documents withheld by Defendants *in camera* [Dkt. 59 at 10].  More specifically, Plaintiff argues the Court "should first reject the CIA's, NSA's, ODNI's, and NSD's improper *Glomar* responses and order them to search for and produce records that were improperly classified, *e.g.*, records about DCLeaks, Guccifer 2.0, COZY BEAR and FANCY BEAR" [Dkt. 59 at 10].

"FOIA provides district courts the option to conduct in camera review, 5 U.S.C. § 552(a)(4)(B), but 'it by no means compels the exercise of that option.'" *Larson*, 565 F.3d at 869

(quoting *Juarez v. Dep't of Just.*, 518 F.3d 54, 60 (D.C. Cir. 2008)).  "If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without in camera review of the documents.'"  *Id.* at 870 (quoting *Hayden v. NSA*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).  "In the absence of any indicia of bad faith or misrepresentation on the agency's part, Plaintiffs' speculation about the withheld documents is insufficient to justify *in camera* review.  *Canning v. U. S. Dep't of State*, 134 F. Supp. 3d 490, 502 (D.D.C. 2015).  Moreover, "[w]hen the agency meets its burden by means of affidavits, in camera review is neither necessary nor appropriate."  *ACLU v. DOD*, 628 F.3d at 626 (quoting *Hayden*, 608 F.2d at 1387).

*In camera* review is not warranted.  Plaintiff has not shown any of the *Glomar* responses are improper nor that any record was incorrectly withheld under the FOIA Exemption invoked.  Plaintiff has not made the required showing that Defendants have acted in bad faith or that any information is contradicted in the record.  Plaintiff instead argues the Court should make the "bad faith" determination after *in camera* review [Dkt. 59 at 10] ("The Court may *then review* the documents in camera *and determine* whether the Defendants have been acting in bad faith") (emphasis added).  But *in camera* review is "not a fishing expedition."  *Canning*, 134 F. Supp. 3d at 502.  Plaintiff's doubt is not enough, and suspicions alone do not allege bad faith or otherwise justify *in camera* review.  *See id.* ("If *in camera* review were justified solely on the basis of Plaintiffs' 'doubt,' it is difficult to imagine any FOIA action in which such review would not be warranted.").  Any request by Plaintiff for the Court to order production of records subject to Defendants' *Glomar* responses should also be denied, otherwise, the purpose of *Glomar*'s protections are defeated.  *See Smith v. U.S. Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d at 97

(D.D.C. 2019) (citing *People for the Ethical Treatment of Animals*, 745 F.3d at 540) ("A *Glomar* response relates to the existence or non-existence of records, therefore ordering an agency to search for responsive records or to produce original classification markings in support of its response would undermine the purpose of *Glomar*."). Summary judgment, as set forth herein, is warranted based on the present record without *in camera* review.  *See Larson*, 565 F.3d at 870 ("The court concluded, and we agree, that the agencies' affidavits standing alone were sufficiently specific to place the challenged documents within the exemption categories, and the plaintiffs did not contest the contents of the withholdings or present any evidence contradicting the affidavits or suggesting bad faith. Summary judgment without *in camera* review was therefore appropriate"); *Smith v. United States Nat'l Archives & Recs. Admin.*, 415 F. Supp. 3d at 97 ("Because the Fitzpatrick Declaration is sufficient to support [the agency's] *Glomar* response, the agency need not conduct a search for any responsive records nor submit them for *in camera* review.").

### PLAINTIFF'S PURPORTED CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants urge Plaintiff has not in fact moved for summary judgement in his response. Plaintiff rejoins only that the "first paragraph [of his filing] []plainly states that the Plaintiff is cross-moving for summary judgment" [Dkt. 63 at 1].  Merely labeling a response to Defendants' motion as Plaintiff's "cross-motion" does not render it a proper motion, as on its face, the "cross-motion" does not comply with the Eastern District of Texas Local Rules related to summary judgment, which provide in relevant part:

> Any motion for summary judgment must include: (1) a statement of the issues to be decided by the court; and (2) a "Statement of Undisputed Material Facts." If the movant relies upon evidence to support its motion, the motion should include appropriate citations to proper summary judgment evidence as set forth below. Proper summary judgment evidence should be attached to the motion in accordance with Section (d) of this rule.

Local Rule CV-56(a).  Nor does the "cross-motion" comply with the district's general rule for the

form of motions and other pleadings, which states in part: "Each pleading, motion, or response to a motion must be filed as a separate document, except for motions for alternative relief (e.g., a motion to dismiss or, alternatively, to transfer)."  Local Rule CV-7(a).

Plaintiff, anticipating the filing may be deemed improper or inadequate, urges that "[i]f the Court grants permission, the Plaintiff will address the remaining issues in an amended response / cross-motion" [Dkt. 59 at 1].  But no motion to extend the deadline or motion for leave to file an amended cross-motion was ever filed.  The Scheduling Order in this cause set January 7, 2022 as the deadline for both Plaintiff's response to Defendants' motion *and* for Plaintiff's cross-motion for summary judgment [Dkt. 27 at 1].  An amended scheduling order was entered at the request of the Parties, extending the date for Defendants' motion [Dkt. 44].  Plaintiff then moved to extend both the deadline to file a response and any cross-motion to April 5, 2022, which the Court granted [Dkts. 55 at 1; 56].  On April 4, 2022, Plaintiff moved for another extension of time to file its response and any cross-motion until April 12 [Dkt. 58].  However, the next day on April 5, before the Court could grant or deny such request, Plaintiff filed the instant response/"cross-motion" [Dkt. 59].  The Court therefore denied the motion as moot in light of the filing [Dkt. 61].  The pretrial case-management orders in this matter, from the beginning, have been tailored to the scheduling and briefing needs unique to FOIA litigation.  Both Parties have filed motions for leave and motions to extend deadlines, and the Court has granted each when unopposed and reasonable. Plaintiff offers no explanation for its failure to file a complete, procedurally proper cross-motion for summary judgment within the extended deadline or to request an extension to do so.  Though the Court finds Plaintiff has not in fact moved for summary judgment, even assuming Plaintiff had filed a procedurally proper cross-motion, the Court would recommend it be denied for the same reasons it recommends granting Defendants' motion.  *See Brewer v. Dep't of Just.*, No. 3:18-CV-

1018-B-BH, 2019 WL 3948351, at *7 (N.D. Tex. July 30, 2019) (denying the plaintiff's cross-motion for summary judgment) ("Because Defendants have met their summary judgment burden and are entitled to judgment on Plaintiff's claims, his cross-motion for summary judgment should be DENIED."), *report and recommendation adopted*, No. 3:18-CV-1018-B, 2019 WL 3947132 (N.D. Tex. Aug. 21, 2019).

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court recommends the Non-FBI Defendants' Motion for Summary Judgment [Dkt. 51] be **GRANTED** as to EOUSA, NSA, CIA, ODNI, CRM, and OIP (on behalf of OGA and OLA), and Plaintiff's FOIA claims as to EOUSA, NSA, CIA, ODNI, CRM, and OIP be **DISMISSED WITH PREJUDICE**. The Court further recommends Plaintiff's "Cross-Motion" [Dkt. 59] be **DENIED**. The Court recommends the Motion for Summary Judgment be **GRANTED** as to NSD's *Glomar* response and **DENIED WITHOUT PREJUDICE TO REFILING** as to the adequacy of NSD's search for the remaining NSD requests, specifically NSD's search for records responsive to the June 15 request items and its search as to part 2 of the June 18 request. The Court will permit NSD to submit an additional affidavit to address the adequacy of its search.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 9th day of September, 2022.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE