IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **THE TRANSPARENCY PROJECT**, <br><br> Plaintiff, <br><br> vs. <br><br> **UNITED STATES DEPARTMENT OF JUSTICE, et al.,** <br><br> Defendants | **Case No. 4:20-cv-467-SDJ** |

### PLAINTIFF'S OBJECTION TO REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

NOW COMES The Transparency Project, the Plaintiff, objecting to the Report and Recommendation of the United States Magistrate Judge ("Report")(Dkt. #64) as permitted by 28 U.S.C. §636(b)(1)(c):

### Introduction

As the Court can see from pages 10-17 of the Report, the Plaintiff sought records from multiple agencies via the Freedom of Information Act ("FOIA"). The Plaintiff will focus on a very limited portion of those requests for purposes of this objection, namely whether the Central Intelligence Agency ("CIA") and National Security Agency ("NSA") fabricated evidence in support of the "Russian collusion" accusations directed at former President Donald Trump (hereinafter the "Russia Hoax"). *See, e.g.,* Greg Jarrett, "'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever," October 7, 2020 *Fox News* (https://www.foxnews.com/opinion/russia-hoax-lie-hillary-clinton-gregg-jarrett). The Government refused to search for responsive records and claimed it could "neither confirm nor

deny" their existence, citing purported national security concerns. The Plaintiff respectfully contends that the Report is excessively deferential to the Government's efforts to hide behind national security classifications.

## Argument

**(1) Standard of review.**

The Plaintiff does not disagree with Report's description of the standard of review for summary judgment in a FOIA case. When a party objects to portions of a magistrate's report, those portions are subject to *de novo* review. 28 U.S.C. § 636(b)(1).

**(2) Summary judgment evidence.**

Summary judgment is unique in FOIA cases because the Court is only tasked with deciding (1) whether an agency conducted an adequate search for records and (2) whether it properly withheld or redacted records. *See Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 827 F. Supp. 2d 242, 249 (S.D.N.Y. 2011); *see also Am. Civil Liberties Union of New Jersey v. F.B.I.*, 733 F.3d 526, 530 (3d Cir. 2013). In that sense, a motion for summary judgment in a FOIA case has much in common with a motion to compel discovery responses in other cases. Some courts have held that a FOIA plaintiff may rely on newspaper articles to establish facts relevant to a motion for summary judgment, namely facts relevant to whether the government should be compelled to search further. *See, e.g., Elec. Frontier Found. v. Dep't of Justice*, 532 F. Supp. 2d 22, 23 (D.D.C. 2008)(considering *Washington Post* article but holding that it was insufficient grounds for reconsideration).

> To be sure, none of [the newspaper articles and human rights reports] ha[ve] been tested and proved in a court of law. But *SafeCard* requires only "compelling" evidence—not tested evidence, and not even evidence that would be admissible at trial. If hundreds of pages of first-hand reports of governmental abuses do not qualify as "compelling" evidence sufficient to justify an investigation into the government's conduct, then I cannot imagine what would. After all, FOIA's purpose, as *SafeCard* recognizes, is to

>  allow the public access to records necessary to ascertain whether the government has acted illegally. If requesters already had tried and tested proof of such illegal activity, then resort to FOIA would be unnecessary. History, moreover, is full of examples of situations in which just these sorts of allegations led to the discovery of serious government wrongdoing—from Teapot Dome in the 1920s to the FBI's COINTELPRO counterintelligence program in the 1960s to Watergate in the 1970s.

*Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 946–47 (D.C. Cir. 2003)(J. Tatel, dissenting); *see also id.* at 930 (majority citing newspaper article); *but see Schoenman v. F.B.I.*, 763 F. Supp. 2d 173, 201 (D.D.C. 2011), aff'd, 841 F. Supp. 2d 69 (D.D.C. 2012)(refusing to consider newspaper article). That result is not surprising, because courts sometimes rely on newspaper articles to determine whether additional discovery is warranted. *See, e.g., Rainsy v. Facebook, Inc.*, 311 F.Supp.3d 1101, 1109 (N.D. Cal. 2019). In this case, the Plaintiff cited newspaper articles for limited purposes, primarily to establish background facts. Ultimately, the Plaintiff relies on reports from the U.S. Government, and those reports are admissible as evidence in any proceeding against the Government. *Harper v. United States Dep't of the Interior*, No. 1:21-CV-00197-CRK, 2021 WL 5281589, at *6 (D. Idaho Nov. 12, 2021)(public document admissible under Fed. R. Evid 201(b); 801(d); 801(c)(2)(A)–(D); and 901(b)(1) and (7)); *see also Mezerhane de Schnapp v. United States Citizenship & Immigration Services*, 67 F. Supp. 3d 95, 107–08 (D.D.C. 2014)(out-of-court statements by government employees acting within the scope of their employment were not hearsay and were admissible at summary judgment stage of FOIA case).

**(3)  The Plaintiff's Cross-Motion.**

The Report concludes that the Plaintiff did not properly submit a cross-motion for summary judgment against the Defendants.[1] The Plaintiff respectfully avers that this is a

---

[1] The undersigned failed to comply with Local Rule CV-56(a) and he apologizes to the Court for that mistake.

distinction without a difference. Regardless of whether a cross-motion is filed, the Government retains the burden of proving that it properly withheld documents or asserted exemptions. *See Jurdi v. United States*, 485 F. Supp. 3d 83, 91–92 (D.D.C. 2020). If the Government fails to meet that burden, then the case obviously is not terminated. It seems the Court's only options would be to direct the Plaintiff to file a proper cross-motion or simply skip that step and order the Government to comply with FOIA.[2] The Plaintiff respectfully requests the latter.

**(4)  Records improperly withheld by the Defendants.**

    **(a) CIA records concerning the Russia Hoax.**

As the Court is undoubtedly aware, the Russia Hoax consumed the attention of the public throughout much of the Trump Administration. *See, e.g.*, Kevin Breuninger, "Robert Mueller's Russia probe cost nearly $32 million in total, Justice Department says," August 2, 2019 CNBC (https://www.cnbc.com/2019/08/02/robert-muellers-russia-probe-cost-nearly-32-million-in-total-doj.html) and Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* ("Mueller Report"), March 2019, U.S. Department of Justice (https://www.justice.gov/archives/sco/file/1373816/download) (attached as Exhibit A). Wikileaks founder Julian Assange strongly inferred in a televised interview that

---

[2] Near the end, the Report notes that the Plaintiff filed a motion for extension of time to file its opposition / cross-motion to the Defendants' motion for summary judgment, further noting that the motion was denied as moot when the Plaintiff filed an opposition the following day. Report 90. Despite his illness, Plaintiff's Counsel had filed a very brief opposition in order to "play at safe" should the motion for extension be denied. That opposition stated in relevant part as follows:
> For the reasons set forth in the Unopposed Motion for Extension of Time (Doc. No. 58), Plaintiff's Counsel was unable to complete the Plaintiff's response in opposition to the MSJ. The Plaintiff will therefore address some of the most important issues raised in the MSJ. If the Court grants permission, the Plaintiff will address the remaining issues in an amended response / cross-motion.

*See* Dkt. #59 at 1. Had the Plaintiff been granted the *unopposed* request for an extension, a more detailed opposition would have been filed.

emails from the 2016 DNC data breach came from Seth Rich rather than from Russian hackers, *see* August 9, 2016 *Nieuwsuur* (https://www.youtube.com/watch?v=Kp7FkLBRpKg), a 27-year-old DNC employee who was murdered on the streets of Washington, D.C. *See* Charlie Mole, "Seth Rich: How a young man's murder attracted conspiracy theories," April 21, 2018 *BBC* (https://www.bbc.com/news/blogs-trending-43727858). Journalist Ellen Ratner publicly relayed a conversation with Mr. Assange wherein he said the emails were obtained from someone inside of the DNC. *See* "Ellen Ratner Fox News talks about meeting Julian Assange on Nov. 5 2016," (https://www.youtube.com/watch?v=_YyuWpjTbg0). A former U.K. ambassador claimed he knew the source of the DNC emails published by Wikileaks, and it was an internal source rather than a Russian source. *See* Dave Boyer, *The Washington Times*, "Craig Murray says source of Hillary Clinton campaign WikiLeaks emails a 'disgusted' Democrat," (https://www.washingtontimes.com/news/2016/dec/14/craig-murray-says-source-of-hillary-clinton-campai/). Pulitzer Prize-winning journalist Sy Hersh was recorded telling someone that, according to a government report, Seth Rich was the source of the email leak rather than Russia. *See* Benjamin Wofford, "Why Isn't Sy Hersh Covering President Trump?" October 8, 2018 *Washingtonian* (https://www.washingtonian.com/2018/10/08/why-isnt-sy-hersh-covering-president-trump/). Mr. Hersh later tried to distance himself from his comments, but then in a deposition he subsequently (and reluctantly) admitted that he obtained the information from a government source, and he still believed his source was telling the truth. *See* Transcript of July 15, 2020 Oral Deposition of Seymour M. Hersh (https://lawflog.com/wp-content/uploads/2020/12/2020.12.30-Exhibit-8-Hersh-depositionstamped.pdf)[3] pp. 198-199.

---

[3] As attested by his electronic signature below, Ty Clevenger testifies under penalty of perjury under the laws of the United States that he uploaded a true and correct copy of the transcript of the July 15, 2020 testimony of Seymour M. Hersh at https://lawflog.com/wp-content/uploads/2020/12/2020.12.30-Exhibit-

Notwithstanding all of this, Mr. Mueller's report rejected the idea of Mr. Rich's involvement, and it did so in a single, conclusory paragraph. *See* Mueller Report 48. Mr. Mueller fully absolved Mr. Rich, instead blaming everything on Russian hackers. That distinction is critical, and for obvious reasons. If a DNC employee had leaked the emails to Wikileaks (rather than Russian agents "hacking" the emails), then there would have been no basis for a two-year criminal investigation to determine whether the President of the United States had "colluded" with Russia. With that background in mind, and in response to a tip, the Plaintiff sought to determine whether U.S. intelligence agencies had *fabricated* the appearance of Russian involvement. On May 28, 2020, the Plaintiff sought the following from the CIA:

> [A]ll metadata, communications (internal or external), records, documents, reports or other evidence regarding whether the CIA, its Directorate of Digital Innovation, or any of the CIA's foreign or domestic affiliates, agents, employees or contractors played a role in inserting Russian "fingerprints" (*e.g.*, "COZY BEAR" or "FANCY BEAR") into data from the 2016 Data Breach.[4]  In other words, the CIA should produce all evidence indicating whether the CIA, its Directorate of Digital Innovation or any of the CIA's foreign or domestic affiliates, agents, employees or contractors inserted or fabricated evidence to make it appear that Russians or other third parties were responsible for the 2016 Data Breach.  This includes, for example, any and all evidence that the Directorate of Digital Innovation created or operated the "Guccifer 2.0" or "DCLeaks" profiles or any other online profile used to promote or distribute data from the 2016 Data Breach.

*See* Report 11-12, citing Plaintiff's May 28, 2020 FOIA request to CIA [Dkt. 5 at 22-24]. "DCLeaks" and "Guccifer 2.0" were alleged to be pseudonymous Russian entities, and they were blamed for stealing and distributing the DNC emails, a fact reflected in Government documents and the Defendants' own evidence. *See* Doc. No. 52-1, pp. 920-921 and Mueller Report, Vol. I, pp. 4, 36, 41-49, 65, and 176. Likewise, COZY BEAR and FANCY BEAR purportedly were

---

8-Hersh-depositionstamped.pdf.

[4] The Plaintiff's request defined "2016 Data Breach" as the events related to "the removal, transfer, copying or stealing of data from Democratic National Committee (hereinafter "DNC") computer servers in 2016, data which was later published by Wikileaks." *See* Report 11, n.8.

Russian entities involved in hacking the DNC emails. *See* Garrett M. Graff, "Indicting 12 Russian Hackers Could Be Mueller's Biggest Move Yet," July 13, 2018 *Wired* (https://www.wired.com/story/mueller-indictment-dnc-hack-russia-fancy-bear). The Plaintiff wanted to know whether DCLeaks, Guccifer 2.0, COZY BEAR, and FANCY BEAR were fabricated by U.S. intelligence agencies for domestic political purposes, namely to undermine (and potentially overthrow) the President of the United States with accusations that he "colluded" with Russia. One would expect the CIA to loudly and vehemently deny that it would ever do such a thing. Instead, it issued *Glomar* responses, refusing to confirm or deny that it had responsive records.[5]

The Defendants sought summary judgment on the basis of *Glomar*, and the Plaintiff responded by directing the magistrate's attention to an executive order restricting the use of national security classification:

> Section 1.7 of Executive Order 13,526 bars classifying information in order to conceal violations of the law. Exec. Order 13,526 § 1.7(1), 75 Fed. Reg. 707 (Jan. 5, 2010). A plaintiff alleging that an agency has classified information to conceal a violation of law "must provide something more than conjecture to show that the agency's withholding decision violates Executive Order 13,526." *Associated Press v. FBI*, 265 F. Supp. 3d 82, 96–97 (D.D.C. 2017). Credible evidence is required. *See Canning v. U.S. Dep't of Just.*, 848 F. Supp. 1037, 1047–48 (D.D.C. 1994) (rejecting plaintiff's challenge where plaintiff presented claims "based primarily on speculation" and failed to present "credible evidence that the agency's motives for its wisthholding decisions were improper or otherwise in violation of E.O. 12356").

---

[5] "The name [*Glomar*] is derived from the facts of *Phillippi v. CIA*, in which this court addressed the CIA's refusal to confirm or deny whether it had documents relating to Howard Hughes' ship, the Glomar Explorer, which had reputedly been used in an attempt to recover a lost Soviet submarine." *Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422, 426 n.1 (D.C. Cir. 2013), citing 546 F.2d 1009 (D.C.Cir.1976)

*See* Plaintiff's Response in Opposition to Non-FBI Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment (hereinafter "Opposition")(Dkt. #59) 4, quoting *Smith v. United States Nat'l Archives & Records Admin.*, 415 F. Supp. 3d 85, 97–98 (D.D.C. 2019). Section 1.7 is actually broader than *Smith* suggests. "In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security." Exec. Order 13,526 § 1.7(a).

      The Plaintiff contended below and contends now that any attempt by the CIA to insert "Russian fingerprints" into DNC data would be illegal. If government personnel attempted to undermine or overthrow a Presidential administration, then they violated the prohibition against rebellion and insurrection. *See* 18 U.S. Code § 2383. Likewise, they violated the Constitution insofar as all executive power is vested in the President of the United States, not a group of subversive bureaucrats whose authority legally derives from the President's. *See* U.S. Constitution, Article II, Section 1. And if intelligence personnel helped the FBI secure search warrants for individuals like Carter Page when they knew the "Russian collusion" premise was false, *see* David Shortell and Evan Perez, "Two of four FISA warrants against Carter Page declared invalid," January 23, 2020 CNN (https://www.cnn.com/2020/01/23/politics/fisa-carter-page-warrants/index.html), then they violated the prohibition on maliciously procuring search warrants. *See* 18 U.S. Code § 2235. The intelligence agencies cannot hide such an illegal scheme beneath the veneer of classification. Exec. Order 13,526 § 1.7(a)(1). Similarly, there is no national security interest in trying to promote or protect a corrupt domestic political scheme. *Id*.

at §1.7(a)(4). And although the revelation of such a scheme would be extraordinarily embarrassing to the intelligence agencies, that militates against classification. *Id*. at §1.7(a)(2).

The Report dismisses these concerns wholesale, and it does so by conflating and misrepresenting holdings from other circuits.[6] First, the Report cites cases from the D.C. Circuit about public disclosures by government agencies. Report 86-87 (citing cases). Those cases hold that a disclosure of generalized government activity is not an admission that specific classified documents exist. That proposition is unremarkable, and for present purposes it is irrelevant. In this case, the CIA claimed that it had never disclosed the generalized government activity (as opposed to the specific classified documents). In particular, the CIA claimed that it had never acknowledged any role in investigating the leak of DNC emails. Report 81, citing and quoting Dkt. #51-1 at 11-12 ("If the CIA were to confirm the existence of records responsive to this item in the request, such confirmation would show that the Agency devoted resources to this subject, and determined the cause of the 2016 data breach."). We know for a fact, however, that the FBI did play a role, and that it "devoted resources to this subject, and [purportedly] determined the cause of the 2016 data breach," and we know that because the CIA publicly admitted as much in early 2017. In the Opposition, the Plaintiff cited a news article for the premise that the CIA's role had been made public, *see* Opposition 7-8, citing Zack Beauchamp, "The key findings from the US intelligence report on the Russia hack, decoded," January 6, 2017 *Vox* (https://www.vox.com/world/2017/1/6/14194986/russia-hack-intelligence-report-election-trump). That article, in turn, described a *joint* report of the CIA, NSA, and ODNI that *jointly* found that the Russian government was responsible for the 2016 "hack" of DNC emails, and that

---

[6] The Report identifies and develops arguments in favor of the Defendants that the Defendants failed to identify and brief for themselves.

underlying report was published on the ODNI website. *See* "Assessing Russian Activities and Intentions in Recent US Elections," January 6, 2017 Intelligence Community Assessment, pp. 2-3 (https://www.dni.gov/files/documents/ICA_2017_01.pdf) (attached as Exhibit B); *see also* Duncan Campbell and James Risen, "CIA Director met advocate of disputed DNC hack theory – at Trumps' request," November 7, 2017 *The Intercept* (https://theintercept.com/2017/11/07/dnc-hack-trump-cia-director-william-binney-nsa/). In the joint report, the CIA plainly and publicly acknowledged its role in investigating the 2016 DNC data breach, *id.*, hence there is no threat to national security if it acknowledges the *mere possibility* that there are documents reflecting those previously-disclosed activities.

This scenario has arisen before. During the Obama Administration, the Government invoked *Glomar* categorically in response to requests for records about drone strikes on alleged terrorists, but both the D.C. Circuit and Second Circuit rejected the government's overbroad reliance on *Glomar*, noting that the CIA already had acknowledged the drone strikes. *See New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100 (2d Cir. 2014), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014) and *Am. Civil Liberties Union v. C.I.A.*, 710 F.3d 422 (D.C. Cir. 2013).

> In this case, the CIA asked the courts to stretch [the *Glomar*] doctrine too far—to give their imprimatur to a fiction of deniability that no reasonable person would regard as plausible. "There comes a point where ... Court[s] should not be ignorant as judges of what [they] know as men" and women. *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (opinion of Frankfurter, J.). We are at that point with respect to the question of whether the CIA has any documents regarding the subject of drone strikes.

*Am. Civil Liberties Union*, 710 F.3d at 431. Given what the CIA has already acknowledged regarding the 2016 Data Breach, it is absurd to quibble about "whether the CIA has any documents regarding the subject." The CIA cannot categorically refuse to confirm or deny that it has responsive records. *Id.*; *see also Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d 1,

12 (D.D.C. 2019) ("In this case, disclosing the mere existence—as opposed to the number or type—of any documents would reveal little, if any, information about the nature or frequency of the FBI's use of computer technician informants beyond what the FBI has already disclosed.").

The Report next argues that because illegal activities might nonetheless produce classified documents, *see* Report 87, citing *ACLU v. DOD*, 628 F.3d 612, 622 (D.C. Cir. 2011), the Plaintiff was obligated to provide affirmative proof that the Defendants invoked national security classifications for the express *purpose* of concealing illegal activities. Report 87, citing *People for the American Way Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 462 F. Supp. 2d 21, 33 (D.D.C. 2006). The foregoing cases do not support such a simple proposition. Unlike *ACLU v. DOD*, for example, the Plaintiff is not seeking records that were sucked up during a terrorism surveillance program, which program may or may not have used illegal methods. The Government may very well obtain information implicating national security under such circumstances, regardless of whether the methods were illegal, but that is hardly the scenario before the Court now.

Some requests seek records that would, by their very nature, reflect activities that are flagrantly illegal, embarrassing, and completely lacking in national security value, *see* Exex. Order 13,526 §1.7(1),(2), and (4), so much so that classification would be improper *per se*. Such is the case here. Consider the request found in the third paragraph of page 12 of the Report, and specifically the portion highlighted below in red text:

> Former CIA Director John Brennan testified that in the summer of 2016, he convened a task force / working group involving the CIA, NSA and FBI to investigate intelligence showing contact between Russian officials and Trump affiliates. I wish to view all documents, records, and/or communications that (1) identify the name and agency affiliation of each member of the task force / working group as well as (2) the dates that each such person began and ceased working with the group.  <span style="color:red">I also wish to view all documents, records, and/or communications indicating whether the task force / working group fabricated or attempted to fabricate evidence of collusion between Donald Trump</span>

> (or his presidential campaign) and Russian officials. If, for example, individuals from the task force tried to create the false impression that Trump campaign officials were acting at the behest of Russian officials, any and all evidence of that should be produced.

Report 12 (emphasis added), quoting Dkt. #5 at 22-24.[7] The Plaintiff defies the Defendants to explain how classification of such information could be proper in light of Exex. Order 13,526 §1.7. Notably, "[a] requester may challenge a *Glomar* response… by arguing that disclosure would not cause any harm under the FOIA exemption invoked." *Elec. Frontier Found.*, 384 F. Supp. 3d at 11, citing *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 20 (D.D.C. 2018). How exactly would national security be harmed by disclosing records regarding the CIA's efforts to frame the President of the United States? The nearest thing we have to an answer is a conclusory declaration from a FOIA bureaucrat, something akin to a one-paragraph religious decree that "all of our classification decisions are kosher."[8]

Finally, the Plaintiff must direct the Court's attention to the second paragraph on page 12 of the complaint:

> I request the opportunity to view all tangible evidence indicating whether the 2016 Data Breach was the result of (1) outside forces (*e.g.*, Russian agents, Pakistani agents, etc.) who hacked the servers from a remote location or (2) an individual or individuals who were present at or inside DNC facilities and copied the data onto a storage device. If, for example, the CIA obtained any communications between Seth Rich and Julian Assange or Wikileaks (*e.g.*, from the National Security Agency, the United Kingdom's Government Communications Headquarters, or any other person or entity), then those communications should be produced. If the CIA has any evidence whatsoever that the DNC servers were hacked externally or that DNC data was leaked from an internal source, that evidence should be produced.

As noted above, in 2017 the CIA publicly acknowledged its role in determining that the 2016 data breach was the fault of Russian hackers, hence there is no national security basis for hiding

---

[7] Note that this request would also encompass the separate request for records about "Russian fingerprints," "Guccifer 2.0," "DCLeaks," etc.
[8] It is the Defendants' responsibility not only to segregate exempt and non-exempt information, but to explain why some portions are exempt and some are not. *See, generally, Batton v. Evers*, 598 F.3d 169, 183 (5th Cir. 2010).

the mere *existence* of records of those activities. Instead, the Defendants must assert exemptions on a record-by-record basis. *Elec. Frontier Found.*, 384 F. Supp. 3d at 11-12. Likewise, the Defendants offer no national security reason for hiding the mere *existence* of records about an internal (*i.e., domestic*) source for the 2016 Data Breach, therefore the Defendants must assert exemptions on a record-by-record basis. *Id*. Records about "Russian agents" or "Pakistani agents" might very well implicate national security, for example, but records about Seth Rich might not.

**(b) NSA records concerning the Russia Hoax.**

The records requests submitted to the NSA are found on pages 15-16 of the Report, and they are nearly identical to the foregoing requests submitted to the CIA. For that reason, the Plaintiff incorporates by reference his previous arguments about the CIA and *Glomar*. The NSA is unique insofar as no law whatsoever "shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof." 50 U.S.C. §3606. That certainly exempts some NSA records, but by no means all of them. The records sought by the Plaintiff may have originated with other agencies and yet found their way to the NSA, therefore such records would not disclose any function of the NSA or information about its activities. *See Shapiro v. Cent. Intelligence Agency*, 170 F. Supp. 3d 147, 158–59 (D.D.C. 2016) (records in the possession of the NSA might not reflect the function or activities of the NSA). It has long been held that "when an agency receives a FOIA request for 'agency records' in its possession, it must take responsibility for processing the request." *McGehee v. C.I.A.*, 697 F.2d 1095, 1110 (D.C. Cir. 1983), on reh'g sub nom. *McGehee v. Cent. Intelligence Agency*, 711 F.2d 1076 (D.C. Cir. 1983). "It cannot simply refuse to act on the ground that the documents originated elsewhere." *Id*. If the NSA is in possession of

responsive records that originated with the CIA or FBI, for example, then it needs to produce those records.

## Conclusion

The CIA and NSA have improperly relied upon *Glomar*. The Court should order the Defendants to search for responsive documents.

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
212 S. Oxford Street #7D
Brooklyn, New York 11217
(979) 985-5289
(979) 530-9523 (fax)
tyclevenger@yahoo.com

**Counsel for Plaintiff**

## Certificate of Service

On September 26, 2022, I filed a copy of this response with the Court's ECF system, which should result in automatic notification via email to Asst. U.S. Attorney Andrea Parker, Counsel for the Defendants, at andrea.parker@usdoj.gov.

**/s/ Ty Clevenger**
Ty Clevenger